# EXHIBIT 1

 **CT Corporation**

**Service of Process Transmittal**
10/12/2016
CT Log Number 529999090

**TO:** Debbie Fowler
Tenet Healthcare Corporation
1445 Ross Ave, Fountain Place, Suite 1400
Dallas, TX 75202-2703

**RE:** **Process Served in Texas**

**FOR:** Tenet Hospitals Limited  (Domestic State: TX)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | JESSICA MELENDEZ-CARRLLLO, etc., Pltf. vs. TENET HOSPITALS LIMITED, etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Notice, Return, Petition, Attachment(s) |
| **COURT/AGENCY:** | 168th Judicial District Court El Paso County, TX<br>Case # 2016DCV3485 |
| **NATURE OF ACTION:** | Medical Injury - Improper Care and Treatment |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Dallas, TX |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 10/12/2016 postmarked on 10/07/2016 |
| **JURISDICTION SERVED :** | Texas |
| **APPEARANCE OR ANSWER DUE:** | By 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, |
| **ATTORNEY(S) / SENDER(S):** | Enrique Chavez, Jr.<br>CHAVEZ LAW FIRM<br>2101 North Stanton Street<br>El Paso, TX 79902<br>(915)351-7772 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 10/12/2016, Expected Purge Date: 10/17/2016<br><br>Image SOP<br><br>Email Notification,  Debbie Fowler  debbie.fowler@tenethealth.com<br><br>Email Notification,  Olga Barnes  olga.barnes@tenethealth.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 1999 Bryan Street<br>Suite 900<br>Dallas, TX 75201 |
| **TELEPHONE:** | 214-932-3601 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

7015 0640 0001 6214 5741


UNITED STATES
POSTAL SERVICE®
1006


75201

U.S. POSTAGE
PAID
EL PASO, TX
79901
OCT 07 16
AMOUNT
**$12.45**
R2304N116792-13

**PRIORITY®**
☆ MAIL ☆

This envelope is made from post-consumer waste. Please recycle - again.


DATE OF DELIVERY SPECIFIED*


USPS TRACKING™ INCLUDED*

$ INSURANCE INCLUDED*

PICKUP AVAILABLE

* Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

RETURN RECEIPT
REQUESTED

FROM: Cherchun Process Servers
1006 Magoffin Ave
El Paso, Texas 79901

TO:

**PRIORITY®**
☆ MAIL ☆

UNITED S
POSTAL S

VISIT US AT US
ORDER FREE SUPPL

FROM:

TO: Tenet Hospitals Limit
D/B/A Providencia Memorial
ct Corporation System
1999 Bryan Street Ste
Dallas Texas 75201

Label 228, July 2013          FOR DOMESTIC AND INTERNA

VISIT US AT USPS.COM®

UNITED STA



# THE STATE OF TEXAS

NOTICE TO DEFENDANT: "You have been sued. You may employ an attorney. If you, or your attorney, do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you."

TO:   **TENET HOSPITALS LIMITED D/B/A PROVIDENCE MEMORIAL HOSPITALS,** who may be served with process by serving its agent for service of process **CT CORPORATION SYSTEM at 1999 BRYAN STREET, STE. 900, DALLAS, TX 75201**

Greetings:

You are hereby commanded to appear by filing a written answer to the Plaintiff's Original Petition and Request for Disclosure at or before ten o'clock A.M. of the Monday next after the expiration of twenty days after the date of service of this citation before the Honorable **168th Judicial District Court,** El Paso County, Texas, at the Court House of said County in El Paso, Texas.

Said Plaintiff's Petition was filed in said court on this the 16th day of September, 2016, by Attorney at Law ENRIQUE CHAVEZ, JR. 2101 NORTH STANTON STREET, EL PASO, TX 79902 in this case numbered **2016DCV3485** on the docket of said court, and styled:

**JESSICA MELENDEZ-CARRILLO, Individually and on Behalf of Others Similarly Situated**
**vs.**
**TENET HOSPITALS LIMITED D/B/A PROVIDENCE MEMORIAL HOSPITAL, NOW KNOWN AS THE HOSPITALS OF PROVIDENCE, PASO DEL NORTE HEALTH FOUNDATION, and ESPERANZA "ESPY" MARTINEZ,**

The nature of Plaintiff's demand is fully shown by a true and correct copy of the Plaintiff's Original Petition and Request for Disclosure accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at El Paso, Texas, on this the 22nd day of September, 2016.

Attest:  NORMA L. FAVELA, District Clerk, El Paso County, Texas.

CLERK OF THE COURT
**NORMA L. FAVELA**
District Clerk
El Paso County Courthouse
500 E. San Antonio Ave, Rm 103
El Paso Texas, 79901

By _____, Deputy
Edith Miledi

CERTIFICATE OF DELIVERY BY MAIL

I hereby certify that on the _____ day of _____, 2016, at _____ I mailed to

ATTACH
RETURN RECEIPTS
WITH
ADDRESSEE'S SIGNATURE
Rule 106 (a) (2) the citation shall be served by mailing to the defendant by Certified Mail Return receipt requested, a true copy of the citation. Sec. 17.027 Rules of Civil Practice and Remedies Code if not prepared by Clerk of Court.

_____

*NAME OF PREPARER            TITLE

_____
ADDRESS
_____
CITY              STATE          ZIP

_____

Defendant(s) by registered mail or certified mail with delivery restricted to addressee only, return receipt requested, a true copy of this citation with a copy of the Plaintiff's Original Petition and Request for Disclosure attached thereto.

_____

_____
TITLE

**RETURN OF SERVICE**

Delivery was completed on _____, delivered to_____
_____ as evidence by Domestic Return Receipt PS Form 3811 attached hereto.

      The described documents were not delivered to the named recipient. The certified mail envelope was returned undelivered marked _____.

      This forwarding address was provided:_____


El Paso County, Texas

By:_____
          Deputy District Clerk

OR

_____
Name of Authorized Person

By:_____


**VERIFICATION BY AUTHORIZED PERSON**

State of Texas

County of El Paso

      Before me, a notary public, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing Return of Service, and being by me first duly sworn, declared, "I am disinterested party qualified to make an oath of that fact and statements contained in the Return of Service and true and correct."

Subscribed and sworn to be on this _____ day of _____, _____.


_____
Notary Public, State of _____
My commission expires:_____

Filed 9/16/2016 4:15:25 PM
Norma L. Favela
District Clerk
El Paso County
2016DCV3485

## IN THE _____ JUDICIAL DISTRICT COURT OF
## EL PASO COUNTY, TEXAS

| | | |
|---|---|---|
| **JESSICA MELENDEZ-CARRILLO,** Individually and on behalf of others similarly situated, | § § § § | |
| Plaintiff(s), | § § | Cause No. _____ |
| v. | § § | |
| **TENET HOSPITALS LIMITED D/B/A PROVIDENCE MEMORIAL HOSPITAL, NOW KNOWN AS THE HOSPITALS OF PROVIDENCE, PASO DEL NORTE HEALTH FOUNDATION, and ESPERANZA "ESPY" MARTINEZ,** Defendants. | § § § § § § § | |

### PLAINTIFFS' ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

TO THE HONORABLE COURT:

        Plaintiffs, by and through interim class counsel, file this Plaintiff's Original Petition on behalf of themselves and all others similarly situated, the members of the Plaintiff Classes described and defined herein and allege against Tenet Hospitals Limited, a Texas Limited Partnership, d/b/a Providence Memorial Hospital (hereinafter "Defendant" and "Providence Memorial Hospital"), Paso Del Norte Health Foundation, Esperanza Martinez and respectfully shows the court and jury as follows:

### I.
### DISCOVERY LEVEL

Discovery is intended to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

## II.
### PARTIES

1. Plaintiffs Martin and Jessica Carrillo, each individually, and as Next Friend of Minors Bianca S. and Valentina Carrillo, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

2. Plaintiffs Marco Carbajal and Socorro Arredondo, each individually, and as Next Friend of Minors Alexis Carbajal and Brandon Carbajal, are individuals residing in El Paso County, Texas, who sue both for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

3. Plaintiffs Jaime and Raquel Arango, each individually, and as Next Friend of Minors Abbygail and Alyssa Arango, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

2

4.  Plaintiffs Jesus A. and Martha A. Uribe, each individually, and as Next Friend of Minors Essau Adrian Uribe and Gael Antonio Uribe, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

5.  Plaintiffs Edgar Rangel and Raquel Barrios, each individually and as Next Friend of Minor Emmanuel C. Rangel, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

6.  Plaintiffs Jaime Ortega and Elizabeth Villareal, each individually and as Next Friend of Minors Emmanuel Ortega and Jaime Ortega, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

3

7.  Plaintiffs Jose and Michelle Ortiz, each individually as Next Friend of Minors Jose Luis Ortiz, Azia Ortiz, and Jeffrey Carrasco, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

8.  Plaintiffs Ismael Perez and Jazmin Delgado, each individually and as Next Friend of Minor, Matthew A. Perez, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

9.  Plaintiffs Alejandro Martinez and Priscilla Garcia-Bracho, each individually, and as Next Friend of Minor, Alejandro Isais Martinez, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

4

10. Plaintiffs Joseph Garza and Monica M. Hughes, each individually and as Next Friend of Minors, Emma R. Garza and Kayla Hughes, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

11. Plaintiffs Edgar A. and Maria G. Macias, each individually, and as Next Friend of Minor Kataleah Macias, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

12. Plaintiffs Alfredo M. and Adriana Reyes, each individually, and as Next Friend of Minors, Natalia O. Reyes and Carolina Reyes, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

5

13. Plaintiffs Miguel Barajas and Paola Sarabia, each individually and as Next Friend of Minor Iker K. Barajas, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, and their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

14. Plaintiffs Sergio and Mayra Briseno, each individually, and as Next Friend of Minor Sergio G. Briseno, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

15. Plaintiffs Ismael and Dina Yepez, each individually and as Next Friend of Amy E. Yepez, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

6

16. Plaintiff Ana Alonzo, individually and as Next Friend of Minors Calixto Iturralde, Jr. and Lorenzo Alonzo, III, is an individual residing in El Paso County, Texas, who sues both for herself, her family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

17. Plaintiffs Edgar Tremillo and Rebecca J. Rincones, each individually and as Next Friend of Minors Jose A. Tremillo and Katelyn Sere Diaz, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

18. Plaintiff's Edward F. and Rosie Ehrle, each individually and as Next Friend of Minors Kate Ehrle and Edward Ehrle, Jr. are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

7

19. Plaintiffs Nicholas Santibanez and Audrey Blanchette, each individually and as Next Friend of Minor Liam Blanchette-Santibanez, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

20. Plaintiffs Jose Rivera and Brenda Gonzalez, each individually and as Next Friend of Minor Alexander Rivera, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

21. Plaintiffs Jaime and Crystal Palacios each individually, as Next Friend of Minors Noah Palacios, Ezra Palacios, and Avery Davila, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

8

22. Plaintiffs Raymond Minor and Estefania Garciduenas, each individually and as Next Friend of Minor Mila Minor, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

23. Plaintiff Margie Magana, individually and as Next Friend of Minor, Ernesto Aguilar, Jr., is an individual residing in El Paso County, Texas, who sues both for herself, her family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

24. Plaintiffs Oswaldo Castillo and Amanda Garcia, each individually and as Next Friend of Minor, Azaleah Ysabella Castillo, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

25. Plaintiffs Roberto Clemente and Ana Alvarado, individually and as Next Friend of Minors: Victor Clemente, Adrian Clemente, Valerie Clemente, Karla Mendoza, and Dafne Mendoza, individually who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

26. Plaintiffs Martin and Jennifer Alvarado, individually and as Next Friend of Minor Logan Alvarado, are individuals residing in El Paso County, Texas, who sue for themselves, their family, and on behalf of all others similarly situated, their families, who were exposed to Tuberculosis by being present in the hospital at the time the Infected Employee was working or by infected individuals who were exposed to Tuberculosis by being present in Providence Memorial Hospital.

27. The class is so numerous that joinder of all persons is impracticable, there are questions of law and fact common to the class, and the claims of Plaintiff are typical of the claims of the class.   Plaintiff, as the representative party, will fairly and adequately protect the interests of the class.

28. Defendant, Tenet Hospitals Limited is a Texas Limited Partnership, the parent company of Providence Memorial Hospital, and is an entity upon whom service can be obtained by serving its agent for service of process CT Corporation System, 1999 Bryan Street., Ste. 900, Dallas, Texas 75201.

10

29. Defendant, Paso del Norte Health Foundation d/b/a Providence Memorial Hospital, is a Texas Corporation, an entity upon whom service can be obtained by serving its agent for service of process Myrna J. Deckert, 221 N. Kansas Street, Suite 1900, El Paso, Texas 79901.

30. Defendant, Esperanza "Espy" Martinez is a natural person who may be served with process by serving her at 7315 Dale Road, El Paso, Texas 79915 or wherever she may be found.

### III.
### JURISDICTION AND VENUE

31. This court has jurisdiction in this matter and venue is proper, in that the Complaint arises from Defendants' negligent and intentional conduct occurring at Providence Memorial Hospital, located at 2001 N. Oregon Street, El Paso, Texas 79902.

### IV.
### PROCEDURAL POSTURE

32. The Class, as defined in the Class Action claim, consists of persons who were exposed to Tuberculosis between the estimated time frame when Infected Employee's Tuberculosis was considered "active," and the date she discontinued employment at Providence Hospital, which was August 15, 2014.

### V.
### CHRONOLOGY OF FACTS

33. Hospitals must safely prevent medical staff who are infected with potentially dangerous and infectious diseases from exposing patients, their families, and employees to protect us all from exposure to deadly infectious diseases.

34. Hospitals must safely monitor its medical staff for potentially deadly, infectious diseases to prevent an outbreak and protect us all from exposure to deadly infectious diseases.

35. Hospitals must safely train supervising personnel to monitor their employees to prevent them from exposing patients, their families, and employees from spreading potentially deadly and infectious diseases to protect us all from an outbreak.

36. Employee Esperanza Martinez ("Infected Employee"), tested positive for latent tuberculosis in 2004.

37. Tuberculosis--also known as "white plague," and "consumption" because its consumed its victims--is a potentially deadly and infectious disease.

38. Providence Hospital hires Infected Employee in 2004.

39. Providence Hospital hires Infected Employe as a Nurse's Assistant with job responsibilities that include bathing and feeding infants in the nursery as well as close contact with post-partum and newborn nursery units, patients, their families, and other employees.

40. On December 2013, Providence Hospital is put on notice by Infected Employee that Infected Employee has symptoms of active tuberculosis, particularly feelings of fatigue and a persistent, bloody cough. Nevertheless, Providence Hospital requires Infected Employee to continue to work 12-hr shifts in close physical contact with newborn babies, patients, and their families and friends.

12

41. From January through July 1, 2014, Providence Hospital continues to require Infected Employee to work 12 hour shifts in close physical contact with thousands of newborn babies, patients and their families and friends.

42. Seven months later, on July 2, 2014, Infected Employee undergoes an annual routine health screening where Infected Employee exhibits a cough, fatigue, and reports coughing up blood.

43. Providence Hospital's post partum director and chief nursing officer meets with Infected Employee several times after the health screening. The chief nursing officer and other administrators attribute the symptoms to allergies and continue to require Infected Employee to work 12 hour shifts, bathing and feeding newborns, while being in close physical contact with, patients, their family and friends.

44. Forty-six days later, on August 16, 2014, Providence Hospital finally takes Infected Employee off work.

45. Five days later, on August 21, 2014, Infected Employee is diagnosed, by her personal physician, with active tuberculosis and reports the case to Providence Hospital.

46. Four days later, on August 25, 2014, Providence Hospital reports the case to the El Paso Health Department.

47. Twenty-nine days after Providence Hospital receives confirmation about Infected Employee's Tuberculosis diagnosis, Providence Hospital notifies only parents of babies *actually born* on days Infected Employee worked.

48. Providence Hospital, thereby, eliminates from receiving notice the population of babies who were: (i) delivered on days Infected Employee did not work, but with

13

whom Infected Employee had physical and close contact because they remained in the nursery for the two or three days after Infected Employee returned to work; or (ii) delivered on days Infected Employee worked, but whose babies were transferred to the Neonatal Intensive Care Unit (NICU), without considering that their babies may spend time in the nursery with Infected Employee prior to being transferred to the NICU.

49. Providence Hospital purposely minimized its population of potentially "exposed" patients, thereby eliminating notice to many, many more exposed babies., their parents, siblings and friends.

50. Providence Hospital, via its letter to only some parents, merely explains that their children may have been exposed to Tuberculosis, and recommends they get tested at the City of El Paso Health Department without offering to test itself, thus shifting costs to tax payers. The letter asks the parents to call the Department to schedule an appointment to get the baby tested. **The letter fails to mention the potential for a "false negative" test result, the dangerous risks of treatment, or the severity of potential exposure.**

51. On or about September 22, 2014, the Health Department begins testing only babies that Providence Hospital approves. The Health Department does not test babies who Providence Hospital eliminates from its "list." Specifically, parents whose babies were born on days Infected Employee did not work, but whose babies were still in the nursery when Infected Employee did work, were told that their babies were "not on the list" and could therefore not be tested.

14

52. Tuberculosis tests administered at the Health Department, by both Providence Hospital and Health Department employees, consist of a TB skin test [conducted at Health Department] and chest x-ray [conducted at Providence Hospital or other lab]. Results are read to the parent two to three days after the test is taken, *by an employee of Providence Hospital* or the Health Department.

53. On September 23, 2014, the Department of Public Health officials raise the number of babies who may have been exposed to tuberculosis at Providence to 751 babies, exclusive of other employees, families, and friends., still undercutting the number of exposures by over two thousand babies and their families.

54. On September 23, 2014, Providence Hospital, via its CEO Eric Evans, apologizes for the hospital's exposure of Tuberculosis.

55. On September 27, 2014, the Health Department acknowledges that at least five babies are reported as having tested positive for Tuberculosis. Also, the number of potentially exposed babies is raised to 858, exclusive of other employees, families, and friends.

56. On September 30, 2014, a report by the Texas Department of State Health Services finds that Providence Hospital failed to "effectively protect patients when a healthcare worker with symptoms of active tuberculosis was permitted to return to work" and failed to "exercise proper oversight over the hospital's infection control program." The report finds that Providence Hospital violated federal and state patient safety standards.

57. Providence Hospital fails to adequately notify all patients who may have been exposed to Tuberculosis when it, based on its own reasoning, eliminated patients that it thought could not have been exposed.

58. The following are chronologies of families who came into close contact with Infected Employee during their time at Providence Hospital:

Baby Yepez

a.    On or about September 16, 2013, Mother Dina Yepez and Father Ismael Yepez enter Providence Hospital to deliver their baby.

b.    Baby Amy Yepez is born on September 16, 2013.

c.    Baby Amy Yepez and parents are discharged from Providence Hospital on September 19, 2013.

d.    Providence Hospital never notifies parents of the tuberculosis outbreak.

e.    Baby Amy Yepez is tested for tuberculosis on September 30, 2014, forty one days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

f.    Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Arango

g.    On or about September 16, 2013, Mother Raquel Arango and Father Jaime Arango enter Providence Hospital to deliver their baby.

h.    Baby Abbygail Arango is born on September 16, 2013.

16

i.      Baby Abbygail Arango and parents are discharged from Providence Hospital on September 18, 2013.

j.      Baby Abbygail Arango is never tested for tuberculosis.

Baby Perez

k.      On or about September 27, 2013, Mother Jazmin Delgado and Father Ismael Perez enter Providence Hospital to deliver their baby.

l.      Baby Matthew Andre Perez is born on September 27, 2013.

m.      Baby Matthew Andre Perez and parents are discharged from Providence Hospital on September 29, 2013.

n.      Baby Matthew Andre Perez is tested for tuberculosis on October 27, 2014, sixty nine days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

o.      Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Alvarado

p.      On or about October 1, 2013, Mother Jennifer Alvarado and Father Martin Alvarado enter Providence Hospital to deliver their baby.

q.      Baby Logan Alvarado is born on October 1, 2013.

r.      Baby Logan Alvarado and parents are discharged from Providence Hospital on October 3, 2013.

s.      Providence Hospital provides notice of tuberculosis outbreak after September 18, 2014.

17

t.      Baby Logan Alvarado is tested for tuberculosis on September 22, 2014, thirty three days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

u.      Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

                                    Baby Rangel

v.      On or about October 5, 2013, Mother Raquel Barrios and Father Edgar Rangel enter Providence Hospital to deliver their baby.

w.      Baby Emmanuel Rangel is born October 5, 2013.

x.      Baby Emmanuel Rangel and parents are discharged from Providence Hospital on October 7, 2013.

y.      Providence Hospital never sends notice to the parents about the tuberculosis outbreak.

z.      Baby Emmanuel Rangel is tested for tuberculosis on September 24, 2014, thirty five days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

aa.     Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

                                    Baby Ortiz

bb.     On or about October 6, 2013, Mother Michelle Ortiz and Father Jose Ortiz enter Providence Hospital to deliver their baby.

cc.     Baby Jose Luis Ortiz is born on October 6, 2013.

                                        18

dd.     Baby Jose Luis Ortiz and parents are discharged from Providence Hospital on October 9, 2013.

ee.     Baby Jose Luis Ortiz is tested for tuberculosis on October 3, 2014, forty four days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

ff.     Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Ramirez

gg.     On or about October 8, 2013, Mother Daniela Martinez and Father Aaron Ramirez enter Providence Hospital to deliver their baby.

hh.     Baby Rosalie Ramirez is born on October 8, 2013.

ii.     Baby Rosalie Ramirez and parents are discharged from Providence Hospital on October 9, 2013.

jj.     Baby Rosalie Ramirez is tested for tuberculosis on September 22, 2014, thirty three days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis,. The results are negative.

kk.     Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Santibanez

ll.     On October 30, 2013, Mother Audrey Blanchette and Father Nicholas Santibanez enter Providence Hospital to deliver their baby.

mm.     Baby Liam Santibanez is born on October 30, 2013.

19

nn.   Baby Liam Santibanez and parents are discharged from Providence Hospital on October 31, 2013.

oo.   Baby Liam Santibanez is tested for tuberculosis on November 20, 2014, ninety two days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

pp.   Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Barajas

qq.   On November 26, 2013, Mother Paola Sarabia and Father Miguel Barajas enter Providence Hospital to deliver their baby.

rr.   Baby Iker Barajas is born on November 26, 2013.

ss.   Baby Iker Barajas and parents are discharged from Providence Hospital on November 28, 2013.

tt.   Providence Hospital sends notice of tuberculosis outbreak after September 18, 2014.

uu.   Baby Iker Barajas is tested for tuberculosis by skin test on October 1, 2014 and by an x-ray on October 2, 2014, forty three days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis, The results are negative.

vv.   Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Uribe

20

ww.     On or about December 16, 2013, Mother Martha Uribe and Father Jesus
Uribe enter Providence Hospital to deliver their baby.

xx.     Baby Essau Uribe is born on December 16, 2013.

yy.     Baby Essau Uribe and parents are discharged from Providence Hospital on
December 18, 2013.

zz.     Providence Hospital provides no notice to parents about the tuberculosis
outbreak.

aaa.    Baby Essau Uribe is tested for tuberculosis on March 4, 2015, one
hundred and ninety six days after Providence Hospital receives
confirmation about Infected Employee's tuberculosis diagnosis. The
results are negative.

bbb.    Plaintiffs fear they and their children have contracted Tuberculosis and
fear their child will test positive in the future.

Baby Carbajal

ccc.    On or about December 20, 2013, Mother Socorro Arredondo and Father
Marco Carbajal enter Providence Hospital to deliver their baby.

ddd.    Baby Alexis Carbajal is born on December 20, 2013.

eee.    Baby Alexis Carbajal and parents are discharged from Providence
Hospital on December 27, 2013.

fff.    Providence Hospital provides no notice to parents about the tuberculosis
outbreak.

21

ggg.    Baby Alexis Carbajal is tested for tuberculosis on October 1, 2014, forty two days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

hhh.    Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Martinez

iii.    On or about December 31, 2013, Mother Priscilla Garcia and Father Alejandro Martinez enter Providence Hospital to deliver their baby.

jjj.    Baby Alejandro Martinez is born on December 31, 2013.

kkk.    Baby Alejandro Martinez and parents are discharged from Providence Hospital on January 2, 2014.

lll.    Providence Hospital provides no notice to parents of tuberculosis outbreak

mmm.    Baby Alejandro Martinez is tested for tuberculosis on October 8, 2014, forty nine days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

nnn.    Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Castillo

ooo.    On or about January 17, 2014 Mother Amanda Garcia and Father Oswaldo Castillo enter Providence Hospital to deliver their baby.

ppp.    Baby Azaleah Castillo is born on January 17, 2014.

22

qqq.    Baby Azaleah Castillo and parents are discharged from Providence Hospital on January 19, 2014.

rrr.    Baby Azaleah Castillo is tested for tuberculosis on September 30, 2014, forty one days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

sss.    Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Ortega

ttt.    On or about January 27, 2014, Mother Elizabeth Villareal and Father Jaime Ortega enter Providence Hospital to deliver their baby.

uuu.    Baby Emmanuel Ortega is born on January 27, 2014.

vvv.    Baby Emmanuel Ortega and parents are discharged from Providence Hospital on January 29, 2014.

www.    Baby Emmanuel Ortega is tested for tuberculosis on September 29, 2014, forty days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

xxx.    Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Brisneo

yyy.    On or about January 31, 2014, Mother Mayra Brisneo and Father Sergio Brisneo enter Providence Hospital to deliver their baby.

zzz.    Baby Sergio Brisneo is born on January 31, 2014.

23

aaaa.   Baby Sergio Brisneo and parents are discharged from Providence Hospital on February 2, 2014.

bbbb.   Providence Hospital provides no notice to parents of tuberculosis outbreak.

cccc.   Baby Sergio Brisneo is tested for tuberculosis by skin test on September 26, 2014 and by x-ray on October 9, 2014, thirty seven and fifty days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

dddd.   Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Ehrle

eeee.   On or about February 21, 2014. Mother Rosie Ehrle and Father Edward Ehrle enter Providence Hospital to deliver their baby.

ffff.   Baby Kate Ehrle is born on February 21, 2014.

gggg.   Baby Kate Ehrle and parents are discharged from Providence Hospital on February 23, 2014.

hhhh.   Baby Kate Ehrle is tested for tuberculosis on October 21, 2014, sixty two days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

iiii.   Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Macias

24

jjjj.       On or about March 19, 2014, Mother Maria Macias and Father Edgar Macias enter Providence Hospital to deliver their baby.

kkkk.      Baby Kataleah Macias is born on March 19, 2014.

llll.       Baby Kataleah Macias and parents are discharged from Providence Hospital on March 22, 2014.

mmmm.   Providence Hospital provides no notice to parents of tuberculosis outbreak.

nnnn.      Baby Kataleah Macias is tested for tuberculosis on October 28, 2014, sixty nine days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

oooo.      Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Rivera

pppp.      On or about March 28, 2014, Mother Brenda Gonzales and Jose Rivera enter Providence Hospital to deliver their baby.

qqqq.      Baby Alexander Rivera is born on March 28, 2014.

rrrr.       Baby Alexander Rivera and parents are discharged from Providence Hospital on March 31, 2014.

ssss.       Providence Hospital provides notice to parents about tuberculosis outbreak on September 18, 2014.

tttt.   Baby Alexander Rivera is tested for tuberculosis on September 24, 2014, thirty five days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

uuuu.   Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

### Baby Garza

vvvv.   On or about June 2, 2014, Mother Monica Hughes and Father Joseph Garza enter Providence Hospital to deliver their baby.

wwww.   Baby Emma Garza is born on June 2, 2014.

xxxx.   Baby Emma Garza and parents are discharged from Providence Hospital on June 8, 2014.

yyyy.   Providence Hospital provides notice of tuberculosis outbreak after September 19, 2014.

zzzz.   Baby Emma Garza is tested for tuberculosis on September 25, 2014, thirty six days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

aaaaa.   Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

### Baby Carrillo

bbbbb.   On or about June 5, 2014, Mother Jessica Melendez-Carrillo and Father Martin Carrillo enter Providence Hospital to deliver their baby.

ccccc.   Baby Bianca Carrillo is born on June 5, 2014.

ddddd.    Baby Bianca Carrillo and parents are discharged from Providence Hospital on June 7, 2014.

eeeee.    Providence Hospital provides no notice of tuberculosis outbreak to the parents.

fffff.    Baby Bianca Carrillo is tested for tuberculosis on October 2, 2014, forty three days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

ggggg.    Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Minor

hhhhh.    On or about June 15, 2014, Mother Estefania Garciduenas and Father Ray Minor enter Providence Hospital to deliver their baby.

iiiii.    Baby Mila Minor is born on June 15, 2014.

jjjjj.    Baby Mila Minor and parents are discharged from hospital on June 17, 2014.

kkkkk.    Providence Hospital provides no notice of tuberculosis outbreak to the parents.

lllll.    Baby Mila Minor is tested for tuberculosis on November 24, 2014, ninety six days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

mmmmm. Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

27

Baby Clemente

nnnnn.    On or about June 17, 2014, Mother Ana Alvarado and Father Roberto Clemente enter Providence Hospital to deliver their baby.

ooooo.    Baby Victor Clemente is born on June 17, 2014.

ppppp.    Baby Victor Clemente and parents are discharged from Providence Hospital on June 17, 2014.

qqqqq.    Baby Victor Clemente is tested for tuberculosis on January 6, 2015, one hundred and thirty nine days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

rrrrr.    Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Aguilar

sssss.    On or about July 3, 2014, Mother Margie Magana and Father Ernesto Aguilar enter Providence Hospital to deliver their baby.

ttttt.    Baby Ernesto Aguilar Jr. is born on July 3, 2014.

uuuuu.    Baby Ernesto Aguilar and parents are discharged from Providence Hospital on or about July 5, 2014, .

vvvvv.    Providence Hospital does not provide notice of tuberculosis outbreak to the parents.

wwwww.  Baby Ernesto Aguilar Jr. has not been tested for tuberculosis.

Baby Tremillo

28

xxxxx.   On or about July 15, 2014, Mother Rebecca Rincones and Father Edgar Jose Tremillo enter Providence Hospital to deliver their baby.

yyyyy.   Baby Jose Antonio Tremillo is born on July 15, 2014.

zzzzz.   Baby Jose Antonio Tremillo and parents are discharged from Providence Hospital on July 17, 2014.

aaaaaa.   Baby Jose Antonio Tremillo is tested for tuberculosis on September 22, 2014, thirty three days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

bbbbbb.   Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Palacios

cccccc.   On or about July 28, 2014, Mother Crystal Palacios and Father Jaime Palacios, Jr. enter Providence Hospital to deliver their baby.

dddddd.   Baby Noah Palacios is born on July 28, 2014.

eeeeee.   Baby Noah Palacios and parents are discharged from Providence Hospital on July 30, 2014.

ffffff.   Providence Hospital provides notice of tuberculosis outbreak to the parents after September 18, 2014.

gggggg.   Baby Noah Palacios is tested for tuberculosis on September 24, 2014, thirty five days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

29

hhhhhh. Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

Baby Iturralde

iiiiii. On or about July 31, 2014, Mother Ana Alonzo enters Providence Hospital to deliver her baby.

jjjjjj. Baby Calixto-Iturralde Jr. is born on July 31, 2014.

kkkkkk. Baby Calixto-Iturralde and mother are discharged from Providence Hospital on August 1, 2014.

llllll. Baby Calixto Iturralde, Jr. is tested for tuberculosis by skin test on September 24, 2014 and by X-ray on October 20, 2014, thirty five and sixty days after Providence Hospital receives confirmation about Infected Employee's tuberculosis diagnosis. The results are negative.

mmmmmm.Plaintiffs fear they and their children have contracted tuberculosis and fear their child will test positive in the future.

Baby Reyes

nnnnnn. On or about August 13, 2014, Mother Adriana Reyes and Father Alfredo Reyes enter Providence Hospital to deliver their baby.

oooooo. Baby Natalia Reyes is born on August 13, 2014.

pppppp. Baby Natalia Reyes and parents are discharged from Providence hospital on August 15, 2014.

qqqqqq. Providence Hospital provides notice of tuberculosis outbreak to the parents after September 18, 2014.

30

rrrrrr.   Baby Natalia Reyes is tested for tuberculosis on September 29, 2014, forty
days after Providence Hospital receives confirmation about Infected
Employee's tuberculosis diagnosis. The results are negative.

ssssss.   Plaintiffs fear they and their children have contracted Tuberculosis and fear
their child will test positive in the future.

tttttt.   On or about September of 2014, CEO of Tenet made various concessions
and admissions while being recorded as follows:

CEO ERIC EVANS:  Even before it was confirmed, this person was off
work. But at that point, we could have done more.

FEMALE SPEAKER:  Okay.

CEO ERIC EVANS:  And that's why I said —

FEMALE SPEAKER:  Explain to me what -- do you have infection
control in this hospital?

CEO ERIC EVANS:  Absolutely.

FEMALE SPEAKER:  Okay.  Who was in charge of making the decision
that she should continue working when there were signs and symptoms of
such a serious illness?

CEO ERIC EVANS:  Yeah. So I think -- so the person they would work
with would be the employee help nurse.

FEMALE SPEAKER:  Okay.

CEO ERIC EVANS: And I will tell you that like I said before more should have been done at that level. There's no doubt. At that point that person made a decision -- upon talking to the employee about those, made a decision that the answer the employee gave was enough. And it was not. That's the -- the reality of it is, unfortunately, no one else made that decision, which is unfortunate. Obviously it would have been great had that been shared a little bit farther because, obviously, it could have been different choices made. We are correcting that so that can never happen again.

FEMALE SPEAKER: But it's happened.

CEO ERIC EVANS: Hum?

FEMALE SPEAKER: It's already happened. I mean, you know, I came here the other day. I came here on Monday.

CEO ERIC EVANS: Okay.

FEMALE SPEAKER: Initially I tried to call 211 because I received a certified letter.

CEO ERIC EVANS: Sure. Right. Right, right.

FEMALE SPEAKER: Okay? I could not get an appointment till like almost October 15 or 20th, which was ridiculous.

CEO ERIC EVANS: We now have you an earlier one, though. Right? I think —

FEMALE SPEAKER: Okay. So then I went to my pediatrician —

32

CEO ERIC EVANS: Okay.

FEMALE SPEAKER: - Monday morning —

CEO ERIC EVANS: Sure. Who's your pediatrician?

FEMALE SPEAKER: Dr. Lozano.

CEO ERIC EVANS: Oh, sure. Lozano's great.

FEMALE SPEAKER: Uh-huh.

CEO ERIC EVANS: Yeah.

FEMALE SPEAKER: Okay. He gave me a referral here.

CEO ERIC EVANS: Okay.

FEMALE SPEAKER: I went through the entire outpatient, whatever you

call it, downstairs.

CEO ERIC EVANS: Yeah.

FEMALE SPEAKER: They registered my son.

CEO ERIC EVANS: Yep.

FEMALE SPEAKER: They gave me a chest x-ray.

CEO ERIC EVANS: Yup.

FEMALE SPEAKER: Dr. Lozano also sent me here —

CEO ERIC EVANS: Uh-huh.

FEMALE SPEAKER: -- for a TB skin test.

CEO ERIC EVANS: Uh-huh.

FEMALE SPEAKER: I was given the runaround. I was running all over

the hospital with my son.

33

CEO ERIC EVANS:  Yeah, I heard it.  I'm sorry.  It should have never happened.

FEMALE SPEAKER:  Okay.  I came here.

CEO ERIC EVANS:  Uh-huh.

FEMALE SPEAKER:  I spoke to the receptionist.  She went and got two ladies from the  back.  I don't remember their name.

CEO ERIC EVANS:  Okay.

FEMALE SPEAKER:  They came out.  I asked them to explain to me -- I showed them the letter from the health department —

CEO ERIC EVANS:  Sure, yup.

FEMALE SPEAKER:  - that says I could also get that testing done here.  I came here with the referral —

CEO ERIC EVANS:  Sure.

FEMALE SPEAKER:  - from my pediatrician.

CEO ERIC EVANS:  Sure.

FEMALE SPEAKER:  I was turned away. And all that your administrators could say to me was that they didn't know. Explain that to me how there's no control in your facility.

CEO ERIC EVANS:  Well, that's not -- that's a -- this is a test, not an infectious disease, but I understand what you're saying. What I would say is this —

34

FEMALE SPEAKER:    No, explain to me why when I asked your administrator, "Read this letter, please. This is what I got. It's indicating that I can get this done here. Why can't anybody help me? I've already had the chest x-ray."

CEO ERIC EVANS: Yeah.

FEMALE SPEAKER:  And she said, "Where did you have the chest x-ray?" And I said, "Just now downstairs in radiology."

CEO ERIC EVANS: Sure.

FEMALE SPEAKER: I said, "So why can't I get a skin TB test? This is a hospital. There's gotta be one here. Right?"

CEO ERIC EVANS:  Right. I'll tell you -- let me tell you why and the way the process is supposed to work and I'm sorry if it wasn't clear in the letter. The health department in order to make sure that everything is clearly tracked, they have one central place they're doing the screening.

FEMALE SPEAKER: Uh-huh.

CEO ERIC EVANS:  So they've demanded that all the initial screening be done at the health department. That way they have their eyes on it, they can document it. There's lots of state stuff they want to make sure they fill out. The initial screening -- now, the x-ray can be done here and we went ahead and did that ahead of the screening because we're going to have to do that for every baby to be sure.

FEMALE SPEAKER:  Uh-huh.

35

CEO ERIC EVANS: But the actual screening has to be done there. Even if we're sending our staff there, we're putting everyone in one place so they can have better tracking. That's exactly the reason. It is. I mean you can call the health department. That's why they wanted to control the process because what happens is you can imagine, Sierra Providence, we've got 25 locations across the city. We want to make sure we have a central location where we don't miss anyone. And so from -- for as far as the screening goes, that is completely controlled by the health department.

FEMALE SPEAKER:  Uh-huh. Okay. So explain to me why downstairs when I asked —

CEO ERIC EVANS:  Uh-huh.

FEMALE SPEAKER:  - when I initially came in and did paperwork —

CEO ERIC EVANS:  Yeah.

FEMALE SPEAKER:  -- I said, "Okay, I'm here for this, this and this. Here's my letter."

CEO ERIC EVANS:  Sure.

FEMALE SPEAKER:  I went through the whole thing.

CEO ERIC EVANS:  Yeah.

FEMALE SPEAKER:  Okay?  And they said, "Oh, yes, yes, yes." You know, "We're going to take care of it." How come nobody from that point said, "You know what, we're doing x-ray, but we're not doing this"?

CEO ERIC EVANS:  Sure.

36

FEMALE SPEAKER:   And how come radiologist said, "Okay, go here and they're going to do it"? And then I go back upstairs and they say, "Go to the auditorium."

CEO ERIC EVANS:  Sure.

FEMALE SPEAKER:  "Oh, no, we're only doing it for employees."

CEO ERIC EVANS:  I know. I heard you got the runaround. Here's what I would tell you.        On day one, when we have 3,000 employees, I don't know that all of them fully understood the process. So shame on us. We have obviously been working to make sure that all of our employees are up to speed on how it's supposed to work. But definitely going through 211, getting a schedule and getting the screen there has to happen and that's the way they're controlling the process. And so I apologize that there was not great information there. That surely should not have happened that way.

FEMALE SPEAKER:  And it's not that I misunderstood the letter. I didn't misunderstand anything. It clearly indicated your hospital and you weren't prepared for this. This shouldn't have happened to begin with.

CEO ERIC EVANS:  We're doing the x-rays. We're doing the x-rays for sure, but we -- we -- and this is -- again, the letter may not be clear, is what I'm saying. The process of how this has to work is they handle the initial screening because they — they -- they are insistent on handling the initial screening for every patient so we don't miss anyone, which I think is a good plan.

FEMALE SPEAKER:  Uh-huh.

CEO ERIC EVANS:   So everything will be done with the health department for the initial screening —

CEO ERIC EVANS:  -- because you went to the physician, got the order, you were able to get the chest x-ray done first.  But the screening they're still insisting on it being done down there.

FEMALE SPEAKER:  Well, these are the results for my chest x-ray and they're negative, but that provides zero relief to me because my son is two months old.

CEO ERIC EVANS:  Uh-huh.

FEMALE SPEAKER:  I'm horrified —

CEO ERIC EVANS:  Sure.

FEMALE SPEAKER:   -- that you, as a hospital -- and I'm personally going to hold you responsible as the CEO of this hospital. Now I have the decision to make if I need to put my son on the antibiotics to prevent this disease from ever attacking him.

CEO ERIC EVANS:  Yeah.  And that's definitely the recommendation. So the recommendation is for children under six months of age -- so this is the CDC regulations or the CDC recommendations are that for children under six months of age, if they think there's any chance of it, they recommend the medication because it's 100 percent curable.  So that is the recommendation, absolutely.

38

FEMALE SPEAKER: I understand that it's curable, but I don't think you understand —

CEO ERIC EVANS: If they even have it. If they —

FEMALE SPEAKER: -- the emotional stress —

CEO ERIC EVANS: I -- no.

FEMALE SPEAKER: -- that this has caused me and my family and everybody else that's involved —

CEO ERIC EVANS: Right.

FEMALE SPEAKER: -- in this.

CEO ERIC EVANS: Absolutely. All I can do is apologize for that. I have a two- and four-year-old. I can only -- I can imagine because my children have been sick. My son started off in the NICU. I -- I do know how hard it is with family. I'm leaving soon to go pick up a little boy in China who's got some health problems that I'm working through. A n d this as I said in the -- as I said in the press conference —

FEMALE SPEAKER: Uh-huh.

**CEO ERIC EVANS:-- regardless -- regardless of what the actual risk of conversion, any risk that we could have prevented, I take full ownership of and we're going to get it fixed.**

FEMALE SPEAKER: And I -- I would like to know what day in July you became aware.

CEO ERIC EVANS: I -- I did not know in July.

39

FEMALE SPEAKER:  Was it before my son was born in this —

CEO ERIC EVANS:  I became aware when this patient (inaudible).

FEMALE SPEAKER:  Okay. But you're the CEO.

CEO ERIC EVANS:  Uh-huh.

FEMALE SPEAKER:  And I understand that you have management in place are supposed to handle their employees.

CEO ERIC EVANS:  Absolutely, yup.

FEMALE SPEAKER:  How is it that everybody is so out of the loop? How is it that you didn't know and that management didn't handle this? An infection control nurse didn't take care of this?

CEO ERIC EVANS:  Sure.  Well, we screen -- we screen obviously thousands and thousands of people.

FEMALE SPEAKER:  Uh-huh.

**CEO ERIC EVANS:  So I'm not going to know about every patient's condition nor should I for HIPAA reasons. What — what -- what I can tell you is the process we had in place obviously did not work in this case and we have to fix it and we will fix it.**

FEMALE SPEAKER:  And when you say that there were some signs and symptoms, was it the annual, you know, TB skin test that came back positive for this employee or what was -- this employee was sick?

CEO ERIC EVANS:  I can't -- I can't talk about specific employee things. What I can say is this. There are many, many workers and all over this city

that have positive TB skin tests and they're fine to work. However, latent TB, when it's -- when you have latent TB, you could have it for years, just like what Mr. Resendes said yesterday, he's the head of the health department, he has it. Many, many people do. What activates it, we don't know.

FEMALE SPEAKER: Uh-huh.

CEO ERIC EVANS: And when that happens we don't know. And obviously what was -- what's in the health report -- and we told this yesterday -- is, you know, somebody who's had -- for example somebody's who's had latent TB for 15 years and they get a cold, they've had many colds along the way, they don't assume because they have a cough they have TB. It's not a natural assumption. Right? So there were lots of checkpoints early on that, again, weren't with us, were with other providers that looking back, you know, could have been symptoms and that's why they're -- they're taking this cautious approach to say, "Gosh, if it could have been then, we'll go back another three months." That's kind of how we got to this broad number. But -- but I will tell you that there's no doubt -- and, again, when I became aware of the situation is when this patient went on leave.

FEMALE SPEAKER: Uh-huh.

**CEO ERIC EVANS: Okay? When this employee went on leave. Obviously then we immediately started investigating, okay, what**

41

happened, what was in our process, how did it work? And that's when we discovered what I told you in July.

FEMALE SPEAKER:  Okay.  Even if this employee had cold-like, flu-like -- you know, was feeling ill —

CEO ERIC EVANS:  Sure.

FEMALE SPEAKER:  — why was she not sent home?  Newborns are so sensitive.

CEO ERIC EVANS:  Well, keep in mind -- so yes.  So couple things there. When we say -- when we say symptoms —

FEMALE SPEAKER:  Uh-huh.

**CEO ERIC EVANS:  -- symptoms being — we have lots of people who have a cough, for example.  We have lots of people who have different symptoms that aren't necessarily contagious and aren't necessarily inappropriate. But I will tell you, too, in health care --and this is a culture problem, this is — same with doctors.  A lot of people when they go through medical school and nursing school, they -- they -- they have this terrible culture of when you're a doctor or a nurse, you press through because you gotta go care for patients. We have to change culturally how we think about symptoms.  We really do. And this is as much — this is as much the employee responsibility because, look, I can come to work today —**

CEO ERIC EVANS:  -- and if I do, I need to report that. There's a -- there's actually certainly employee responsibilities in this, too. Because I'll tell you if we're only going to rely on the annual test, that leaves a lot up to chance.  And so it's got to be the physicians in the community, it's got to be the employee, it's got to be us. And part of our action plan is thinking robustly around how do we educate in a way where regardless of what happens between those 12 months, that everyone's hypervigilant on it. And I'll tell you this is exactly how it's happened in other cities.This is exactly how it happened here. I -- I could never have imagined this happening in my facility, but it did and we're going to do everything we can to make it right and we're going to fix it going forward. That's all I can tell you. That's all — it's the best I can do. My -- listen, my heart goes out to you. I can only imagine how scary it is. I have two little kids myself. Trust me, my two- and four-year-old are my life and I -- I -- I do -- I sincerely apologize for the angst.

FEMALE SPEAKER:  Let me ask you, sir.

CEO ERIC EVANS:  Yes.

FEMALE SPEAKER:  If it would have been your newborn son —

CEO ERIC EVANS:  Uh-huh.

FEMALE SPEAKER:  -- or newborn daughter —

CEO ERIC EVANS:  Yup.

**FEMALE SPEAKER: -- would it have been acceptable to you to wait two, three, four weeks or not even get a phone call and be fearing for your baby's safety? Would that be acceptable to you?**

**CEO ERIC EVANS:   Absolutely not. You waited -- oh, I see what you're saying took from the time of figuring this out --**

FEMALE SPEAKER:  Not -- not just from the time of figuring this out. I called and I said, "I -- I received this letter."

CEO ERIC EVANS:  Right.

FEMALE SPEAKER:  "I want my son seen right away."  Because it says, "Please call and be seen right away."

CEO ERIC EVANS:  Right.

FEMALE SPEAKER:   And two, three weeks out was not acceptable. When I came here with doctor's orders, that was not acceptable the way I was treated, the way it was handled. I even went back to my pediatrician.

CEO ERIC EVANS:  Uh-huh.

FEMALE SPEAKER:  I let him know —

CEO ERIC EVANS:  Uh-huh.

FEMALE SPEAKER:  — what happened here.

CEO ERIC EVANS:  Sure.

FEMALE SPEAKER:  He was very disappointed —

CEO ERIC EVANS:  Yeah.

FEMALE SPEAKER:  — in the way you handled things —

44

CEO ERIC EVANS:  Sure. 1

FEMALE SPEAKER:  -- and then suddenly the health department calls me and suddenly they have an appointment for me the very next day. Explain that to me, sir. This is not organized.

CEO ERIC EVANS:  I'll tell you what. Well, let me just say this. The health department — obviously, this is a big screening.  The health department on day one, we -- we trained our nurses to make sure we knew exactly what the screening would do. On day two, they -- they started off to see 40 patients. They quickly realized they could see more. On day three, they saw 80. They now believe they can see 120 a day. So being -- being -- making sure that they had the right numbers -- they really thought initially they were going to be 40 a day, which at that pace, as you can imagine, with 700 people, that's way too long.

FEMALE SPEAKER:  Uh-huh.

CEO ERIC EVANS:  They now plan to get everyone done in three weeks.

**FEMALE SPEAKER:  Even three weeks seems too long.  Even a day seems too long.**

**CEO ERIC EVANS:  Understood, for the worry.**

**FEMALE SPEAKER:  Consumed with worry.**

CEO ERIC EVANS:  Understood.  When -- when — do you -- are you in -- you said you're in tomorrow.

FEMALE SPEAKER:  I've already been.

CEO ERIC EVANS:  Okay, good.

FEMALE SPEAKER:  But why did it take me coming here, me making a scene here with your administrator for her to reach out to the health department and how is it that suddenly there's an appointment available for me when a few days before, there wasn't. And I don't want to hear that you doubled up on the patients. I don't want to hear that.

CEO ERIC EVANS:  Yeah, no. I don't know why the health department initially gave those answers. We -- again, I don't run the health department.

FEMALE SPEAKER:  Uh-huh.

CEO ERIC EVANS:  What I will tell you is the health department was insistent that they see the patient first, which I think I understand why, because they want to make sure we don't miss anyone. The one thing that I can tell you about TB that I've learned over the past few weeks -- and trust me I -- I've -- I've done more reading on this than I've ever could imagine -- is that it is extremely, extremely slow moving and -- and -- and the reality of it is — and he said this last night, whether you're in that first week or that third week or that fifth week, the outcome will not change. Nonetheless, what is -- what is terrible in that is the angst. And that's why we have been pushing to say, "Okay, gosh, can we increase capacity?  Can we somehow hire more staffing? Can we go extra hours?" And that's why I'm excited that they got it down to three weeks because they initially said

46

six. And obviously I can only imagine with their parents sitting around for weeks to get a test result. So —

FEMALE SPEAKER: And -- and -- and I don't understand why the health department indicated, your hospital indicated the pediatricians. When I went to my pediatrician —

CEO ERIC EVANS: Uh-huh.

FEMALE SPEAKER: -- he didn't have a skin TB test on hand because he hadn't had to deal with this. So before they're going to indicate them, shouldn't everybody pull together and make sure everybody has the proper supplies to handle this issue?

CEO ERIC EVANS: When you say "indicate the pediatrician" —

FEMALE SPEAKER: On the certified letter —

CEO ERIC EVANS: Okay.

FEMALE SPEAKER: Okay-- it says "Dear parent," it goes into the explanation that we were accidentally exposed.

CEO ERIC EVANS: Uh-huh.

FEMALE SPEAKER: It says these testings will be performed at -- you can either go call 211 —

CEO ERIC EVANS: Uh-huh.

FEMALE SPEAKER: — Providence Memorial Hospital or your local pediatrician.

CEO ERIC EVANS: Okay.

47

FEMALE SPEAKER: Okay? And they can perform these exams for you.

CEO ERIC EVANS: Uh-huh.

FEMALE SPEAKER: So when I arrived at my pediatrician's office and I'm showing him the letter and he's sitting there and he's reading it, he didn't have a skin TB test in his office.

CEO ERIC EVANS: Sure. Are you sure it said pediatrician's office?

FEMALE SPEAKER: Yes, I am. And I will be happy to send you a copy.

CEO ERIC EVANS: Oh, I've got a copy. Because we were very careful to say -- because pediatricians -- even -- even pediatricians who know of a TB, they send it to the health department because most pediatricians will never do that test. So in general I will tell you most pediatricians, if you go to their office, they don't do that. They -- if they think you've been exposed, they're going to send you to the health department, too.

FEMALE SPEAKER: Uh-huh.

CEO ERIC EVANS: So that -- that obviously was a miscommunication.

FEMALE SPEAKER: It -- it clearly says — and I'll be happy to e-mail you the letter that I have.

CEO ERIC EVANS: Okay. I think -- what I will tell you this is what needs to be the clear communication and what we have to make sure we do a good job of is the clear thing we have to do is the first call is to 211.

FEMALE SPEAKER: Uh-huh. Okay. Well, 211, no.

CEO ERIC EVANS: There's now a second number, I know. They —

48

FEMALE SPEAKER: It's 211, as well. It's 211. It leads back.

CEO ERIC EVANS: Well, it is, but it -- but it gives you directly to -- sometimes you push 11 and you go through the questions. The second line's supposed to be more direct.

FEMALE SPEAKER: I didn't have a problem with the automated system with the prompts, no. I had a problem with the scheduling.

CEO ERIC EVANS: Okay.

FEMALE SPEAKER: Even having to wait a day is too long.

CEO ERIC EVANS: Sure, sure.

FEMALE SPEAKER: And I understand that you don't run the health department. And it doesn't seem like you have control over this hospital, either. And I feel bad saying that to you but, you know, that's how it seems.

**CEO ERIC EVANS: But what I can say is this. We had a process that in this case failed that we are working to fix quickly. As soon as we knew that employee had tuberculosis, obviously, we -- even before they were officially diagnosed, they were out of work. There was an opportunity in July to have done more. The rest of that period is the period when you think about that year you're looking at, there's 45 days we could have and should have done more. There is nine -- 10 and a half months where we have to figure out as a community and as a profession how do we deal with situations where no -- someone's not**

49

clearly diagnosed, they're not sure what's going on, nobody connects the dots, there's no communication about something being wrong with the patient.   Those are really tricky and — and I -- what we're thinking about as an organization is not just saying "yes, we got to fix the process and obviously, there was a poor decision made by an individual." But more than an individual, it's about the process. I -- being -- my background was an engineer. I was an industrial engineer for General Motors for a number of years.  Almost every time something fails, it's not about necessarily the person, it's about a process problem.  Right?  So if you have a -- if you have a fail-proof process, regardless of who the person is, it should work.  And that's what we have to design in this case. The harder part is that first nine and a half, 10 months.  Because in those cases there is no clear checkpoint and the question becomes how do we make sure the physician and the employee are more hypervigilant on thinking through those symptoms so...

**FEMALE SPEAKER:   And I heard in your press conference that you're continuing to add babies because of a clerical billing code error. Please explain that to me.**

**CEO ERIC EVANS: Yeah.  So that was a bad wording —**

FEMALE SPEAKER:  How many errors can -- can one hospital make?

CEO ERIC EVANS:  That was a bad wording.  That was a bad wording. It's not necessarily an error.  What I would say is this. So the way the -- the

50

way the CDC experts -- look, we talk to them about okay, here's a situation. Who -- who should we be testing? And they said any baby born on the day that that person was working. So we (inaudible).

FEMALE SPEAKER: But that leaves out a lot of babies. You guys did a time frame, the employee's shift time frame. I've seen the calendar that's printed out with highlighted days.

CEO ERIC EVANS: Sure.

FEMALE SPEAKER: That doesn't seem error proof.

CEO ERIC EVANS: Well, again, we go -- we're going on -- we have -- we have epidemiologists, we have physicians, we have CDC involved. They look at what the patient worked and they make recommendations on which patients they feel have a risk. Okay?

FEMALE SPEAKER: Uh-huh.

CEO ERIC EVANS: What they said is we want you to pull every single baby that was born on a shift where that worker was working. Which we did. That was the initial number you saw, the 706. What we realized through the process was there is a portion of babies that do phototherapy in the nursery. Now, most of them do phototherapy in the NICU. Those babies were not affected at all. For the ones that do phototherapy in the nursery, while they're there a shorter period of time, we felt it was great to add them. What I -- what I will tell you is this. If I find something else where I think there's another place that it could have been, I'm going to add

51

them. **And so the easy thing to do would be not to add them because people are getting anxious.** The right answer for me is if we find anything, we're going to go to the route of adding. So I know it -- I know there's questions about it. I will tell you if tomorrow we find it out about one more child, absolutely we will add them and check. It's always safer to check because what we know about kids, if you check them and you treat them, they will not have it. And we have to make sure we don't miss a chance.

**FEMALE SPEAKER: Why not call everybody within that time frame that had a baby born here? Because it's causing public panic.**

**CEO ERIC EVANS: Because there's -- there's a certain group that -- that's not a risk and so —**

FEMALE SPEAKER: Are you sure about that?

CEO ERIC EVANS: That's what the ex- —

FEMALE SPEAKER: You're positive.

CEO ERIC EVANS: So what I do is I rely on physicians and the experts who deal with this every day.

FEMALE SPEAKER: Uh-huh.

CEO ERIC EVANS: It's not my call. I mean obviously we have people that are trained as epidemiologists across this country. They deal with this. They've dealt with it in Philly, they dealt with it in LA, they dealt with it in

52

Vegas. They're dealing with it here and they're giving their evidence-based guidelines. That's what we have to follow.

**FEMALE SPEAKER:  Are you ever going to release the day in July that you became aware that the employee had a possible —**

**CEO ERIC EVANS:  Absolutely.  It was July 2nd.  Absolutely.  It'll be in the -- it'll be in the plan.**

FEMALE SPEAKER:  So you allowed me —

CEO ERIC EVANS:  That's when they had the possible screening.

FEMALE SPEAKER:  You allowed me to come into your hospital and deliver my baby here knowing that there was a potential that this employee -- there was a possibility that they could have been sick.

CEO ERIC EVANS:  So as I said before, there was someone in our organization that knew that made a decision.  I did not know.  I wish —

FEMALE SPEAKER:  But you're CEO of this hospital.

CEO ERIC EVANS:  Uh-huh, yup.

FEMALE SPEAKER:  Is it not your overall responsibility to control all management?

CEO ERIC EVANS:  Our key -- my -- my responsibility is to make sure we have safe processes in place and that execute upon them. There's no doubt about it. In this case it wasn't good execution. I can tell you right now we're treating people down in the ED that people have to make clinical decisions every day. My physicians are, the nurses are. I can't

53

possibly know every one. What we have to make sure is we have processes in place that allow them to make the right decisions. **We're looking at this case because it didn't work and we're trying to figure out why it didn't work. And I can tell you we're hypervigilant on getting it fixed.** That's all I can tell you and I'm sorry that it happened and I can absolutely promise you that we're dedicated to fixing this.

FEMALE SPEAKER:  Sorry doesn't make this better for me.

CEO ERIC EVANS:  I understand that.

FEMALE SPEAKER:  You -- somebody in your hospital knew and I was still came in here and delivered my baby.

CEO ERIC EVANS:   Certainly, they didn't know this patient had TB. They made an assumption that was a wrong assumption.  That's what I can tell you.

FEMALE SPEAKER:   And who -- who are you holding responsible in your hospital

CEO ERIC EVANS:  Oh, trust me, the people that were involved in this, absolutely. Anybody that was involved in this process.  But what I would tell you is that -- number one, the employee certainly didn't know.  So this employee, I can tell you, it's not — they certainly didn't know they had it. The health nurse certainly didn't think they had it. But they made an assumption when they could have had a chance to find it and where they should have found it. Neither one of these people thought they had it. I

54

want to be very clear on this.  It's not as if someone in this hospital said --

(inaudible.) they probably have TB, but we —

FEMALE SPEAKER:  But guess what, look what happened.  Look what it

caused.

CEO ERIC EVANS:  I understand.

FEMALE SPEAKER:  Look how many people came in on July 2nd and

after —

CEO ERIC EVANS:  I understand.

FEMALE SPEAKER:  -- blind to the situation in your hospital that you

had no knowledge of.

CEO ERIC EVANS:  And we have to make it right and we have to fix it.

FEMALE SPEAKER:  How are you going to make this right?

CEO ERIC EVANS:  We're going to offer (inaudible) and we're going to

offer treatment and make sure that the babies —

FEMALE SPEAKER:  That doesn't make it right.  And I was very

appalled on the press conference when you said -- you know, thanked

Providence for their gratitude.  What exactly should we thank you for?

**CEO ERIC EVANS:     (Inaudible.)     What I would say is that**

**(inaudible) say that we are covering the costs through our generosity**

**and that was a bad —**

55

**FEMALE SPEAKER:    Yeah, but he thanked you. What exactly should we thank you for?   For, you know, public panic?   For exposing our babies to TB?**

**CEO ERIC EVANS: I completely agree with you on that.** Again those are not my words. You have to realize people are -- when they're public speaking, he used the wrong choice of words.   I didn't say it. What I did say is we have absolutely every reason to make sure we step up and do everything we can to make this right.   I understand.   I (inaudible).   I can't fix that part of it.   But here's what I know.   There was a (inaudible) that we have to fix to make sure it never happens again.   And anything that I can do for what happened, we're going to do.

FEMALE SPEAKER:    Well, what else are you going to do to all the families that you caused an extreme amount of stress to? Sorry doesn't make it better.   **Putting a better plan together so you don't lose your Medicare and Medicaid funding doesn't make it better, sir.**

CEO ERIC EVANS:   It certainly makes it better to (inaudible) absolutely. And I will tell you, obviously as you know, we've delivered thousands and thousands of babies here.       This is an example of a process that didn't work this time that we have to fix. Have to fix it. And as much as I'd like to say everywhere is perfect, it's not and when we make a mistake, it's not about -- we have to make sure how we fix it.   We have to make sure how we fix it and **we have to make sure that we do everything we can to**

**make sure that these children are taken care of as best as we can. That's all I can do at this point and** (inaudible).

FEMALE SPEAKER:  And how do you expect me, as a mother, to come and make the decision on whether or not I should place my two-month infant son on antibiotics?  And I don't buy that it doesn't have side effects. I know it has side effects.  I've researched it.

CEO ERIC EVANS:  Every medicine, including Tylenol -- every medicine has some —

FEMALE SPEAKER:  It doesn't seem okay that this happened and now I have to make the decision on should I place my son on this. What do I do? Do I — do I risk it? What are the side effects? **He's little. I came into your facility and I had a happy, healthy baby boy. And now I'm consumed with worry, with fear and with hard choices to make in regards to his health.**

**CEO ERIC EVANS: I agree.  I agree.**

**FEMALE SPEAKER:  Sorry doesn't fix it.  I want you to know that I'm going to hold this hospital and you personally responsible. This is not the end just because I have a negative chest x-ray.  This is not the end for me.**

**CEO ERIC EVANS: Okay.  I'm very sorry.**

**SEE TRANSCRIPT, ATTACHED.**

## VI.
### ACTS OF AGENTS

59. Whenever in this petition it is alleged that either Defendant did any act, it is meant that Defendant performed or participated in the act, or the officers, agents, or employees of Defendant performed or participated in the act, with the actual, vicarious, or imputed authority of the Defendant.

## VII.
### CLASS ACTION ALLEGATIONS

60. Plaintiffs' claims are typical of the claims of absent Class members. The harm to Plaintiffs and other Class members generally was caused by Providence Memorial's conduct. Plaintiffs' claims arise from the same factual background and same legal theories as those of the other Class members.

61. Class certification is appropriate because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes which, as a practical matter, may be dispositive of the interests of other members not parties to the adjudication or which may substantially impair or impede their ability to protect their interests.

62. Class certification is also appropriate because common issues of law and fact predominate over any questions of law or fact affecting only individual members of the Class, including, but not limited to, issues as to Providence Memorial's liability based upon all causes of action which may be pled or proved by the Class.

58

63. This Court may elect, in its discretion, to certify the claims asserted in this action; to designate particular claims or issues for class treatment; and/or to designate subclasses.

64. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy. Plaintiffs allege that the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to the individual members of the class which would establish incompatible standards of conduct by the parties opposing the class, and adjudication with respect to the individual members of the class would be dispositive of the interests of other members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests.

65. Plaintiffs bring this action as a class action on their own behalf and on behalf of all Texas residents similarly situated. The global class which Plaintiffs seek to represent is composed of all Texas residents who were exposed, or fear exposure, to the Tuberculosis outbreak that occurred at Providence Memorial Hospital in El Paso, Texas during the approximate time period of September 2013 (or exact date Infected Employee was hired, exact date is unknown at this time) to August 15, 2014 (when Infected Employee discontinued working with patients at Providence Hospital). The subclasses of Texas and New Mexico residents which Plaintiffs seek to represent are composed of:

    a.  The parents of all Providence Hospital patients--newborn babies--who were exposed to Tuberculosis at Providence Hospital in El Paso, Texas during the

approximate time period of September 2013 up to the present and continuing timeframe, for and on behalf of themselves, their newborn babies and siblings whom, because of the intimacy of familial contact, fear being exposed to Tuberculosis by Providence Hospital's Infected Employee.

b.  The parents of all Providence Hospital patients--newborn babies--who were exposed to Tuberculosis at Providence Hospital in El Paso, Texas during the approximate time period of September 2013 up to the present and continuing timeframe, for and on behalf of themselves, their newborn babies and siblings whom, because of the intimacy of familial contact, fear being exposed to Tuberculosis by Providence Hospital's Infected Employee and seek testing by use of the gold standard for tuberculosis testing--QuantiFERON®-TB Gold In-Tube or similar quality blood test, if any--instead of the method chosen by Providence Hospital, managed by Providence Hospital and administered by Providence Hospital.

c.  The advantages of QuantiFERON®-TB Gold In-Tube testing over the tuberculin skin test (TST) used by Providence Hospital are:

d.  Improved specificity;

e.  Results are not subject to interpretive bias by Providence Hospital whom initially interpreted the results for the hundreds of newborns tested;

f.  Results are not affected by the booster phenomenon (i.e., increased sensitivity on subsequent test, leading to false-positive results);

g.  Accuracy is not affected by prior BCG (bacille Calmette-Guérin) vaccination;

60

h. Requires only 1 patient visit.

i. The cost of this gold standard TB blood test is approximately $150.00 per test.

66. Plaintiffs alleged that the class is so numerous, approximately 3000 newborns, their parents,, and their siblings, that joinder of all plaintiffs individually would be impractical and that disposition of their claims in a representative suit is a benefit to all of the parties and to the Court.

67. There is a well-defined community of interest in the questions of law and fact affecting the Class that Plaintiffs represent. The class members' claims against Defendants, and each of them, involve common questions of interest including, but not limited to:

a. The negligence and lack of oversight at Providence Memorial Hospital regarding the proper screening, diagnosis, evaluation, monitoring and implementation of appropriate disease control measures to staff persons and employees, patients, family members, vendors, contractors, or other third persons, and members of the general public who entered the Providence Hospital's Nursery or Labor and Delivery unit, and members of the public who were exposed to such persons;

b. The negligence of Defendants who failed to properly manage and implement appropriate protocols for the screening and diagnosis of illnesses, implementation of fundamental disease control protocols, safety and warning measures, monitoring, dissemination of information, testing and monitoring

for Tuberculosis of its staff and other employees. Defendants acted in deliberate, intentional, reckless and/or grossly negligent fashion to deprive their staff persons and employees, patients, family members, vendors, contractors, or other third persons, and members of the general public of vital information to preserve and safeguard their health, in order to avoid the liability and expense that they would incur to address the outbreak of Tuberculosis exposure that was caused by said Defendants' failure to properly care for and ensure the health and safety of its staff persons and employees, patients, family members, vendors, contractors, or other third persons, and members of the general public.

c. The negligence of Defendants who failed to acknowledge and raise concern about its employee who was **complaining of fatigue** and **constantly coughing** around patients, patients' family members, newborn babies, other employees, in hospital rooms, hospital common areas, hospital nursery unit, and hospital labor and delivery unit.

d. The negligence of Defendants who failed to act immediately after its employee **admitted she was coughing up blood** during Defendant's routine annual exam.

e. Furthermore, the negligence of Defendants by their conduct including:

(1) The failure to *timely* disclose to *all* patients, visitors and family members of patients that they had been exposed to Tuberculosis after learning its employee was infected with active Tuberculosis;

(2) The failure to *timely* recommend and set up a procedure to test and monitor employees, patients, visitors and family members of patients that had been exposed to Tuberculosis after learning its employee was exerting symptoms of Tuberculosis such as constant fatigue, coughing and "coughing up blood."

68. These common questions are such that the proof of facts common to the class will entitle each member of the class to the relief requested in this complaint.

69. Plaintiffs will fairly and adequately represent the interests of the class because Plaintiffs are members of the class and their claims are typical of those in the class.

70. Defendants, and each of them, had a general duty to Plaintiffs, which arose from Defendants' positions as a health provider system, hospital system, medical group and health care providers, and from the representations made by Defendants to said Plaintiffs, and the trust and confidence that Plaintiffs placed in said Defendants.

71. Plaintiffs allege that this action involves questions of law and fact common to each member of the class and that all members of the class have suffered damages as a result of Defendant's actions, which has created a public health hazard.

72. As a direct and proximate result, all Plaintiffs will require testing by use of the gold standard blood test described above, free from the interpretive and clear moral bias of Providence Hospital which employed its own agents and employees to interpret TB test results for its patients. **That is, PROVIDENCE HOSPITAL SHOULD NEVER HAVE BEEN INVOLVED in the PROCESS OF TESTING OR INTERPRETING TB TEST RESULTS precisely because it had a tremendous**

63

**monetary, and legal interest, also known as a bias, in minimizing the damage to its public image, which would impact it's bottom line profits, by making false negative TB test readings**. By claiming to have tested everyone exposed to TB, which Providence Hospital did not do but rather left out thousands of newborn babies whom likely had contact with its Infected Employee, and then declare false "negative" test results, if such patients or their families were later found to have Tuberculosis, it could claim that such TB exposure resulted from some source other than its Infected Employee.

73. As a direct and proximate result, all Plaintiffs sustained emotional distress from fear of contracting Tuberculosis. Some plaintiffs have also sustained, or will sustain, grievous physical injury from tuberculosis and suffering, and other damages including lost wages and earning capacity, past and future medical expenses, loss of enjoyment of life, pain and suffering, attorney fees, court costs, litigation costs, and other damages.

74. Defendants owed a duty to Plaintiffs to use due care in the operation of Providence Memorial Hospital and not to conduct business in such a manner that would result in the spread of an infectious disease.

75. Plaintiffs allege that Defendants breached their duty of care by failing to adhere to standard protocols regarding screening, diagnosis, safety, warning and other measures related to infection management and control at Providence Memorial Hospital.

64

76. Providence Memorial Hospital is a medical facility licensed to do business in the State of Texas to provide care to patients in conjunction with all applicable federal, state and local patient safety laws, regulations, protocols and procedures, established for the safety of the community, all of us and which have been incorporated into Providence Memorial Hospital's protocols for its facility related to the providing of care.

77. Defendant Providence Memorial Hospital failed to implement, follow and enforce applicable federal, state and local laws safety, protocols and procedures regarding infection control, thereby exposing Providence Memorial Hospital's staff persons and employees, patients, family members, vendors, contractors, or other third persons, and members of the general public to a dangerous, potentially deadly, infectious disease, tuberculosis.

78. Defendant Tenet Hospitals, Ltd. has general responsibility, supervision and oversight of all procedures and protocols of Providence Memorial Hospital to assure compliance with all applicable state and local laws, protocols and procedures, all of which have been incorporated into said Defendant's hospital protocols for its facility related to the providing of care.

79. Defendant Tenet Hospitals, Ltd. Chose not to exercise appropriate responsibility, supervision and oversight of all procedures and protocols of Providence Memorial Hospital, including applicable federal, state and local laws, protocols and procedures, for patient and community safety thereby exposing Providence Memorial Hospital's staff persons and employees, patients, family members, vendors,

65

contractors, or other third persons, and members of the general public to unreasonable risks of harm.

80. By allowing an employee who **displayed symptoms of an infectious disease** to continue working in and around hospital grounds, Defendants acted negligently, carelessly, recklessly and with a conscious disregard for Plaintiffs' safety and rights. Defendants' actions are a result of negligent hiring, training and supervision of Providence Memorial Hospital's staff and/or any other persons under its direction or control.

81. Each Plaintiff was exposed to Tuberculosis, as a result of Defendants' intentional and/or negligent actions, in violation of established state and local laws, protocols and procedures as well as Providence Memorial Hospital's own policies and protocols.

82. As a direct and proximate result of all the foregoing, and as a result of the acts/ omissions of Defendants, Plaintiffs have sustained damages in several forms, including by not limited to fear and anxiety of contracting an infectious and potentially lethal infections disease, causing them to have to undergo past and future testing and medical monitoring. Other Plaintiffs are either latent or untested. In any case, Plaintiffs will either suffer positive, full-blown Tuberculosis or the fear of developing Tuberculosis every time they cough, sneeze or have a fever and will continue to suffer from the disease and/or fear the disease becoming active in the future, requiring treatment which entails months of drug therapy, quarantine and

66

other treatments, if their physical condition can endure the treatment, together with attendant pain and suffering.

83. The class representatives' claims are typical of the claims of the class. Plaintiffs and all members of the class sustained damages as a result of Defendants' conduct alleged in this Complaint. The class representatives will fairly and adequately protect the interest of the class.

**Factual Allegations Related to Plaintiffs Jessica Melendez-Carrillo and Martin Carrillo, Individually and As Next Friend of Minors Bianca S. Carrillo and Valentina Carrillo**

84. Between June 5, 2014 and June 7, 2014, Mother Jessica Melendez-Carrillo and Father Martin Carrillo entered Providence Hospital to deliver their baby. On June 5, 2014, Bianca Carrillo was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. Plaintiffs called City of El Paso Health Department (CEPHD), where they scheduled Plaintiffs to test Baby Bianca Carrillo. On October 2, 2014, Baby Bianca Carrillo was tested by skin test, and results were "negative." Plaintiffs were never warned about the possibility of a false-negative result, and fear either they or their children have contracted Tuberculosis and fear their child or children will test positive in the future.

**Factual Allegations Related to Plaintiffs Socorro Arredondo and Marco Carbajal, Individually and As Next Friend of Minors Alexis Carbajal and Brandon Carbajal**

85. Between December 20, 2013 and December 27, 2013, Mother Socorro Arredondo and Father Marco Carbajal entered Providence Hospital to deliver their baby. On December 20, 2013 Baby Alexis Carbajal was born. Plaintiffs never received notice

67

from Providence about the Tuberculosis outbreak. Plaintiffs received a letter from CEPHD, who scheduled Baby Alexis Carbajal for a skin and X-ray test on October 1, 2014. Both tests were negative. Plaintiffs feared they had their children had contracted Tuberculosis and still fear their child will test positive in the future.

**Factual Allegations Related to Plaintiffs Raquel Arango and Jaime Arango, Individually and As Next Friend of Minors Abbygail Arango and Alyssa Arango**

86. Between September 16, 2013 and September 18, 2013, Mother Raquel Arango and Father Jaime Arango entered Providence Hospital to deliver their baby. On September 16, 2013, Baby Abigail Arango was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. Baby Abigail Arango has not yet been tested. Because Plaintiffs were exposed to Tuberculosis, Plaintiffs fear they have contracted Tuberculosis or that they will test positive in the future.

**Factual Allegations Related to Plaintiffs Martha Uribe and Jesus Uribe, Individually and As Next Friend of Minors Essau Adrian Uribe and Gael Antonio Uribe**

87. Between September 16, 2013 and September 17, 2013, Mother Martha Uribe and Father Jesus Uribe entered Providence Hospital to deliver their baby. On September 16, 2013, Baby Essau Uribe was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. CEPHD will not test Baby Essau Uribe without charging them.

**Factual Allegations Related to Plaintiffs Raquel Barrios and Edgar Rangel, Individually and As Next Friend of Minor Emmanuel C. Rangel**

88. Between October 5, 2013 and October 7, 2013, Mother Raquel Barrios and Father Edgar Rangel entered Providence Hospital to deliver their baby. On October 5, 2013, Baby Emmanuel C. Rangel was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. Plaintiffs called CEPHD to schedule an appointment to test baby. On September 29, 2014, Baby Emmanuel Rangel was tested and results of skin test was negative. On February or March 2014, Mother Barrios was tested for her employment, and her test was "inconclusive." Plaintiffs feared they and their children had contracted Tuberculosis and still fear their child will test positive in the future.

### Factual Allegations Related to Plaintiffs Elizabeth Villarreal and Jaime Ortega, Individually and As Next Friend of Minors Emmanuel Ortega and Jaime Ortega

89. Between January 27, 2014 and January 29, 2014, Mother Elizabeth Villareal and Father Jaime Ortega entered Providence Hospital to deliver their baby. On January 27, 2014, Baby Emmanuel Ortega was born. Plaintiffs never received notice rom Providence about the Tuberculosis outbreak. Plaintiffs received a letter from CEPHD, who scheduled Baby Emmanuel Ortega for a skin test, which was negative. Plaintiffs feared they and their children had contracted Tuberculosis and fear their child will test positive in the future.

### Factual Allegations Related to Plaintiffs Raquel Barrios and Edgar Rangel, Individually and As Next Friend of Minors Jose Luis Ortiz, Azia Ortiz, and Jeffrey Carrasco

90. Between October 6, 2013 and October 9, 2013, Mother Michelle and Father Jose Ortiz entered Providence Hospital to deliver their baby. On October 6, 2013, Baby

Jose Luis Ortiz was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. In September 2014, Plaintiffs received a letter from CEPHD, who scheduled Baby Jose Luis Ortiz for a skin test, which was negative. Plaintiffs feared they and their children had contracted Tuberculosis and fear their child will test positive in the future.

**Factual Allegations Related to Plaintiffs Jazmin Delgado and Ismael Perez, Individually and As Next Friend of Minor Matthew A. Perez**

91. Between September 27, 2018, 2014 3 and September 29, 2013, Mother Jazmin Delgado and Father Ismael Perez entered Providence Hospital to deliver their baby. On September 27, 2013, Baby Matthew Andre Perez was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. In October 2014, Baby Matthew Andre Perez was tested by X-ray, and results were negative. Plaints fear they and their children contracted Tuberculosis and fear their child will test positive in the future.

**Factual Allegations Related to Plaintiffs Priscilla Garcia-Bracho and Alejandro Martinez, Individually and As Next Friend of Minor Alejandro I. Martinez**

92. Between December 31, 2013 and January 2, 2014, Mother Priscilla Garcia-Bracho and Father Alejandro Martinez entered Providence Hospital to deliver their baby. On December 31, 2013, Baby Alejandro Isaias Martinez was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. Plaintiffs learned of the outbreak from the news and contacted their pediatrician to test Baby Alejandro Martinez. On October 8, 2014, Baby Martinez was tested by skin test which was

70

negative.  Plaintiffs feared they and their children had contracted Tuberculosis and still fear their child will test positive in the future.

**Factual Allegations Related to Plaintiffs Monica Hughes and Joseph Garza, Individually and As Next Friend of Minors Emma Garza and Kayla Hughes**

93. Between June 2, 2014 and June 8, 2014, Mother Monica Hughes and Father Joseph Garza entered Providence Hospital to deliver their baby.  On June 2, 2014, Baby Emma Garza was born.  Baby Emma Garza went to the Nursery Plaintiffs never received notice from Providence about the Tuberculosis outbreak.  On September 25, 2014, Baby Emma Garza was tested by skin and X-ray tests, which were negative. Plaintiffs feared they and their child had contracted Tuberculosis and still fear their child will test positive in the future.

**Factual Allegations Related to Plaintiffs Maria Macias and Edgar Macias, Individually and As Next Friend of Minor Kataleah Macias**

94. Between March 19, 2014 and March 21, 2014, Mother Maria Macias and Father Edgar Macias entered Providence Hospital to deliver their baby.  On March 19, 2014, Baby Kataleah Macias was born.  Plaintiffs never received notice from Providence about the Tuberculosis outbreak.  Baby Kataleah Macias has not yet been tested. Plaintiffs fear they and their children have contracted Tuberculosis and fear their child will test positive in the future.

**Factual Allegations Related to Plaintiffs Adriana Reyes and Alfredo M. Reyes, Individually and As Next Friend of Minors Natalia O. Reyes and Carolina Reyes**

95. Between August 13, 2014 and August 15, 2014, Mother Adriana Reyes and Father Alfredo M. Reyes entered Providence Hospital to deliver their baby.  On August 13,

2014, Baby Natalia Olivia Reyes was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. In September 2014, Plaintiffs received a letter from CEPHD, informing them of such exposure. Baby Natalia Reyes was tested on September 29, 2014 for both skin and X-ray tests, which were negative. Plaintiffs feared they and their children had contracted Tuberculosis and fear their child will test positive in the future.

### Factual Allegations Related to Plaintiffs Paola Pena and Miguel Barajas, Individually and As Next Friend of Minor Iker L. Barajas

96. Between November 26, 2013 and November 28, 2013, Mother Paola Pena and Father Miguel Barajas entered Providence Hospital to deliver their baby. On November 26, 2013, Baby Iker Leonardo Barajas was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. In September 2014, Plaintiffs received a letter from CEPHD, informing them of such exposure. Baby Iker Barajas was tested on October 1, 2014 for the skin test, which was negative. On October 2, 2014, Baby Iker Barajas was tested for X-ray tests, which were negative. Plaintiffs feared they and their children had contracted Tuberculosis and fear their child will test positive in the future.

### Factual Allegations Related to Plaintiffs Mayra Briseno and Sergio Briseno, Individually and As Next Friend of Minor Sergio G. Briseno, Jr.

97. Between January 31, 2014 and February 2, 2014, Mother Mayra Briseno and Father Sergio Briseno entered Providence Hospital to deliver their baby. On January 31, 2014, Baby Sergio Gabriel Briseno was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. On September 19 2014, Plaintiffs

72

received a letter from CEPHD, informing them of such exposure. Plaintiffs failed to receive approval from CEPHD for a skin test for Baby Briseno. On September 29, 2014, Baby Briseno was tested at Fox Plaza by skin test, which was negative. On October 7, 2014, Baby Briseno was contacted by CEPHD to test Baby Briseno by X-ray, which were also negative. Plaintiffs feared they and their children had contracted Tuberculosis and fear their child will test positive in the future.

**Factual Allegations Related to Plaintiffs Dina Yepez and Ismael Yepez, Individually and As Next Friend of Minor Amy Yepez**

98. Between September 16, 2013 and September 15, 2013, Mother Dina Yepez and Father Ismael Yepez entered Providence Hospital to deliver their baby. On September 16, 2013, Baby Amy Yepez was born. Plaintiffs never received notice from Providence about the Tuberculosis outbreak. In September 2014, Plaintiffs received a letter from CEPHD, informing them of such exposure. Baby Amy Yepez was tested on September 30, 2014 for both skin and X-ray tests, which were negative. Plaintiffs feared they and their children had contracted Tuberculosis and fear their child will test positive in the future.

**Factual Allegations Related to Plaintiff Ana Alonzo, Individually and As Next Friend of Minors Calixto Iturralde, Jr. and Lorenzo Alonzo, III.**

99. Between July 31, 2014 and August 2, 2014, Mother Ana Alonzo entered Providence Hospital to deliver her baby. On July 31, 2014, Baby Calixto Iturralde, Jr. was born. Plaintiff never received notice from Providence about the Tuberculosis outbreak. Baby Calixto Iturralde, Jr. was tested on September 23, 2014 by X-ray, which was "inconclusive." Baby Calixto Iturralde, Jr. was tested yet again on October 20, 2014,

which was negative.   Plaintiffs feared they and their children had contracted Tuberculosis and fear their child will test positive in the future.

### Factual Allegations Related to Plaintiffs Rebecca Rincones and Edgar Jose Tremillo, Individually and As Next Friend of Minors Jose A. Tremillo and Katelyn Sere Diaz

100.Between July 15, 2014 and July 17, 2014, Mother Rebecca Rincones and Father

Edgar Jose Tremillo entered Providence Hospital to deliver their baby.  On July 15,

2014, Baby Jose Antonio Tremillo was born.  Plaintiff never received notice from

Providence about the Tuberculosis outbreak.  Baby Jose Antonio Tremillo was tested

at Providence Hospital by X-ray, which was negative.  Plaintiffs feared they and their

children had contracted Tuberculosis and fear they will test positive in the future.

### Factual Allegations Related to Plaintiffs Rosie Ehrle and Edward Ehrle, Individually and As Next Friend of Minors Kate Ehrle and Edward Ehrle, Jr.

101.Between February 21, 2014 and February 23, 2014, Mother Rosie Ehrle and Father

Edward Ehrle entered Providence Hospital to deliver their baby.  On February 21,

2014, Baby Kate Ehrle was born.  Plaintiff never received notice from Providence

about the Tuberculosis outbreak.  Baby Kate Ehrle was tested on October 21, 2014 by

skin test, which was negative.    Plaintiffs fear they or their children contracted

Tuberculosis and fear they will test positive in the future.

### Factual Allegations Related to Plaintiffs Audrey Blanchette and Nicholas Santibanez, Individually and As Next Friend of Minor Liam Blanchette-Santibanez

102.Between October 30, 2014 and November 1, 2014, Mother Audrey Blanchette and

Father Nicholas Santibanez entered Providence Hospital to deliver their baby.  On

October 30, 2014, Baby Liam Blanchette Santibanez was born.  Plaintiffs never

74

received notice about the Tuberculosis outbreak. Baby Liam Blanchette Santibanez was tested on November 20, 2014 by skin test, which was negative. Plaintiffs feared they and their child had contracted Tuberculosis and fear they will test positive in the future.

### Factual Allegations Related to Plaintiffs Brenda Gonzalez and Jose A. Rivera, Individually and As Next Friend of Minor Alexander Rivera

103. Between March 28, 2014 and March 30, 3014, Mother Brenda Gonzalez and Father Jose Alejandro Rivera entered Providence Hospital to deliver their baby. On March 28, 2014, Baby Alexander Rivera was born. Plaintiffs received a letter from City of El Paso Health Department dated September 18, 2014 about the outbreak. Baby Alexander Rivera was tested with the skin test and x-rays, both of which were negative. Plaintiffs feared they and their child had contracted Tuberculosis and fear they will test positive in the future.

### Factual Allegations Related to Plaintiffs Crystal Palacios and Jaime Palacios, Individually and As Next Friend of Minors Noah Palacios, Ezra Palacios, and Avery Davila

104. Between July 28, 2014 and July 31, 2014, Mother Crystal Palacios and Father Jaime Palacios, Jr. entered Providence Hospital to deliver their baby. Baby Noah Palacios was born July 28, 2014. Plaintiffs received a letter from the City of El Paso Health Department dated September 18, 2014 about the outbreak. Baby Noah Palacios was tested on September 29, 2014 by skin test, which was negative. Baby Noah Palacios was also tested on September 24, 2014 by chest x-ray, paid for by Plaintiffs, which

were negative. Plaintiffs feared they and their child had contracted Tuberculosis and fear they will test positive in the future.

### Factual Allegations Related to Plaintiffs Estefania Garciduenas and Raymundo Minor, Individually and As Next Friend of Minor Mila R. Minor

105. Between June 14, 2014 and June 17, 2014, Mother Estefania Garciduenas and Father Raymundo Minor entered Providence Hospital to deliver their baby. On June 15, 2014, Baby Mila Regina Minor was born. Plaintiffs never received notice of the Tuberculosis outbreak. Plaintiffs tried calling City of El Paso Health Department for a test, but was told Baby Mila Minor was "fine" since she was "not on the list." Baby Mila Minor has not yet been tested. Plaintiffs fear they have or their child has contracted Tuberculosis or fear they will test positive in the future.

### Factual Allegations Related to Plaintiffs Margie Magana and Ernesto Aguilar, Individually and As Next Friend of Minor Ernesto Aguilar, Jr.

106. Between July 3, 2014 and July 5, 2014, Mother Margie Magana and Father Ernesto Aguilar entered Providence Hospital to deliver their baby. On July 3, 2014, Baby Ernesto Aguilar, Jr. was born on July 3, 2014. Plaintiffs never received any notice of the Tuberculosis outbreak. Baby Ernesto Aguilar, Jr. has not yet been tested. Plaintiffs fear they have or their child has contracted Tuberculosis or fear they will test positive in the future.

### Factual Allegations Related to Plaintiffs Amanda Garcia and Oswaldo Castillo, Individually and As Next Friend of Minor Azaleah Castillo

107. Between January 16, 2014 and January 19, 2014, Mother Amanda Garcia and Father Oswaldo Castillo entered Providence Hospital to deliver their baby. On January 17,

2014, Baby Azaleah Castillo was born. Plaintiffs never received notice about the Tuberculosis outbreak. Plaintiffs called Providence Hospital who told them there was "nothing to worry about" since the Baby Azaleah Castillo was "not exposed to Tuberculosis." After demanding testing with the City of El Paso Health Department, Baby Azaleah Castillo was tested by X-ray, which were negative. Plaintiffs feared they or their child had contracted Tuberculosis and fear they will test positive in the future.

### Factual Allegations Related to Plaintiffs Ana Alvarado and Roberto Clemente, Individually and As Next Friend of Minors Victor Clemente, Adrian Clemente, Valerie Clemente, Karla Mendoza, and Dafne Mendoza

108. Between June 17, 2014 and June 19, 2014, Mother Ana Alvarado and Father Roberto Clemente entered Providence Hospital to deliver their baby. Baby Victor Clemente was born on June 17, 2014. Plaintiffs received a letter dated September 18, 2014, explaining about the Tuberculosis outbreak. On September 1, 2014, Baby Victor Clemente was tested by skin test. However, Plaintiffs were told to return in December to take another test by x-ray. On December 2, 2014, Baby Victor Clemente was tested again by X-ray, which was negative. An official of the City of El Paso Health Department told Plaintiff that Baby Victor Clemente should undergo treatment for Tuberculosis anyway, but Plaintiff denied such advice . Plaintiffs fear they have or their child has contracted Tuberculosis or fear they will test positive in the future.

### Factual Allegations Related to Plaintiffs Jennifer Alvarado and Martin Alvarado, Individually and As Next Friend of Minor Logan Alvarado

109. Between October 1, 2013 and October 3, 2014, Mother Jennifer Alvarado and Father Martin Alvarado entered Providence Hospital to deliver their baby.  On October 1, 2013, Baby Logan Alvarado was born.  Plaintiffs never received notice from Providence about the Tuberculosis outbreak.  Baby Logan Alvarado was tested at the City of El Paso Health Department by x-ray.  When results were supposed to be ready, the Department could not locate their results.  A few days later, the Department claims they found the results, which were negative. Baby Logan Alvarado was tested for Tuberculosis with his pediatrician, Dr. Kahn by skin test, which was negative. Plaintiffs fear they have or their child has contracted Tuberculosis or fear they will test positive in the future.

## VIII.
### LEGAL CAUSES OF ACTION

### First Cause of Action:  Negligent Transmission of Infectious Disease

110. Plaintiffs refer to the allegations contained in previous paragraphs of this complaint and incorporate them by reference into this Cause of Action, as though fully set forth herein.

111. Defendants, and each of them, as Texas licensed individuals, health facilities and entities, had a duty to use reasonable care in furnishing its patients, patients' visitors, staff persons, contractors, vendors and members of the general public appropriate care, attention and protection required.  Such duty in this instance requires a hospital to conduct medical examinations / screenings and to maintain appropriate employee records, etc., to ensure the health, safety and well-being of its patients, their family

78

members and visitors, Providence Memorial Hospital staff persons, contractors, vendors and members of the general public who could be affected by outbreaks of diseases, such as Tuberculosis.

112. It is also the duty of the hospital, such as Providence Memorial Hospital, to use reasonable care in selecting, training, overseeing and reviewing the competency of their administrative and medical staff to insure their wellbeing for the safety of other employees and patients.

113. The amount of caution, attention and protection in this instance required Defendants, and each of them to conduct medical examinations / screenings to enable proper diagnosis of employees in order to insure the safety and well-being of other employees and patients.

114. Defendant Providence Memorial Hospital breached its duty to Plaintiffs by negligently and carelessly failing to exercise that degree of care ordinarily possessed and exercised by other hospital administrators, physicians and health care providers engaged in said professions in the same locality as the defendants, and each of them, in that, among other things, defendants failed to properly administer, conduct medical examinations / screenings to enable proper screening of its employees during its annual health examination, to insure the safety and wellbeing of its patients.

115. As owners and operators of Providence Memorial Hospital and as the entities and individuals responsible for the proper provision of medical and health services in El Paso County, Texas, had a duty to Plaintiffs to properly oversee and take appropriate actions to insure that proper protocols and standards of practice and record keeping

would be adhered to and implemented and that, if persons were exposed to diseases such as Tuberculosis that proper actions would be taken to warn, test and monitor those persons who could have been exposed to said Tuberculosis.

116. Defendants breached their duty of care to Plaintiffs by failing to properly administrate, oversee, audit, supervise, investigate, evaluate, maintain appropriate employee medical records and/or take steps to notify and communicate the need to test, monitor and treat employees, and other similarly situated persons, who either were or might have been exposed to Tuberculosis originating from Providence Memorial Hospital between September 2013 and August 2014 up to the present and continuing timeframe, as a result of Defendants' refusal and/or failure to comply with their practices and protocols as licensed, Texas health care facilities and providers.

117. As a result of the said negligence of the defendants, and each of them, Plaintiffs were prevented from attending to their usual occupations, and Plaintiffs were informed and believed and thereon allege that they will thereby be prevented from attending to said usual occupation for a period in the future. The exact amount of earnings lost or to be lost by Plaintiffs are unknown at this time and Plaintiffs will thus ask leave to amend this pleading to set for the exact amounts thereof when ascertained or will offer proof thereof at the time of trial.

118. As a further legal result of the negligence of defendants, Plaintiffs suffered severe and continuing shock, horror, and physical and emotional distress and pain and suffering, and other general damages, in an amount in excess of the minimum jurisdictional limits of this Court.

119. Furthermore, said Plaintiffs have employed lawyers to protect and advance Plaintiff's legal rights to insure that they will be properly treated and compensated for the damages caused by Defendants.

120. The exact amount of such expense is unknown to Plaintiffs at this time, and plaintiffs will thus ask leave to amend this pleading to set forth the exact amount thereof when the same is ascertained, or will offer proof thereof at the time of trial.

121. Plaintiffs will also seek prejudgment interest on all items of damage including general and specials. These will include, but are not limited to, past and future medicals, any lost wages, any and all incidentals, and compensatory damages, as permitted by law.

122. Wherefore, Plaintiffs pray judgment against Defendants and each of them, as set forth hereinafter.

### Second Cause of Action: Medical Negligence—Health Care Liability Claim

123. Plaintiffs refer to the allegations contained in previous paragraphs of this complaint and incorporate them by reference into this Cause of Action, as though fully set forth herein.

124. Defendant Providence Hospital is a health-care provider as defined by the Tex. Civ. Prac. & Rem. Code section 74.001(a)(12)(A).

125. Defendant Providence Hospital departed from accepted standards of healthcare, as defined by Tex. Civ. Prac. & Rem. Code section 74.001(a)(10), when it negligently allowed its own employee to continue working despite exerting symptoms of illness

81

such as fatigue, constant coughing lasting for months, and a report of coughing up blood.

126. Defendant Providence Hospital also departed from accepted standards of patient safety when it negligently allowed its own employee to continue working in the Nursery and Labor and Delivery units, in patients' rooms, and common areas, despite exerting symptoms of illness such as fatigue, constant coughing lasting for months, and a report of coughing up blood.

127. Defendant Providence Hospital's departure from accepted standards proximately caused Plaintiffs' injuries.

128. Defendant Providence Hospital owed a duty of care to patients admitted for treatment.

129. Defendant Providence Hospital had a duty to not depart from accepted standards of safety to patients and third parties.

130. Defendant Providence Hospital breached its duty by not using reasonable care in formulating the policies and procedures that govern its medical staff and nonphysician personnel.

131. Defendant Providence Hospital further breached its duty by not keeping its premises in a reasonably safe condition.

132. Defendant Providence Hospital further breached its duty by not exercising reasonable care in supervising its staff.

133. Defendant's breach of said duties proximately caused the plaintiffs' injuries.

82

134. A person of ordinary intelligence should have anticipated the danger that resulted from Defendant's negligence.

### Third Cause of Action:  Negligence Per Se Against All Defendants

135. Plaintiffs refer to the allegations contained in previous paragraphs of this complaint and incorporate them by reference into this Cause of Action, as though fully set forth herein.

136. Plaintiffs are informed and believe and on such basis allege that during all times relevant to this lawsuit, in particular in the September 2013 up to the present and continuing timeframe, there were in force Texas state laws, regulations and protocols, required for licensed facilities such as Providence Hospital to operate under.

137. Defendants were possessed of appropriate information, medical skill, knowledge, resources and ability to be aware of these Texas state laws, regulations and protocols, required for licensed facilities such as Providence Memorial Hospital to operate under.

138. Nevertheless, despite their medical skill, knowledge, resources and ability to be aware of the Texas state laws, required for licensed facilities such as Providence Memorial Hospital to properly administer, conduct medical examinations / screenings to enable proper screening, diagnoses and monitoring of patients, and to maintain appropriate medical records in order to insure its staff and employees are healthy as to protect its patients from contracting an infectious disease such as Tuberculosis.

139. Furthermore, when Defendants did notify *some* of the Plaintiffs who were exposed to Tuberculosis stemming from Providence Memorial Hospital in the September 2013

up to the present and continuing timeframe, they advised said Plaintiffs that they did not need to be tested for Tuberculosis, again, a violation of Texas laws for licensed facilities.

140. Finally, even after the El Paso City Health Department investigated the matter, Defendants continued to violate Texas law by not taking steps to properly notify and truthfully communicate to all Plaintiffs that they should be tested or re-tested, monitored and treated for the exposure to Tuberculosis.

141. Defendants' continued violations of Texas laws for Defendants' licensed facility, constitutes Negligence Per Se, as a matter of law, with no excuse or justification for Defendants' actions or failure to properly act.

142. As a result of Defendants' Negligence Per Se, some Plaintiffs were required to and did employ physicians and other professionals to test, examine, treat, care and monitor Plaintiffs thereby incurring medical and incidental expenses.

143. As a further legal result of the said negligence of the Defendants, Plaintiffs were prevented from attending to their usual occupations, and Plaintiffs were informed and believe and thereon allege that they will thereby be prevented from attending to said usual occupation for a period in the future. The exact amount of earnings lost or to be lost by Plaintiffs are unknown at this time and plaintiffs will thus ask leave to amend this pleading to set for the exact amounts thereof when ascertained or will offer proof thereof at the time of trial.

144. Furthermore, said Plaintiffs have employed lawyers to protect and advance Plaintiff's legal rights to insure that they will be properly treated and compensated for the damages caused by Defendants.

145. As a further legal result of the said intentional acts of the Defendants, Plaintiffs have sustained severe and continuing shock, horror, and physical and emotional distress and pain and suffering, and other general damages, in an amount in excess of the minimum jurisdictional limits of the above entitled Court.

146. Plaintiffs will also seek prejudgment interest on all items of damage including general and specials.,   These will include, but are not limited to, past and future medicals, any lost wages, any and all incidentals, and compensatory damages, as permitted by law.

147. Wherefore, Plaintiffs pray judgment against Defendants and each of them, as set forth hereinafter.

**Fourth Cause of Action:  Negligence / Premises Liability Against All Defendants**

148. Plaintiffs refer to the allegations contained in previous paragraphs of this complaint and incorporate them by reference into this Cause of Action, as though fully set forth herein.

149. Plaintiffs are informed and believe and thereon allege that Defendant Providence Memorial Hospital is the legal owner, property manager, lessees, tenants or sub-tenants, and owned, managed, controlled, designed, constructed, maintained, equipped, supplied, cleaned, staffed, supervised or otherwise had responsibility for the condition of the premises located at 2001 N. Oregon Street, El Paso, Texas 79902.

150. From the date Infected Employee was hired up to the present and continuing timeframe, Plaintiffs were invitees and were present with permission of Defendants, and each of them, through Providence Memorial Hospital, at the above mentioned premises.

151. Defendants, by reason of their relationship to said premises, owed certain duties to said plaintiff and to others of the class of persons who might reasonably be expected to utilize those premises, which duties included, but are not limited to, a duty to maintain and/or provide premises that are in a reasonable and safe condition and/or keep said premises or maintain said premises in a reasonable and safe manner for the presence of persons in a class to which plaintiff belonged.

152. On or about the times mentioned herein, and/or prior thereto, defendants carelessly, negligently, recklessly or otherwise improperly maintained, supplied, repaired, cleaned, supervised, provided proper warning and safety signs, and/or carried out their relationship to said premises such that a Plaintiffs were exposed to Tuberculosis, which caused the premises to be in an unsafe and dangerous condition which caused Plaintiffs to be exposed to Tuberculosis from Providence Memorial Hospital patients, visiting family members and other visitors, staff, contractors, vendors, and other members of the general public who were exposed to said Tuberculosis stemming from Providence Memorial Hospital in the September 2013 up to the present and continuing timeframe.

153. At all times herein mentioned, and for some time prior thereto, Defendants, in the exercise of due care, had actual knowledge and/or should have had knowledge of said

86

dangerous and defective conditions of said premises, and negligently failed to take reasonable measures, or any measures to remedy this dangerous condition, by isolating persons exposed to Tuberculosis and having appropriate warning signs and implementing mandated protocols to insure that Plaintiffs would not be exposed to Tuberculosis at the Providence Memorial Hospital premises, and also negligently creating and failing to prevent and/or eliminate this dangerous condition from existing on the premises.

154. As a legal result of the said negligence of the defendants, and each of them, Plaintiffs were required to and did employ physicians and surgeons to examine, treat and care for said Plaintiffs, and did include medical and incidental expenses. The exact amount of such expenses are unknown to Plaintiffs at this time, and Plaintiffs will thus ask leave to amend this pleading to set forth the exact amount thereof wen the sane is ascertained, or will offer proof thereof at the time of trial.

155. As a further legal result of the said negligence of the defendants, and each of them, Plaintiffs were prevented from attending to their usual occupations, and Plaintiffs were informed and believe and thereon allege that they will thereby be prevented from attending to said usual occupation for a period of time in the future. The exact amount of earnings lost or to be lost by plaints are unknown at this time and Plaintiffs will thus ask leave to amend this pleading to set for the exact amounts thereof when ascertained or will offer proof thereof at the time of trial.

156. As a further legal result of the negligence of Defendants, Plaintiffs suffered severe and continuing shock, horror, and physical and emotional distress and pain and

87

suffering, and other general damages, in an amount in excess of the minimum jurisdictional limits of this Court.

157. Furthermore, said Plaintiffs have employed lawyers to protect and advance Plaintiff's legal rights to insure that they will be properly treated and compensated for the damages caused by Defendants.

158. Plaintiffs will also seek prejudgment interest on all items of damage including general and specials.   These will include, but are not limited to, past and future medicals, any lost wages, any and all incidentals, and compensatory damages, as permitted by law.

159. Wherefore, Plaintiffs pray judgment against Defendants, and each of them, as set forth herein.

## IX.
## Jury Trial Demand

Plaintiffs demand this case be decided by jury as allowed by Texas Rule of Civil Procedure 216.

## X.
## Request for Disclosure

Pursuant to Texas Rule of Civil Procedure 194, Defendant is requested to disclose the information and material described in Rule 194.2(a)-(k).

**Prayer**

Plaintiffs pray that they recover from Defendants, actual damages over $1,000,000.00, including but not limited to, past and future lost earnings, mental anguish and inconvenience, emotional pain and suffering, loss of enjoyment of life, bodily injury, pain and suffering, economic damages and benefits in the past and future, compensatory damages, punitive damages, reinstatement, prejudgment interest, post judgment interest, costs and such other and further relief to which he may show himself to be justly entitled, in law and in equity. The damages sought are within the jurisdictional limits of the court and because there are likely several thousand patient class members, damages will likely exceed $1,500,000,000.00.

SIGNED on this ___16___ day of September 2016.

Respectfully submitted,

**CHAVEZ LAW FIRM**
2101 North Stanton Street
El Paso, Texas 79902
(915) 351-7772
(915) 351-7773 facsimile

By: _____

**Enrique Chavez, Jr.**
State Bar No.: 24001873
Attorney for Plaintiff

89

El Paso County - 327th District Court

Filed 8/19/2016 10:50:18 PM
Norma L. Favela
District Clerk
El Paso County
2016DCV3176

1

2

3

4

5

6

7

8

9

10

11                    Audio Transcription for

12                        ENRIQUE CHAVEZ

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed on 12/13/14

25   By Caryn R. Miller, CSR

2

```
 1              MALE SPEAKER:  Even before it was
 2  confirmed, this person was off work.  But at that point,
 3  we could have done more.
 4              FEMALE SPEAKER:  Okay.
 5              MALE SPEAKER:  And that's why I said --
 6              (End of tape 1.)
 7              (Beginning of tape 2.)
 8              FEMALE SPEAKER:  Explain to me what -- do
 9  you have infection control in this hospital?
10              MALE SPEAKER:  Absolutely.
11              FEMALE SPEAKER:  Okay.  Who was in charge
12  of making the decision that she should continue working
13  when there were signs and symptoms of such a serious
14  illness?
15              MALE SPEAKER:  Yeah.  So I think -- so the
16  person they would work with would be the employee help
17  nurse.
18              FEMALE SPEAKER:  Okay.
19              MALE SPEAKER:  And I will tell you that
20  like I said before more should have been done at that
21  level.  There's no doubt.  At that point that person
22  made a decision -- upon talking to the employee about
23  those, made a decision that the answer the employee gave
24  was enough.  And it was not.  That's the -- the reality
25  of it is, unfortunately, no one else made that decision,
```

3

1  which is unfortunate.

2            Obviously it would have been great had that

3  been shared a little bit farther because, obviously, it

4  could have been different choices made.  We are

5  correcting that so that can never happen again.

6            FEMALE SPEAKER:  But it's happened.

7            MALE SPEAKER:  Hum?

8            FEMALE SPEAKER:  It's already happened.  I

9  mean, you know, I came here the other day.  I came here

10 on Monday.

11            MALE SPEAKER:  Okay.

12            FEMALE SPEAKER:  Initially I tried to call

13 211 because I received a certified letter.

14            MALE SPEAKER:  Sure.  Right.  Right, right.

15            FEMALE SPEAKER:  Okay?  I could not get an

16 appointment till like almost October 15 or 20th, which

17 was ridiculous.

18            MALE SPEAKER:  We now have you an earlier

19 one, though.  Right?  I think --

20            FEMALE SPEAKER:  Okay.  So then I went to

21 my pediatrician --

22            MALE SPEAKER:  Okay.

23            FEMALE SPEAKER:  -- Monday morning --

24            MALE SPEAKER:  Sure.  Who's your

25 pediatrician?

4

1              FEMALE SPEAKER:  Dr. Lozano.

2              MALE SPEAKER:  Oh, sure.  Lozano's great.

3              FEMALE SPEAKER:  Uh-huh.

4              MALE SPEAKER:  Yeah.

5              FEMALE SPEAKER:  Okay.  He gave me a

6  referral here.

7              MALE SPEAKER:  Okay.

8              FEMALE SPEAKER:  I went through the entire

9  outpatient, whatever you call it, downstairs.

10              MALE SPEAKER:  Yeah.

11              FEMALE SPEAKER:  They registered my son.

12              MALE SPEAKER:  Yep.

13              FEMALE SPEAKER:  They gave me a chest

14  x-ray.

15              MALE SPEAKER:  Yup.

16              FEMALE SPEAKER:  Dr. Lozano also sent me

17  here --

18              MALE SPEAKER:  Uh-huh.

19              FEMALE SPEAKER:  -- for a TB skin test.

20              MALE SPEAKER:  Uh-huh.

21              FEMALE SPEAKER:  I was given the runaround.

22  I was running all over the hospital with my son.

23              MALE SPEAKER:  Yeah, I heard it.  I'm

24  sorry.  It should have never happened.

25              FEMALE SPEAKER:  Okay.  I came here.

5

1              MALE SPEAKER:  Uh-huh.

2              FEMALE SPEAKER:  I spoke to the

3  receptionist.  She went and got two ladies from the

4  back.  I don't remember their name.

5              MALE SPEAKER:  Okay.

6              FEMALE SPEAKER:  They came out.  I asked

7  them to explain to me -- I showed them the letter from

8  the health department --

9              MALE SPEAKER:  Sure, yup.

10             FEMALE SPEAKER:  -- that says I could also

11  get that testing done here.  I came here with the

12  referral --

13             MALE SPEAKER:  Sure.

14             FEMALE SPEAKER:  -- from my pediatrician.

15             MALE SPEAKER:  Sure.

16             FEMALE SPEAKER:  I was turned away.  And

17  all that your administrators could say to me was that

18  they didn't know.

19             Explain that to me how there's no control

20  in your facility.

21             MALE SPEAKER:  Well, that's not -- that's

22  a -- this is a test, not an infectious disease, but I

23  understand what you're saying.

24             What I would say is this --

25             FEMALE SPEAKER:  No, explain to me why when

6

 1  I asked your administrator, "Read this letter, please.

 2  This is what I got.  It's indicating that I can get this

 3  done here.  Why can't anybody help me?  I've already had

 4  the chest x-ray."

 5              MALE SPEAKER:  Yeah.

 6              FEMALE SPEAKER:  And she said, "Where did

 7  you have the chest x-ray?"  And I said, "Just now

 8  downstairs in radiology."

 9              MALE SPEAKER:  Sure.

10              FEMALE SPEAKER:  I said, "So why can't I

11  get a skin TB test?  This is a hospital.  There's gotta

12  be one here.  Right?"

13              MALE SPEAKER:  Right.  I'll tell you -- let

14  me tell you why and the way the process is supposed to

15  work and I'm sorry if it wasn't clear in the letter.

16              The health department in order to make sure

17  that everything is clearly tracked, they have one

18  central place they're doing the screening.

19              FEMALE SPEAKER:  Uh-huh.

20              MALE SPEAKER:  So they've demanded that all

21  the initial screening be done at the health department.

22  That way they have their eyes on it, they can document

23  it.  There's lots of state stuff they want to make sure

24  they fill out.

25              The initial screening -- now, the x-ray can

 1  be done here and we went ahead and did that ahead of the

 2  screening because we're going to have to do that for

 3  every baby to be sure.

 4           FEMALE SPEAKER:  Uh-huh.

 5           MALE SPEAKER:  But the actual screening has

 6  to be done there.  Even if we're sending our staff

 7  there, we're putting everyone in one place so they can

 8  have better tracking.  That's exactly the reason.

 9           It is.  I mean you can call the health

10  department.  That's why they wanted to control the

11  process because what happens is you can imagine, Sierra

12  Providence, we've got 25 locations across the city.  We

13  want to make sure we have a central location where we

14  don't miss anyone.  And so from -- for as far as the

15  screening goes, that is completely controlled by the

16  health department.

17           FEMALE SPEAKER:  Uh-huh.  Okay.  So explain

18  to me why downstairs when I asked --

19           MALE SPEAKER:  Uh-huh.

20           FEMALE SPEAKER:  -- when I initially came

21  in and did paperwork --

22           MALE SPEAKER:  Yeah.

23           FEMALE SPEAKER:  -- I said, "Okay, I'm here

24  for this, this and this.  Here's my letter."

25           MALE SPEAKER:  Sure.

8

1               FEMALE SPEAKER:  I went through the whole
2  thing.
3               MALE SPEAKER:  Yeah.
4               FEMALE SPEAKER:  Okay?  And they said, "Oh,
5  yes, yes, yes."  You know, "We're going to take care of
6  it."
7               How come nobody from that point said, "You
8  know what, we're doing x-ray, but we're not doing this"?
9               MALE SPEAKER:  Sure.
10              FEMALE SPEAKER:  And how come radiologist
11  said, "Okay, go here and they're going to do it"?  And
12  then I go back upstairs and they say, "Go to the
13  auditorium."
14              MALE SPEAKER:  Sure.
15              FEMALE SPEAKER:  "Oh, no, we're only doing
16  it for employees."
17              MALE SPEAKER:  I know.  I heard you got the
18  runaround.
19              Here's what I would tell you.  On day one,
20  when we have 3,000 employees, I don't know that all of
21  them fully understood the process.  So shame on us.  We
22  have obviously been working to make sure that all of our
23  employees are up to speed on how it's supposed to work.
24              But definitely going through 211, getting a
25  schedule and getting the screen there has to happen and

9

1 that's the way they're controlling the process.  And so

2 I apologize that there was not great information there.

3 That surely should not have happened that way.

4          FEMALE SPEAKER:  And it's not that I

5 misunderstood the letter.  I didn't misunderstand

6 anything.  It clearly indicated your hospital and you

7 weren't prepared for this.  This shouldn't have happened

8 to begin with.

9          MALE SPEAKER:  We're doing the x-rays.

10 We're doing the x-rays for sure, but we -- we -- and

11 this is -- again, the letter may not be clear, is what

12 I'm saying.

13          The process of how this has to work is they

14 handle the initial screening because they --

15 they -- they are insistent on handling the initial

16 screening for every patient so we don't miss anyone,

17 which I think is a good plan.

18          FEMALE SPEAKER:  Uh-huh.

19          MALE SPEAKER:  So everything will be done

20 with the health department for the initial screening --

21          (End of tape 2.)

22          (Beginning of tape 3.)

23          MALE SPEAKER:  -- because you went to the

24 physician, got the order, you were able to get the chest

25 x-ray done first.  But the screening they're still

1  insisting on it being done down there.

2          FEMALE SPEAKER:  Well, these are the

3  results for my chest x-ray and they're negative, but

4  that provides zero relief to me because my son is two

5  months old.

6          MALE SPEAKER:  Uh-huh.

7          FEMALE SPEAKER:  I'm horrified --

8          MALE SPEAKER:  Sure.

9          FEMALE SPEAKER:  -- that you, as a

10 hospital -- and I'm personally going to hold you

11 responsible as the CEO of this hospital.  Now I have the

12 decision to make if I need to put my son on the

13 antibiotics to prevent this disease from ever attacking

14 him.

15          MALE SPEAKER:  Yeah.  And that's definitely

16 the recommendation.  So the recommendation is for

17 children under six months of age -- so this is the CDC

18 regulations or the CDC recommendations are that for

19 children under six months of age, if they think there's

20 any chance of it, they recommend the medication because

21 it's 100 percent curable.  So that is the

22 recommendation, absolutely.

23          FEMALE SPEAKER:  I understand that it's

24 curable, but I don't think you understand --

25          MALE SPEAKER:  If they even have it.  If

```
 1  they --
 2            FEMALE SPEAKER:  -- the emotional stress --
 3            MALE SPEAKER:  I -- no.
 4            FEMALE SPEAKER:  -- that this has caused me
 5  and my family and everybody else that's involved --
 6            MALE SPEAKER:  Right.
 7            FEMALE SPEAKER:  -- in this.
 8            MALE SPEAKER:  Absolutely.  All I can do is
 9  apologize for that.  I have a two- and four-year-old.  I
10  can only -- I can imagine because my children have been
11  sick.  My son started off in the NICU.  I -- I do know
12  how hard it is with family.
13            I'm leaving soon to go pick up a little boy
14  in China who's got some health problems that I'm working
15  through.  And this as I said in the -- as I said in the
16  press conference --
17            FEMALE SPEAKER:  Uh-huh.
18            MALE SPEAKER:  -- regardless -- regardless
19  of what the actual risk of conversion, any risk that we
20  could have prevented, I take full ownership of and we're
21  going to get it fixed.
22            FEMALE SPEAKER:  And I -- I would like to
23  know what day in July you became aware.
24            MALE SPEAKER:  I -- I did not know in July.
25            FEMALE SPEAKER:  Was it before my son was
```

12

1  born in this --

2              MALE SPEAKER:  I became aware when this

3  patient (inaudible).

4              FEMALE SPEAKER:  Okay.  But you're the CEO.

5              MALE SPEAKER:  Uh-huh.

6              FEMALE SPEAKER:  And I understand that you

7  have management in place are supposed to handle their

8  employees.

9              MALE SPEAKER:  Absolutely, yup.

10              FEMALE SPEAKER:  How is it that everybody

11  is so out of the loop?  How is it that you didn't know

12  and that management didn't handle this?  An infection

13  control nurse didn't take care of this?

14              MALE SPEAKER:  Sure.  Well, we screen -- we

15  screen obviously thousands and thousands of people.

16              FEMALE SPEAKER:  Uh-huh.

17              MALE SPEAKER:  So I'm not going to know

18  about every patient's condition nor should I for HIPAA

19  reasons.  What -- what -- what I can tell you is the

20  process we had in place obviously did not work in this

21  case and we have to fix it and we will fix it.

22              FEMALE SPEAKER:  And when you say that

23  there were some signs and symptoms, was it the annual,

24  you know, TB skin test that came back positive for this

25  employee or what was -- this employee was sick?

13

1          MALE SPEAKER:  I can't -- I can't talk

2  about specific employee things.  What I can say is this.

3  There are many, many workers and all over this city that

4  have positive TB skin tests and they're fine to work.

5  However, latent TB, when it's -- when you have latent

6  TB, you could have it for years, just like what

7  Mr. Resendes said yesterday, he's the head of the health

8  department, he has it.  Many, many people do.  What

9  activates it, we don't know.

10          FEMALE SPEAKER:  Uh-huh.

11          MALE SPEAKER:  And when that happens we

12  don't know.  And obviously what was -- what's in the

13  health report -- and we told this yesterday -- is, you

14  know, somebody who's had -- for example somebody's who's

15  had latent TB for 15 years and they get a cold, they've

16  had many colds along the way, they don't assume because

17  they have a cough they have TB.  It's not a natural

18  assumption.  Right?

19          So there were lots of checkpoints early on

20  that, again, weren't with us, were with other providers

21  that looking back, you know, could have been symptoms

22  and that's why they're -- they're taking this cautious

23  approach to say, "Gosh, if it could have been then,

24  we'll go back another three months."  That's kind of how

25  we got to this broad number.

14

1            But -- but I will tell you that there's no

2    doubt -- and, again, when I became aware of the

3    situation is when this patient went on leave.

4            FEMALE SPEAKER:  Uh-huh.

5            MALE SPEAKER:  Okay?  When this employee

6    went on leave.  Obviously then we immediately started

7    investigating, okay, what happened, what was in our

8    process, how did it work?  And that's when we discovered

9    what I told you in July.

10            FEMALE SPEAKER:  Okay.  Even if this

11   employee had cold-like, flu-like -- you know, was

12   feeling ill --

13            MALE SPEAKER:  Sure.

14            FEMALE SPEAKER:  -- why was she not sent

15   home?  Newborns are so sensitive.

16            MALE SPEAKER:  Well, keep in mind -- so

17   yes.  So couple things there.  When we say -- when we

18   say symptoms --

19            FEMALE SPEAKER:  Uh-huh.

20            MALE SPEAKER:  -- symptoms being -- we have

21   lots of people who have a cough, for example.  We have

22   lots of people who have different symptoms that aren't

23   necessarily contagious and aren't necessarily

24   inappropriate.

25            But I will tell you, too, in health care --

15

1  and this is a culture problem, this is -- same with

2  doctors.  A lot of people when they go through medical

3  school and nursing school, they -- they -- they have

4  this terrible culture of when you're a doctor or a

5  nurse, you press through because you gotta go care for

6  patients.

7        We have to change culturally how we think

8  about symptoms.  We really do.  And this is as much --

9  this is as much the employee responsibility because,

10  look, I can come to work today --

11        (End of tape 3.)

12        (Beginning of tape 4.)

13        MALE SPEAKER:  -- and if I do, I need to

14  report that.

15        There's a -- there's actually certainly

16  employee responsibilities in this, too.  Because I'll

17  tell you if we're only going to rely on the annual test,

18  that leaves a lot up to chance.  And so it's got to be

19  the physicians in the community, it's got to be the

20  employee, it's got to be us.

21        And part of our action plan is thinking

22  robustly around how do we educate in a way where

23  regardless of what happens between those 12 months, that

24  everyone's hypervigilant on it.  And I'll tell you this

25  is exactly how it's happened in other cities.  This is

16

1  exactly how it happened here.

2              I -- I could never have imagined this

3  happening in my facility, but it did and we're going to

4  do everything we can to make it right and we're going to

5  fix it going forward.

6              That's all I can tell you.  That's all --

7  it's the best I can do.

8              My -- listen, my heart goes out to you.  I

9  can only imagine how scary it is.  I have two little

10 kids myself.  Trust me, my two- and four-year-old are my

11 life and I -- I -- I do -- I sincerely apologize for the

12 angst.

13             FEMALE SPEAKER:  Let me ask you, sir.

14             MALE SPEAKER:  Yes.

15             FEMALE SPEAKER:  If it would have been your

16 newborn son --

17             MALE SPEAKER:  Uh-huh.

18             FEMALE SPEAKER:  -- or newborn daughter --

19             MALE SPEAKER:  Yup.

20             FEMALE SPEAKER:  -- would it have been

21 acceptable to you to wait two, three, four weeks or not

22 even get a phone call and be fearing for your baby's

23 safety?  Would that be acceptable to you?

24             MALE SPEAKER:  Absolutely not.  You

25 waited -- oh, I see what you're saying took from the

17

1  time of figuring this out --

2            FEMALE SPEAKER:  Not -- not just from the

3  time of figuring this out.  I called and I said, "I -- I

4  received this letter."

5            MALE SPEAKER:  Right.

6            FEMALE SPEAKER:  "I want my son seen right

7  away."  Because it says, "Please call and be seen right

8  away."

9            MALE SPEAKER:  Right.

10            FEMALE SPEAKER:  And two, three weeks out

11  was not acceptable.  When I came here with doctor's

12  orders, that was not acceptable the way I was treated,

13  the way it was handled.  I even went back to my

14  pediatrician.

15            MALE SPEAKER:  Uh-huh.

16            FEMALE SPEAKER:  I let him know --

17            MALE SPEAKER:  Uh-huh.

18            FEMALE SPEAKER:  -- what happened here.

19            MALE SPEAKER:  Sure.

20            FEMALE SPEAKER:  He was very

21  disappointed --

22            MALE SPEAKER:  Yeah.

23            FEMALE SPEAKER:  -- in the way you handled

24  things --

25            MALE SPEAKER:  Sure.

1          FEMALE SPEAKER:  -- and then suddenly the

2  health department calls me and suddenly they have an

3  appointment for me the very next day.  Explain that to

4  me, sir.  This is not organized.

5          MALE SPEAKER:  I'll tell you what.  Well,

6  let me just say this.  The health department --

7  obviously, this is a big screening.  The health

8  department on day one, we -- we trained our nurses to

9  make sure we knew exactly what the screening would do.

10 On day two, they -- they started off to see 40 patients.

11 They quickly realized they could see more.  On day

12 three, they saw 80.  They now believe they can see 120 a

13 day.  So being -- being -- making sure that they had the

14 right numbers -- they really thought initially they were

15 going to be 40 a day, which at that pace, as you can

16 imagine, with 700 people, that's way too long.

17          FEMALE SPEAKER:  Uh-huh.

18          MALE SPEAKER:  They now plan to get

19 everyone done in three weeks.

20          FEMALE SPEAKER:  Even three weeks seems too

21 long.  Even a day seems too long.

22          MALE SPEAKER:  Understood, for the worry.

23          FEMALE SPEAKER:  Consumed with worry.

24          MALE SPEAKER:  Understood.  When -- when --

25 do you -- are you in -- you said you're in tomorrow.

1              FEMALE SPEAKER:  I've already been.

2              MALE SPEAKER:  Okay, good.

3              FEMALE SPEAKER:  But why did it take me

4  coming here, me making a scene here with your

5  administrator for her to reach out to the health

6  department and how is it that suddenly there's an

7  appointment available for me when a few days before,

8  there wasn't.

9              And I don't want to hear that you doubled

10  up on the patients.  I don't want to hear that.

11              MALE SPEAKER:  Yeah, no.  I don't know why

12  the health department initially gave those answers.

13  We -- again, I don't run the health department.

14              FEMALE SPEAKER:  Uh-huh.

15              MALE SPEAKER:  What I will tell you is the

16  health department was insistent that they see the

17  patient first, which I think I understand why, because

18  they want to make sure we don't miss anyone.

19              The one thing that I can tell you about TB

20  that I've learned over the past few weeks -- and trust

21  me I -- I've -- I've done more reading on this than I've

22  ever could imagine -- is that it is extremely, extremely

23  slow moving and -- and -- and the reality of it is --

24  and he said this last night, whether you're in that

25  first week or that third week or that fifth week, the

1  outcome will not change.

2          Nonetheless, what is -- what is terrible in

3  that is the angst.  And that's why we have been pushing

4  to say, "Okay, gosh, can we increase capacity?  Can we

5  somehow hire more staffing?  Can we go extra hours?"

6          And that's why I'm excited that they got it

7  down to three weeks because they initially said six.

8  And obviously I can only imagine with their parents

9  sitting around for weeks to get a test result.  So --

10          FEMALE SPEAKER:  And -- and -- and I don't

11  understand why the health department indicated, your

12  hospital indicated the pediatricians.  When I went to my

13  pediatrician --

14          MALE SPEAKER:  Uh-huh.

15          FEMALE SPEAKER:  -- he didn't have a skin

16  TB test on hand because he hadn't had to deal with this.

17  So before they're going to indicate them, shouldn't

18  everybody pull together and make sure everybody has the

19  proper supplies to handle this issue?

20          MALE SPEAKER:  When you say "indicate the

21  pediatrician" --

22          FEMALE SPEAKER:  On the certified letter --

23          MALE SPEAKER:  Okay.

24          FEMALE SPEAKER:  Okay? -- it says "Dear

25  parent," it goes into the explanation that we were

21

1  accidentally exposed.

2              MALE SPEAKER:  Uh-huh.

3              FEMALE SPEAKER:  It says these testings

4  will be performed at -- you can either go call 211 --

5              MALE SPEAKER:  Uh-huh.

6              FEMALE SPEAKER:  -- Providence Memorial

7  Hospital or your local pediatrician.

8              MALE SPEAKER:  Okay.

9              FEMALE SPEAKER:  Okay?  And they can

10 perform these exams for you.

11             MALE SPEAKER:  Uh-huh.

12             FEMALE SPEAKER:  So when I arrived at my

13 pediatrician's office and I'm showing him the letter and

14 he's sitting there and he's reading it, he didn't have a

15 skin TB test in his office.

16             MALE SPEAKER:  Sure.  Are you sure it said

17 pediatrician's office?

18             FEMALE SPEAKER:  Yes, I am.  And I will be

19 happy to send you a copy.

20             MALE SPEAKER:  Oh, I've got a copy.

21 Because we were very careful to say -- because

22 pediatricians -- even -- even pediatricians who know of

23 a TB, they send it to the health department because most

24 pediatricians will never do that test.  So in general I

25 will tell you most pediatricians, if you go to their

1  office, they don't do that.  They -- if they think

2  you've been exposed, they're going to send you to the

3  health department, too.

4          FEMALE SPEAKER:  Uh-huh.

5          MALE SPEAKER:  So that -- that obviously

6  was a miscommunication.

7          FEMALE SPEAKER:  It -- it clearly says --

8  and I'll be happy to e-mail you the letter that I have.

9          MALE SPEAKER:  Okay.  I think -- what I

10  will tell you this is what needs to be the clear

11  communication and what we have to make sure we do a good

12  job of is the clear thing we have to do is the first

13  call is to 211.

14          FEMALE SPEAKER:  Uh-huh.  Okay.  Well, 211,

15  no.

16          MALE SPEAKER:  There's now a second number,

17  I know.  They --

18          FEMALE SPEAKER:  It's 211, as well.  It's

19  211.  It leads back.

20          MALE SPEAKER:  Well, it is, but it -- but

21  it gives you directly to -- sometimes you push 11 and

22  you go through the questions.  The second line's

23  supposed to be more direct.

24          FEMALE SPEAKER:  I didn't have a problem

25  with the automated system with the prompts, no.  I had a

1   problem with the scheduling.

2              MALE SPEAKER:  Okay.

3              FEMALE SPEAKER:  Even having to wait a day

4   is too long.

5              MALE SPEAKER:  Sure, sure.

6              FEMALE SPEAKER:  And I understand that you

7   don't run the health department.  And it doesn't seem

8   like you have control over this hospital, either.  And I

9   feel bad saying that to you but, you know, that's how it

10  seems.

11             MALE SPEAKER:  But what I can say is this.

12  We had a process that in this case failed that we are

13  working to fix quickly.  As soon as we knew that

14  employee had tuberculosis, obviously, we -- even before

15  they were officially diagnosed, they were out of work.

16             There was an opportunity in July to have

17  done more.  The rest of that period is the period when

18  you think about that year you're looking at, there's 45

19  days we could have and should have done more.  There is

20  nine -- 10 and a half months where we have to figure out

21  as a community and as a profession how do we deal with

22  situations where no -- someone's not clearly diagnosed,

23  they're not sure what's going on, nobody connects the

24  dots, there's no communication about something being

25  wrong with the patient.  Those are really tricky and --

24

1  and I -- what we're thinking about as an organization is

2  not just saying "yes, we got to fix the process and

3  obviously, there was a poor decision made by an

4  individual."  But more than an individual, it's about

5  the process.

6           I -- being -- my background was an

7  engineer.  I was an industrial engineer for General

8  Motors for a number of years.  Almost every time

9  something fails, it's not about necessarily the person,

10 it's about a process problem.  Right?  So if you have

11 a -- if you have a fail-proof process, regardless of who

12 the person is, it should work.  And that's what we have

13 to design in this case.

14           The harder part is that first nine and a

15 half, 10 months.  Because in those cases there is no

16 clear checkpoint and the question becomes how do we make

17 sure the physician and the employee are more

18 hypervigilant on thinking through those symptoms so...

19           FEMALE SPEAKER:  And I heard in your press

20 conference that you're continuing to add babies because

21 of a clerical billing code error.  Please explain that

22 to me.

23           MALE SPEAKER:  Yeah.  So that was a bad

24 wording --

25           FEMALE SPEAKER:  How many errors can -- can

25

1  one hospital make?

2              MALE SPEAKER:  That was a bad wording.

3              That was a bad wording.

4              It's not necessarily an error.  What I

5  would say is this.  So the way the -- the way the CDC

6  experts -- look, we talk to them about okay, here's a

7  situation.  Who -- who should we be testing?  And they

8  said any baby born on the day that that person was

9  working.  So we (inaudible).

10             FEMALE SPEAKER:  But that leaves out a lot

11  of babies.  You guys did a time frame, the employee's

12  shift time frame.  I've seen the calendar that's printed

13  out with highlighted days.

14             MALE SPEAKER:  Sure.

15             FEMALE SPEAKER:  That doesn't seem error

16  proof.

17             MALE SPEAKER:  Well, again, we go -- we're

18  going on -- we have -- we have epidemiologists, we have

19  physicians, we have CDC involved.  They look at what the

20  patient worked and they make recommendations on which

21  patients they feel have a risk.  Okay?

22             FEMALE SPEAKER:  Uh-huh.

23             MALE SPEAKER:  What they said is we want

24  you to pull every single baby that was born on a shift

25  where that worker was working.  Which we did.  That was

26

1  the initial number you saw, the 706.

2             What we realized through the process was

3  there is a portion of babies that do phototherapy in the

4  nursery.  Now, most of them do phototherapy in the NICU.

5  Those babies were not affected at all.  For the ones

6  that do phototherapy in the nursery, while they're there

7  a shorter period of time, we felt it was great to add

8  them.

9             What I -- what I will tell you is this.  If

10 I find something else where I think there's another

11 place that it could have been, I'm going to add them.

12 And so the easy thing to do would be not to add them

13 because people are getting anxious.  The right answer

14 for me is if we find anything, we're going to go to the

15 route of adding.

16            So I know it -- I know there's questions

17 about it.  I will tell you if tomorrow we find it out

18 about one more child, absolutely we will add them and

19 check.  It's always safer to check because what we know

20 about kids, if you check them and you treat them, they

21 will not have it.  And we have to make sure we don't

22 miss a chance.

23            FEMALE SPEAKER:  Why not call everybody

24 within that time frame that had a baby born here?

25 Because it's causing public panic.

1              MALE SPEAKER:  Because there's -- there's a

2    certain group that -- that's not a risk and so --

3              FEMALE SPEAKER:  Are you sure about that?

4              MALE SPEAKER:  That's what the ex- --

5              FEMALE SPEAKER:  You're positive.

6              MALE SPEAKER:  So what I do is I rely on

7    physicians and the experts who deal with this every day.

8              FEMALE SPEAKER:  Uh-huh.

9              MALE SPEAKER:  It's not my call.  I mean

10   obviously we have people that are trained as

11   epidemiologists across this country.  They deal with

12   this.  They've dealt with it in Philly, they dealt with

13   it in LA, they dealt with it in Vegas.  They're dealing

14   with it here and they're giving their evidence-based

15   guidelines.  That's what we have to follow.

16             FEMALE SPEAKER:  Are you ever going to

17   release the day in July that you became aware that the

18   employee had a possible --

19             MALE SPEAKER:  Absolutely.  It was July

20   2nd.  Absolutely.  It'll be in the -- it'll be in the

21   plan.

22             FEMALE SPEAKER:  So you allowed me --

23             MALE SPEAKER:  That's when they had the

24   possible screening.

25             FEMALE SPEAKER:  You allowed me to come

1 into your hospital and deliver my baby here knowing that

2 there was a potential that this employee -- there was a

3 possibility that they could have been sick.

4            MALE SPEAKER:  So as I said before, there

5 was someone in our organization that knew that made a

6 decision.  I did not know.  I wish --

7            FEMALE SPEAKER:  But you're CEO of this

8 hospital.

9            MALE SPEAKER:  Uh-huh, yup.

10           FEMALE SPEAKER:  Is it not your overall

11 responsibility to control all management?

12           MALE SPEAKER:  Our key -- my -- my

13 responsibility is to make sure we have safe processes in

14 place and that execute upon them.  There's no doubt

15 about it.  In this case it wasn't good execution.

16           I can tell you right now we're treating

17 people down in the ED that people have to make clinical

18 decisions every day.  My physicians are, the nurses are.

19 I can't possibly know every one.  What we have to make

20 sure is we have processes in place that allow them to

21 make the right decisions.

22           We're looking at this case because it

23 didn't work and we're trying to figure out why it didn't

24 work.  And I can tell you we're hypervigilant on getting

25 it fixed.  That's all I can tell you and I'm sorry that

29

1  it happened and I can absolutely promise you that we're
2  dedicated to fixing this.
3              FEMALE SPEAKER:  Sorry doesn't make this
4  better for me.
5              MALE SPEAKER:  I understand that.
6              FEMALE SPEAKER:  You -- somebody in your
7  hospital knew and I was still came in here and delivered
8  my baby.
9              MALE SPEAKER:  Certainly, they didn't know
10 this patient had TB.  They made an assumption that was a
11 wrong assumption.  That's what I can tell you.
12             FEMALE SPEAKER:  And who -- who are you
13 holding responsible in your hospital?
14             MALE SPEAKER:  Oh, trust me, the people
15 that were involved in this, absolutely.  Anybody that
16 was involved in this process.  But what I would tell you
17 is that -- number one, the employee certainly didn't
18 know.  So this employee, I can tell you, it's not --
19 they certainly didn't know they had it.  The health
20 nurse certainly didn't think they had it.  But they made
21 an assumption when they could have had a chance to find
22 it and where they should have found it.  Neither one of
23 these people thought they had it.
24             I want to be very clear on this.  It's not
25 as if someone in this hospital said -- (inaudible.)

30

1              -- they probably have TB, but we --

2              FEMALE SPEAKER:  But guess what, look what

3 happened.  Look what it caused.

4              MALE SPEAKER:  I understand.

5              FEMALE SPEAKER:  Look how many people came

6 in on July 2nd and after --

7              MALE SPEAKER:  I understand.

8              FEMALE SPEAKER:  -- blind to the situation

9 in your hospital that you had no knowledge of.

10             MALE SPEAKER:  And we have to make it right

11 and we have to fix it.

12             FEMALE SPEAKER:  How are you going to make

13 this right?

14             MALE SPEAKER:  We're going to offer

15 (inaudible) and we're going to offer treatment and make

16 sure that the babies --

17             FEMALE SPEAKER:  That doesn't make it

18 right.  And I was very appalled on the press conference

19 when you said -- you know, thanked Providence for their

20 gratitude.  What exactly should we thank you for?

21             MALE SPEAKER:  (Inaudible.)  What I would

22 say is that (inaudible) say that we are covering the

23 costs through our generosity and that was a bad --

24             FEMALE SPEAKER:  Yeah, but he thanked you.

25 What exactly should we thank you for?  For, you know,

1  public panic?  For exposing our babies to TB?

2              MALE SPEAKER:  I completely agree with you

3  on that.  Again those are not my words.  You have to

4  realize people are -- when they're public speaking, he

5  used the wrong choice of words.  I didn't say it.

6              What I did say is we have absolutely every

7  reason to make sure we step up and do everything we can

8  to make this right.  I understand.  I (inaudible).  I

9  can't fix that part of it.  But here's what I know.

10 There was a (inaudible) that we have to fix to make sure

11 it never happens again.  And anything that I can do for

12 what happened, we're going to do.

13             FEMALE SPEAKER:  Well, what else are you

14 going to do to all the families that you caused an

15 extreme amount of stress to?  Sorry doesn't make it

16 better.  Putting a better plan together so you don't

17 lose your Medicare and Medicaid funding doesn't make it

18 better, sir.

19             MALE SPEAKER:  It certainly makes it better

20 to (inaudible) absolutely.  And I will tell you,

21 obviously as you know, we've delivered thousands and

22 thousands of babies here.  This is an example of a

23 process that didn't work this time that we have to fix.

24 Have to fix it.

25             And as much as I'd like to say everywhere

1  is perfect, it's not and when we make a mistake, it's

2  not about -- we have to make sure how we fix it.  We

3  have to make sure how we fix it and we have to make sure

4  that we do everything we can to make sure that these

5  children are taken care of as best as we can.  That's

6  all I can do at this point and (inaudible).

7            FEMALE SPEAKER:  And how do you expect me,

8  as a mother, to come and make the decision on whether or

9  not I should place my two-month infant son on

10 antibiotics?  And I don't buy that it doesn't have side

11 effects.  I know it has side effects.  I've researched

12 it.

13           MALE SPEAKER:  Every medicine, including

14 Tylenol -- every medicine has some --

15           FEMALE SPEAKER:  It doesn't seem okay that

16 this happened and now I have to make the decision on

17 should I place my son on this.  What do I do?  Do I --

18 do I risk it?  What are the side effects?

19           He's little.  I came into your facility and

20 I had a happy, healthy baby boy.  And now I'm consumed

21 with worry, with fear and with hard choices to make in

22 regards to his health.

23           MALE SPEAKER:  I agree.  I agree.

24           FEMALE SPEAKER:  Sorry doesn't fix it.  I

25 want you to know that I'm going to hold this hospital

33

1  and you personally responsible.  This is not the end

2  just because I have a negative chest x-ray.  This is not

3  the end for me.

4              MALE SPEAKER:  Okay.  I'm very sorry.

5              (End of tape 4.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                              34
 1                      CERTIFICATE

 2  State of Texas     )
                       )
 3  County of El Paso  )

 4            I, Caryn Miller, a Certified Shorthand

 5  Reporter, in and for the State of Texas, do hereby

 6  certify that this transcript is a true record of the

 7  stenographic notes taken by me of the audio file

 8  provided to me, and that said transcription is done to

 9  the best of my ability.

10

11

12

13            Given under my hand and seal of office on

14  this 14th day of December, 2014.

15

16

17

18

19

20

21

22
            _____
23          Caryn Miller, CSR, Texas #9276
            Expiration Date:  12/31/15
24          Firm Registration #734
            420 E. San Antonio, 2nd Floor
25          El Paso, Texas  79901
            (915) 533-1199
```

Audio Transcription   12-15-2014      Page 1 of 10

---

| 1 |
| --- |

**1** 2:6

**10** 23:20 24:15

**100** 10:21

**11** 22:21

**12** 15:23

**12/13/14** 1:24

**12/31/15** 34:23

**120** 18:12

**14th** 34:14

**15** 3:16 13:15

---

| 2 |
| --- |

**2** 2:7 9:21

**2014** 34:14

**20th** 3:16

**211** 3:13 8:24 21:4
   22:13,14,18,19

**25** 7:12

**2nd** 27:20 30:6 34:24

---

| 3 |
| --- |

**3** 9:22 15:11

**3,000** 8:20

---

| 4 |
| --- |

**4** 15:12 33:5

**40** 18:10,15

**420** 34:24

**45** 23:18

---

| 5 |
| --- |

**533-1199** 34:25

---

| 7 |
| --- |

**700** 18:16

**706** 26:1

**734** 34:24

**79901** 34:25

---

| 8 |
| --- |

**80** 18:12

---

| 9 |
| --- |

**915** 34:25

**9276** 34:23

---

| A |
| --- |

**ability** 34:9

**able** 9:24

**absolutely** 2:10
   10:22 11:8 12:9
   16:24 26:18
   27:19,20 29:1,15
   31:6,20

**acceptable** 16:21,23
   17:11,12

**accidentally** 21:1

**across** 7:12 27:11

**action** 15:21

**activates** 13:9

**actual** 7:5 11:19

**actually** 15:15

**add** 24:20
   26:7,11,12,18

**adding** 26:15

**administrator** 6:1
   19:5

**administrators** 5:17

**affected** 26:5

**age** 10:17,19

**ahead** 7:1

**allow** 28:20

**allowed** 27:22,25

**already** 3:8 6:3 19:1

**am** 21:18

**amount** 31:15

**angst** 16:12 20:3

**annual** 12:23 15:17

**answer** 2:23 26:13

**answers** 19:12

**antibiotics** 10:13
   32:10

**Antonio** 34:24

**anxious** 26:13

**anybody** 6:3 29:15

**anyone** 7:14 9:16
   19:18

**anything** 9:6 26:14
   31:11

**apologize** 9:2 11:9
   16:11

**appalled** 30:18

**appointment** 3:16
   18:3 19:7

**approach** 13:23

**aren't** 14:22,23

**arrived** 21:12

**assume** 13:16

**assumption** 13:18
   29:10,11,21

**attacking** 10:13

**audio** 1:11 34:7

**auditorium** 8:13

**automated** 22:25

**available** 19:7

**aware** 11:23 12:2
   14:2 27:17

**away** 5:16 17:7,8

---

| B |
| --- |

**babies** 24:20 25:11
   26:3,5 30:16
   31:1,22

**baby** 7:3 25:8,24
   26:24 28:1 29:8
   32:20

Audio Transcription  12-15-2014   Page 2 of 10

**baby's** 16:22

**background** 24:6

**bad** 23:9 24:23
25:2,3 30:23

**became** 11:23 12:2
14:2 27:17

**becomes** 24:16

**begin** 9:8

**Beginning** 2:7 9:22
15:12

**believe** 18:12

**best** 16:7 32:5 34:9

**better** 7:8 29:4
31:16,18,19

**billing** 24:21

**bit** 3:3

**blind** 30:8

**born** 12:1 25:8,24
26:24

**boy** 11:13 32:20

**broad** 13:25

**buy** 32:10

————————
C
————————
**calendar** 25:12

**capacity** 20:4

**care** 8:5 12:13 14:25
15:5 32:5

**careful** 21:21

**Caryn** 1:25 34:4,23

**case** 12:21 23:12
24:13 28:15,22

**cases** 24:15

**caused** 11:4 30:3
31:14

**causing** 26:25

**cautious** 13:22

**CDC** 10:17,18 25:5,19

**central** 6:18 7:13

**CEO** 10:11 12:4 28:7

**certain** 27:2

**certainly** 15:15
29:9,17,19,20 31:19

**CERTIFICATE** 34:1

**certified** 3:13 20:22
34:4

**certify** 34:6

**chance** 10:20 15:18
26:22 29:21

**change** 15:7 20:1

**charge** 2:11

**CHAVEZ** 1:12

**check** 26:19,20

**checkpoint** 24:16

**checkpoints** 13:19

**chest** 4:13 6:4,7
9:24 10:3 33:2

**child** 26:18

**children** 10:17,19
11:10 32:5

**China** 11:14

**choice** 31:5

**choices** 3:4 32:21

**cities** 15:25

**city** 7:12 13:3

**clear** 6:15 9:11
22:10,12 24:16
29:24

**clearly** 6:17 9:6
22:7 23:22

**clerical** 24:21

**clinical** 28:17

**code** 24:21

**cold** 13:15

**cold-like** 14:11

**colds** 13:16

**coming** 19:4

**communication** 22:11
23:24

**community** 15:19
23:21

**completely** 7:15 31:2

**condition** 12:18

**conference** 11:16
24:20 30:18

**confirmed** 2:2

**connects** 23:23

**consumed** 18:23 32:20

**contagious** 14:23

**continue** 2:12

**continuing** 24:20

**control** 2:9 5:19
7:10 12:13 23:8
28:11

**controlled** 7:15

**controlling** 9:1

**conversion** 11:19

**copy** 21:19,20

**correcting** 3:5

**costs** 30:23

**cough** 13:17 14:21

**country** 27:11

**County** 34:3

**couple** 14:17

**covering** 30:22

**CSR** 1:25 34:23

**culturally** 15:7

**culture** 15:1,4

**curable** 10:21,24

————————
D
————————
**Date** 34:23

**daughter** 16:18

**day** 3:9 8:19 11:23

18:3,8,10,11,13,15,
21 23:3 25:8
27:7,17 28:18 34:14

**days** 19:7 23:19
25:13

**deal** 20:16 23:21
27:7,11

**dealing** 27:13

**dealt** 27:12,13

**Dear** 20:24

**December** 34:14

**decision**
2:12,22,23,25 10:12
24:3 28:6 32:8,16

**decisions** 28:18,21

**dedicated** 29:2

**definitely** 8:24
10:15

**deliver** 28:1

**delivered** 29:7 31:21

**demanded** 6:20

**department** 5:8
6:16,21 7:10,16
9:20 13:8 18:2,6,8
19:6,12,13,16 20:11
21:23 22:3 23:7

**design** 24:13

**diagnosed** 23:15,22

**different** 3:4 14:22

**direct** 22:23

**directly** 22:21

**disappointed** 17:21

**discovered** 14:8

**disease** 5:22 10:13

**doctor** 15:4

**doctors** 15:2

**doctor's** 17:11

**document** 6:22

**done** 2:3,20 5:11

6:3,21 7:1,6
9:19,25 10:1 18:19
19:21 23:17,19 34:8

**dots** 23:24

**doubled** 19:9

**doubt** 2:21 14:2
28:14

**downstairs** 4:9 6:8
7:18

**Dr** 4:1,16

---
**E**

**earlier** 3:18

**early** 13:19

**easy** 26:12

**ED** 28:17

**educate** 15:22

**effects** 32:11,18

**either** 21:4 23:8

**El** 34:3,25

**else** 2:25 11:5 26:10
31:13

**e-mail** 22:8

**emotional** 11:2

**employee** 2:16,22,23
12:25 13:2 14:5,11
15:9,16,20 23:14
24:17 27:18 28:2
29:17,18

**employees** 8:16,20,23
12:8

**employee's** 25:11

**engineer** 24:7

**ENRIQUE** 1:12

**entire** 4:8

**epidemiologists**
25:18 27:11

**error** 24:21 25:4,15

**errors** 24:25

**everybody** 11:5 12:10
20:18 26:23

**everyone** 7:7 18:19

**everyone's** 15:24

**everything** 6:17 9:19
16:4 31:7 32:4

**everywhere** 31:25

**evidence-based** 27:14

**ex** 27:4

**exactly** 7:8 15:25
16:1 18:9 30:20,25

**example** 13:14 14:21
31:22

**exams** 21:10

**excited** 20:6

**execute** 28:14

**execution** 28:15

**expect** 32:7

**experts** 25:6 27:7

**Expiration** 34:23

**explain** 2:8
5:7,19,25 7:17 18:3
24:21

**explanation** 20:25

**exposed** 21:1 22:2

**exposing** 31:1

**extra** 20:5

**extreme** 31:15

**extremely** 19:22

**eyes** 6:22

---
**F**

**facility** 5:20 16:3
32:19

**failed** 23:12

**fail-proof** 24:11

**fails** 24:9

**families** 31:14

family 11:5,12

farther 3:3

fear 32:21

fearing 16:22

feel 23:9 25:21

feeling 14:12

felt 26:7

FEMALE 2:4,8,11,18
  3:6,8,12,15,20,23
  4:1,3,5,8,11,13,16,
  19,21,25
  5:2,6,10,14,16,25
  6:6,10,19
  7:4,17,20,23
  8:1,4,10,15 9:4,18
  10:2,7,9,23
  11:2,4,7,17,22,25
  12:4,6,10,16,22
  13:10 14:4,10,14,19
  16:13,15,18,20
  17:2,6,10,16,18,20,
  23 18:1,17,20,23
  19:1,3,14
  20:10,15,22,24
  21:3,6,9,12,18
  22:4,7,14,18,24
  23:3,6 24:19,25
  25:10,15,22 26:23
  27:3,5,8,16,22,25
  28:7,10 29:3,6,12
  30:2,5,8,12,17,24
  31:13 32:7,15,24

fifth 19:25

figure 23:20 28:23

figuring 17:1,3

file 34:7

fill 6:24

fine 13:4

Firm 34:24

first 9:25 19:17,25
  22:12 24:14

fix 12:21 16:5 23:13
  24:2 30:11

31:9,10,23,24
  32:2,3,24

fixed 11:21 28:25

fixing 29:2

Floor 34:24

flu-like 14:11

forward 16:5

four-year-old 11:9
  16:10

frame 25:11,12 26:24

full 11:20

fully 8:21

funding 31:17

_____
          G
_____

general 21:24 24:7

generosity 30:23

getting 8:24,25
  26:13 28:24

given 4:21 34:13

gives 22:21

giving 27:14

gosh 13:23 20:4

gotta 6:11 15:5

gratitude 30:20

great 3:2 4:2 9:2
  26:7

group 27:2

guess 30:2

guidelines 27:15

guys 25:11

_____
          H
_____

half 23:20 24:15

hand 20:16 34:13

handle 9:14 12:7,12
  20:19

handled 17:13,23

handling 9:15

happen 3:5 8:25

happened 3:6,8 4:24
  9:3,7 14:7 15:25
  16:1 17:18 29:1
  30:3 31:12 32:16

happens 7:11 13:11
  15:23 31:11

happy 21:19 22:8
  32:20

hard 11:12 32:21

harder 24:14

having 23:3

head 13:7

health 5:8 6:16,21
  7:9,16 9:20 11:14
  13:7,13 14:25
  18:2,6,7
  19:5,12,13,16 20:11
  21:23 22:3 23:7
  29:19 32:22

healthy 32:20

hear 19:9,10

heard 4:23 8:17
  24:19

heart 16:8

help 2:16 6:3

hereby 34:5

here's 7:24 8:19
  25:6 31:9

he's 13:7 21:14
  32:19

highlighted 25:13

HIPAA 12:18

hire 20:5

hold 10:10 32:25

holding 29:13

home 14:15

horrified 10:7

hospital 2:9 4:22

```
6:11 9:6 10:10,11
20:12 21:7 23:8
25:1 28:1,8
29:7,13,25 30:9
32:25
hours 20:5
Hum 3:7
hypervigilant 15:24
  24:18 28:24
_____ I _____
I'd 31:25
ill 14:12
I'll 6:13 15:16,24
  18:5 22:8
illness 2:14
I'm 4:23 6:15 7:23
  9:12 10:7,10
  11:13,14 12:17 20:6
  21:13 26:11 28:25
  32:20,25 33:4
imagine 7:11 11:10
  16:9 18:16 19:22
  20:8
imagined 16:2
immediately 14:6
inappropriate 14:24
inaudible 12:3 25:9
  29:25 30:15,21,22
  31:8,10,20 32:6
including 32:13
increase 20:4
indicate 20:17,20
indicated 9:6
  20:11,12
indicating 6:2
individual 24:4
industrial 24:7
infant 32:9
infection 2:9 12:12
```

```
infectious 5:22
information 9:2
initial 6:21,25
  9:14,15,20 26:1
initially 3:12 7:20
  18:14 19:12 20:7
insistent 9:15 19:16
insisting 10:1
investigating 14:7
involved 11:5 25:19
  29:15,16
issue 20:19
it'll 27:20
it's 3:6,8 6:2 8:23
  9:4 10:21,23
  13:5,17
  15:18,19,20,25 16:7
  22:18 24:4,9,10
  25:4 26:19,25 27:9
  29:18,24 32:1
I've 6:3 19:1,20,21
  21:20 25:12 32:11
_____ J _____
job 22:12
July 11:23,24 14:9
  23:16 27:17,19 30:6
_____ K _____
key 28:12
kids 16:10 26:20
knew 18:9 23:13 28:5
  29:7
knowledge 30:9
_____ L _____
LA 27:13
ladies 5:3
last 19:24
latent 13:5,15
```

```
leads 22:19
learned 19:20
leave 14:3,6
leaves 15:18 25:10
leaving 11:13
letter 3:13 5:7
  6:1,15 7:24 9:5,11
  17:4 20:22 21:13
  22:8
level 2:21
life 16:11
line's 22:22
listen 16:8
little 3:3 11:13
  16:9 32:19
local 21:7
location 7:13
locations 7:12
long 18:16,21 23:4
loop 12:11
lose 31:17
lot 15:2,18 25:10
lots 6:23 13:19
  14:21,22
Lozano 4:1,16
Lozano's 4:2
_____ M _____
MALE 2:1,5,10,15,19
  3:7,11,14,18,22,24
  4:2,4,7,10,12,15,18
  ,20,23
  5:1,5,9,13,15,21
  6:5,9,13,20
  7:5,19,22,25
  8:3,9,14,17
  9:9,19,23
  10:6,8,15,25
  11:3,6,8,18,24
  12:2,5,9,14,17
  13:1,11
```

14:5,13,16,20 15:13
16:14,17,19,24
17:5,9,15,17,19,22,
25 18:5,18,22,24
19:2,11,15
20:14,20,23
21:2,5,8,11,16,20
22:5,9,16,20
23:2,5,11 24:23
25:2,14,17,23
27:1,4,6,9,19,23
28:4,9,12 29:5,9,14
30:4,7,10,14,21
31:2,19 32:13,23
33:4

**management** 12:7,12
  28:11

**may** 9:11

**mean** 3:9 7:9 27:9

**Medicaid** 31:17

**medical** 15:2

**Medicare** 31:17

**medication** 10:20

**medicine** 32:13,14

**Memorial** 21:6

**Miller** 1:25 34:4,23

**mind** 14:16

**miscommunication**
  22:6

**miss** 7:14 9:16 19:18
  26:22

**mistake** 32:1

**misunderstand** 9:5

**misunderstood** 9:5

**Monday** 3:10,23

**months** 10:5,17,19
  13:24 15:23 23:20
  24:15

**morning** 3:23

**mother** 32:8

**Motors** 24:8

**moving** 19:23

**myself** 16:10

---

### N

**natural** 13:17

**necessarily** 14:23
  24:9 25:4

**negative** 10:3 33:2

**Neither** 29:22

**newborn** 16:16,18

**Newborns** 14:15

**NICU** 11:11 26:4

**night** 19:24

**nine** 23:20 24:14

**nobody** 8:7 23:23

**Nonetheless** 20:2

**nor** 12:18

**notes** 34:7

**nurse** 2:17 12:13
  15:5 29:20

**nursery** 26:4,6

**nurses** 18:8 28:18

**nursing** 15:3

---

### O

**obviously** 3:2,3 8:22
  12:15,20 13:12 14:6
  18:7 20:8 22:5
  23:14 24:3 27:10
  31:21

**October** 3:16

**offer** 30:14,15

**office** 21:13,15,17
  22:1 34:13

**officially** 23:15

**oh** 4:2 8:4,15 16:25
  21:20 29:14

**okay** 2:4,11,18
  3:11,15,20,22
  4:5,7,25 5:5

7:17,23 8:4,11 12:4
14:5,7,10 19:2
20:4,23,24 21:8,9
22:9,14 23:2
25:6,21 32:15 33:4

**old** 10:5

**ones** 26:5

**opportunity** 23:16

**order** 6:16 9:24

**orders** 17:12

**organization** 24:1
  28:5

**organized** 18:4

**outcome** 20:1

**outpatient** 4:9

**overall** 28:10

**ownership** 11:20

---

### P

**pace** 18:15

**panic** 26:25 31:1

**paperwork** 7:21

**parent** 20:25

**parents** 20:8

**Paso** 34:3,25

**past** 19:20

**patient** 9:16 12:3
  14:3 19:17 23:25
  25:20 29:10

**patients** 15:6 18:10
  19:10 25:21

**patient's** 12:18

**pediatrician** 3:21,25
  5:14 17:14 20:13,21
  21:7

**pediatricians** 20:12
  21:22,24,25

**pediatrician's**
  21:13,17

**people** 12:15 13:8

14:21,22 15:2 18:16
26:13 27:10 28:17
29:14,23 30:5 31:4

**percent** 10:21

**perfect** 32:1

**perform** 21:10

**performed** 21:4

**period** 23:17 26:7

**person** 2:2,16,21
24:9,12 25:8

**personally** 10:10
33:1

**Philly** 27:12

**phone** 16:22

**phototherapy**
26:3,4,6

**physician** 9:24 24:17

**physicians** 15:19
25:19 27:7 28:18

**pick** 11:13

**plan** 9:17 15:21
18:18 27:21 31:16

**please** 6:1 17:7
24:21

**point** 2:2,21 8:7
32:6

**poor** 24:3

**portion** 26:3

**positive** 12:24 13:4
27:5

**possibility** 28:3

**possible** 27:18,24

**possibly** 28:19

**potential** 28:2

**prepared** 9:7

**press** 11:16 15:5
24:19 30:18

**prevent** 10:13

**prevented** 11:20

**printed** 25:12

**probably** 30:1

**problem** 15:1 22:24
23:1 24:10

**problems** 11:14

**process** 6:14 7:11
8:21 9:1,13 12:20
14:8 23:12
24:2,5,10,11 26:2
29:16 31:23

**processes** 28:13,20

**profession** 23:21

**promise** 29:1

**prompts** 22:25

**proof** 25:16

**proper** 20:19

**provided** 34:8

**Providence** 7:12 21:6
30:19

**providers** 13:20

**provides** 10:4

**public** 26:25 31:1,4

**pull** 20:18 25:24

**push** 22:21

**pushing** 20:3

**putting** 7:7 31:16

---
Q
---

**question** 24:16

**questions** 22:22
26:16

**quickly** 18:11 23:13

---
R
---

**radiologist** 8:10

**radiology** 6:8

**reach** 19:5

**reading** 19:21 21:14

**reality** 2:24 19:23

**realize** 31:4

**realized** 18:11 26:2

**really** 15:8 18:14
23:25

**reason** 7:8 31:7

**reasons** 12:19

**received** 3:13 17:4

**receptionist** 5:3

**recommend** 10:20

**recommendation**
10:16,22

**recommendations**
10:18 25:20

**record** 34:6

**referral** 4:6 5:12

**regardless** 11:18
15:23 24:11

**regards** 32:22

**registered** 4:11

**Registration** 34:24

**regulations** 10:18

**release** 27:17

**relief** 10:4

**rely** 15:17 27:6

**remember** 5:4

**report** 13:13 15:14

**Reporter** 34:5

**researched** 32:11

**Resendes** 13:7

**responsibilities**
15:16

**responsibility** 15:9
28:11,13

**responsible** 10:11
29:13 33:1

Audio Transcription  12-15-2014    Page 8 of 10

rest 23:17

result 20:9

results 10:3

ridiculous 3:17

risk 11:19 25:21
  27:2 32:18

robustly 15:22

route 26:15

run 19:13 23:7

runaround 4:21 8:18

running 4:22

------------------

S

safe 28:13

safer 26:19

safety 16:23

San 34:24

saw 18:12 26:1

scary 16:9

scene 19:4

schedule 8:25

scheduling 23:1

school 15:3

screen 8:25 12:14,15

screening 6:18,21,25
  7:2,5,15
  9:14,16,20,25
  18:7,9 27:24

seal 34:13

second 22:16,22

seem 23:7 25:15
  32:15

seems 18:20,21 23:10

seen 17:6,7 25:12

send 21:19,23 22:2

sending 7:6

sensitive 14:15

sent 4:16 14:14

serious 2:13

shame 8:21

shared 3:3

shift 25:12,24

shorter 26:7

Shorthand 34:4

showed 5:7

showing 21:13

sick 11:11 12:25
  28:3

Sierra 7:11

signs 2:13 12:23

sincerely 16:11

single 25:24

sir 16:13 18:4 31:18

sitting 20:9 21:14

situation 14:3 25:7
  30:8

situations 23:22

six 10:17,19 20:7

skin 4:19 6:11 12:24
  13:4 20:15 21:15

slow 19:23

somebody 13:14 29:6

somebody's 13:14

somehow 20:5

someone 28:5 29:25

someone's 23:22

son 4:11,22 10:4,12
  11:11,25 16:16 17:6
  32:9,17

sorry 4:24 6:15
  28:25 29:3 31:15
  32:24 33:4

SPEAKER
  2:1,4,5,8,10,11,15,
  18,19

3:6,7,8,11,12,14,15
,18,20,22,23,24
4:1,2,3,4,5,7,8,10,
11,12,13,15,16,18,1
9,20,21,23,25
5:1,2,5,6,9,10,13,1
4,15,16,21,25
6:5,6,9,10,13,19,20
7:4,5,17,19,20,22,2
3,25
8:1,3,4,9,10,14,15,
17 9:4,9,18,19,23
10:2,6,7,8,9,15,23,
25
11:2,3,4,6,7,8,17,1
8,22,24,25
12:2,4,5,6,9,10,14,
16,17,22 13:1,10,11
14:4,5,10,13,14,16,
19,20 15:13
16:13,14,15,17,18,1
9,20,24
17:2,5,6,9,10,15,16
,17,18,19,20,22,23,
25
18:1,5,17,18,20,22,
23,24
19:1,2,3,11,14,15
20:10,14,15,20,22,2
3,24
21:2,3,5,6,8,9,11,1
2,16,18,20
22:4,5,7,9,14,16,18
,20,24
23:2,3,5,6,11
24:19,23,25
25:2,10,14,15,17,22
,23 26:23
27:1,3,4,5,6,8,9,16
,19,22,23,25
28:4,7,9,10,12
29:3,5,6,9,12,14
30:2,4,5,7,8,10,12,
14,17,21,24
31:2,13,19
32:7,13,15,23,24
33:4

speaking 31:4

Audio Transcription   12-15-2014   Page 9 of 10

**specific** 13:2

**speed** 8:23

**spoke** 5:2

**staff** 7:6

**staffing** 20:5

**started** 11:11 14:6
  18:10

**state** 6:23 34:2,5

**stenographic** 34:7

**step** 31:7

**stress** 11:2 31:15

**stuff** 6:23

**suddenly** 18:1,2 19:6

**supplies** 20:19

**supposed** 6:14 8:23
  12:7 22:23

**sure** 3:14,24 4:2
  5:9,13,15 6:9,16,23
  7:3,13,25 8:9,14,22
  9:10 10:8 12:14
  14:13 17:19,25
  18:9,13 19:18 20:18
  21:16 22:11 23:5,23
  24:17 25:14 26:21
  27:3 28:13,20 30:16
  31:7,10 32:2,3,4

**surely** 9:3

**symptoms** 2:13 12:23
  13:21 14:18,20,22
  15:8 24:18

**system** 22:25

───────── T ─────────
**taking** 13:22

**talk** 13:1 25:6

**talking** 2:22

**tape** 2:6,7 9:21,22
  15:11,12 33:5

**TB** 4:19 6:11 12:24
  13:4,5,6,15,17
  19:19 20:16

21:15,23 29:10 30:1
31:1

**terrible** 15:4 20:2

**test** 4:19 5:22 6:11
  12:24 15:17 20:9,16
  21:15,24

**testing** 5:11 25:7

**testings** 21:3

**tests** 13:4

**Texas** 34:2,5,23,25

**thank** 30:20,25

**thanked** 30:19,24

**that's** 2:5,24 5:21
  7:8,10 9:1 10:15
  11:5 13:22,24 14:8
  16:6 18:16 20:3,6
  23:9 24:12 25:12
  27:2,4,15,23 28:25
  29:11 32:5

**there's** 2:21 5:19
  6:11,23 10:19 14:1
  15:15 19:6 22:16
  23:18,24 26:10,16
  27:1 28:14

**they're** 6:18 8:11
  9:1,25 10:3 13:4,22
  20:17 22:2 23:23
  26:6 27:13,14 31:4

**they've** 6:20 13:15
  27:12

**third** 19:25

**thousands** 12:15
  31:21,22

**till** 3:16

**today** 15:10

**tomorrow** 18:25 26:17

**tracked** 6:17

**tracking** 7:8

**trained** 18:8 27:10

**Transcribed** 1:24

**transcript** 34:6

**transcription** 1:11
  34:8

**treat** 26:20

**treated** 17:12

**treating** 28:16

**treatment** 30:15

**tricky** 23:25

**tried** 3:12

**true** 34:6

**trust** 16:10 19:20
  29:14

**trying** 28:23

**tuberculosis** 23:14

**turned** 5:16

**two-month** 32:9

**Tylenol** 32:14

───────── U ─────────
**Uh-huh** 4:3,18,20 5:1
  6:19 7:4,17,19 9:18
  10:6 11:17 12:5,16
  13:10 14:4,19 16:17
  17:15,17 18:17
  19:14 20:14
  21:2,5,11 22:4,14
  25:22 27:8 28:9

**understand** 5:23
  10:23,24 12:6 19:17
  20:11 23:6 29:5
  30:4,7 31:8

**understood** 8:21
  18:22,24

**unfortunate** 3:1

**unfortunately** 2:25

**upon** 2:22 28:14

**upstairs** 8:12

───────── V ─────────
**Vegas** 27:13

Audio Transcription  12-15-2014       Page 10 of 10

---
**W**
---
**wait** 16:21 23:3

**waited** 16:25

**wasn't** 6:15 19:8
  28:15

**week** 19:25

**weeks** 16:21 17:10
  18:19,20 19:20
  20:7,9

**we'll** 13:24

**we're** 7:2,6,7
  8:5,8,15 9:9,10
  11:20 15:17 16:3,4
  24:1 25:17 26:14
  28:16,22,23,24 29:1
  30:14,15 31:12

**we've** 7:12 31:21

**whatever** 4:9

**whether** 19:24 32:8

**whole** 8:1

**who's** 3:24 11:14
  13:14

**wish** 28:6

**wording** 24:24 25:2,3

**work** 2:2,16 6:15
  8:23 9:13 12:20
  13:4 14:8 15:10
  23:15 24:12
  28:23,24 31:23

**worked** 25:20

**worker** 25:25

**workers** 13:3

**working** 2:12 8:22
  11:14 23:13 25:9,25

**worry** 18:22,23 32:21

**wrong** 23:25 29:11
  31:5

---
**X**
---
**x-ray** 4:14 6:4,7,25

8:8 9:25 10:3 33:2

**x-rays** 9:9,10

---
**Y**
---
**Yep** 4:12

**yesterday** 13:7,13

**you've** 22:2

**yup** 4:15 5:9 12:9
  16:19 28:9

---
**Z**
---
**zero** 10:4

7015 3430 0001 0445 5019


1004


75201

U.S. POSTAGE
PAID
EDWARDSVILLE
62025
OCT 07, 16
AMOUNT
**$12.4**
R2305M147597-


PRIORITY
☆ MAIL ☆

 **DATE OF DELIVERY SPECIFIED***

 **USPS TRACKING™ INCLUDED***

 **INSURANCE INCLUDED***

 **PICKUP AVAILABLE**

    **\* Domestic only**

**WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.**

**FROM:**

Gori Julian & Associates PC
156 N. Main St.
Edwardsville, IL 62025

<u>Bilfinger Westcon Inc.</u>
National Registered Agents Inc
1999 Bryan St., Ste. 900
Dallas, TX 75201

This envelope is made from post-consumer waste. Please recycle - again.



**EP14F July 2013**

**VISIT US AT USPS.COM®**

**UNITED ST**

**Hasler**

FIRST-CLASS MAIL

 $00.46⁵

 ZIP 62025
011D11634438

Gori Julian & Associates PC
156 N. Main St.
Edwardsville, IL 62025

Attention:  Service Dept.

IN THE CIRCUIT COURT OF THE
TWENTY-SECOND JUDICIAL CIRCUIT
(ST. LOUIS CITY)

MICHAEL GREPPS and ANN GREPPS,   )
   )
        Plaintiffs,   )
   )     No. 1622-CC09887
   )
vs.   )
   )
AGCO CORPORATION f/k/a MASSEY-   )
FERGUSON, et al.,   )
   )
   )
        Defendants,   )

## NOTICE

TO:   Bilfinger Westcon Inc.
       National Registered Agents Inc
       1999 Bryan St., Ste. 900
       Dallas, TX 75201

The enclosed Summons and Petition are served pursuant to Missouri Supreme Court Rule 54.16.

You may sign and date the acknowledgment part of this form and return one copy of the completed form to the sender within thirty (30) days of October 7, 2016.

If you are served on behalf of a corporation, unincorporated association, including a partnership, or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within thirty (30) days, you or the party on whose behalf you are being served may be required to pay any expenses incurred in serving a summons and petition in any other manner permitted by law.

If you do complete and return this form, you or the party on whose behalf you are being

served must answer the petition within thirty (30) days of the date you sign the acknowledgment below. If you fail to do so, judgment by default may be taken against you for the relief demanded in the petition.

I DECLARE, UNDER PENALTY OF PERJURY, THAT THIS NOTICE WAS MAILED ON October 7, 2016.

_____
Signature

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND PETITION

I declare, under penalty of filing a false affidavit, that I received a copy of the Summons and of the Petition in the above-captioned matter.

_____
Signature

_____
Relationship to Entity/Authority
Receive Service of Process

_____
Date

IN THE CIRCUIT COURT OF THE
TWENTY-SECOND JUDICIAL CIRCUIT
(ST. LOUIS CITY)

| | |
|---|---|
| MICHAEL GREPPS and ANN GREPPS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 1622-CC09887 |
| | ) |
| vs. | ) |
| | ) |
| AGCO CORPORATION f/k/a MASSEY- | ) |
| FERGUSON, et al., | ) |
| | ) |
| | ) |
| Defendants, | ) |

## **NOTICE**

TO:    Bilfinger Westcon Inc.
       National Registered Agents Inc
       1999 Bryan St., Ste. 900
       Dallas, TX 75201

        The enclosed Summons and Petition are served pursuant to Missouri Supreme Court Rule 54.16.
        You may sign and date the acknowledgment part of this form and return one copy of the

completed form to the sender within thirty (30) days of October 7, 2016.

        If you are served on behalf of a corporation, unincorporated association, including a

partnership, or other entity, you must indicate under your signature your relationship to that

entity. If you are served on behalf of another person and you are authorized to receive process,

you must indicate under your signature your authority.

        If you do not complete and return the form to the sender within thirty (30) days, you or

the party on whose behalf you are being served may be required to pay any expenses incurred in

serving a summons and petition in any other manner permitted by law.

        If you do complete and return this form, you or the party on whose behalf you are being

served must answer the petition within thirty (30) days of the date you sign the acknowledgment

below.  If you fail to do so, judgment by default may be taken against you for the relief

demanded in the petition.

     I DECLARE, UNDER PENALTY OF PERJURY, THAT THIS NOTICE WAS

MAILED ON October 7, 2016.

_____
                    Signature

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND PETITION

     I declare, under penalty of filing a false affidavit, that I received a copy of the Summons
and of the Petition in the above-captioned matter.

_____
                    Signature

_____
          Relationship to Entity/Authority
             Receive Service of Process

_____
                    Date



## IN THE 22ND JUDICIAL CIRCUIT COURT OF CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>BRYAN L HETTENBACH | Case Number: 1622-CC09887 | |
|---|---|---|
| Plaintiff/Petitioner:<br>MICHAEL GREPPS | Plaintiff's/Petitioner's Attorney/Address:<br>RANDY LEE GORI<br>GORI, JULIAN ASSOCIATES P C<br>156 NORTH MAINE STREET<br>EDWARDSVILLE, IL 62025 | Process Server 1<br><br>Process Server 2 |
| Defendant/Respondent:<br>AGCO CORPORATION | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | Process Server 3 |
| Nature of Suit:<br>CC Asbestos | | (Date File Stamp) |

vs.

### Summons for Personal Service Outside the State of Missouri
#### (Except Attachment Action)

The State of Missouri to: **BILFINGER WESTCON INC**
Alias: **SUCC TEPSCO INC**
NATIONAL REGISTERED AGENTS INC
1999 BRYAN ST STE 900
DALLAS, TX 75201

**COURT SEAL OF**

You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

**September 29, 2016**
Date

*Thomas Kloeppinger*
Thomas Kloeppinger
Circuit Clerk

**CITY OF ST LOUIS**

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1. I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2. My official title is _____ of _____ County, _____ (state).
3. I have served the above summons by: (check one)
   ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
   ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years.
   ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
   ☐ other (describe) _____.
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

Printed Name of Sheriff or Server | Signature of Sheriff or Server

Subscribed and Sworn To me before this _____ (day) _____ (month) _____ (year)
I am: (check one)  ☐ the clerk of the court of which affiant is an officer.
☐ the judge of the court of which affiant is an officer.
☐ authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
☐ authorized to administer oaths. (use for court-appointed server)

*(Seal)*

Signature and Title

| Service Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____ ( _____ miles @ $_____ per mile) |
| Total | $_____ |

See the following page for directions to clerk and to officer making return on service of summons.

**Directions to Clerk**

Personal service outside the State of Missouri is permitted only upon certain conditions set forth in Rule 54.  The clerk should insert in the summons the names of only the Defendant/Respondent or Defendants/Respondents who are to be personally served by the officer to whom the summons is delivered.  The summons should be signed by the clerk or deputy clerk under the seal of the court and a copy of the summons and a copy of the petition for each Defendant/Respondent should be mailed along with the original summons to the officer who is to make service.  The copy of the summons may be a carbon or other copy and should be signed and sealed in the same manner as the original but it is unnecessary to certify that the copy is a true copy.  The copy of the motion may be a carbon or other copy and should be securely attached to the copy of the summons but need not be certified a true copy.  If the Plaintiff's/Petitioner has no attorney, the Plaintiff's/Petitioner's address and telephone number should be stated in the appropriate square on the summons.  This form is not for use in attachment actions.  (See Rule 54.06, 54.07 and 54.14)

**Directions to Officer Making Return on Service of Summons**

A copy of the summons and a copy of the motion must be served on each Defendant/Respondent.  If any Defendant/Respondent refuses to receive the copy of the summons and motion when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and motion and the Defendant's/Respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion to the individual personally or by leaving a copy of the summons and motion at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body.  Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States.  If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths.  This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than 30 days from the date the Defendant/Respondent is to appear in court.  The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.



Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

IN THE CIRCUIT COURT
STATE OF MISSOURI
TWENTY-SECOND JUDICIAL CIRCUIT
(City of St. Louis)

| | | |
|---|---|---|
| MICHAEL GREPPS and ANN GREPPS, | ) | Cause No.  1622-CC09887 |
| | ) | |
| Plaintiffs, | ) | Division No.1 |
| | ) | (Asbestos) |
| -vs.- | ) | JURY TRIAL DEMANDED |
| | ) | PERSONAL INJURY |
| | ) | PRODUCTS LIABILITY |
| AGCO CORPORATION f/k/a MASSEY- | ) | |
|     FERGUSON, | ) | |
| AIR PRODUCTS AND CHEMICALS, INC., | ) | |
|     Individually and as Successor-in-Interest | ) | |
|     to STEARNS-ROGERS CORP., | ) | |
| ALLIED CRANE, LLC, | ) | |
| ALLIS-CHALMERS CORPORATION | ) | |
|     PRODUCTS LIABILITY TRUST, | ) | |
| AMERICAN CRANE & EQUIPMENT | ) | |
|     CORPORATION, | ) | |
| ANCO INSULATIONS, INC., | ) | |
| ARMSTRONG PUMPS, INC., | ) | |
| BORG-WARNER MORSE TEC LLC, as | ) | |
|     Successor-By-Merger To BORG-WARNER | ) | |
|     CORPORATION, | ) | |
| BP PRODUCTS NORTH AMERICA, INC., f/k/a | ) | |
|     Amoco Oil Company, | ) | |
| BUCYRUS INTERNATIONAL, INC., | ) | |
| BWDAC, INC. f/k/a BWD AUTOMOTIVE | ) | |
|     CORPORATION, | ) | |
| CARRIER CORPORATION d/b/a BRITISHER | ) | |
|     HTG AND COOLING, | ) | |
| CATERPILLAR, INC., | ) | |
| CBS CORPORATION, a DELAWARE CORP., | ) | |
|     f/k/a VIACOM, INC., successor by merger | ) | |
|     to CBS CORP., a PENNSYLVANIA | ) | |
|     CORP., f/k/a WESTINGHOUSE | ) | |
|     ELECTRIC CORPORATION, | ) | |
| CERTAIN-TEED CORPORATION, | ) | |
| CP CHEM COMPANY LLC f/k/a CHEVRON | ) | |
|     PHILLIPS CHEMICAL COMPANY LLC, | ) | |
| CHEVRON PHILLIPS CHEMICAL COMPANY | ) | |
|     LP, | ) | |
| CLARK MATERIAL HANDLING COMPANY, | ) | |

1

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

CLARK-RELIANCE CORPORATION,                    )
CNH INDUSTRIAL AMERICA LLC, f/k/a              )
      CASE INTERNATIONAL HARVESTER,  )
      and NEW HOLLAND NORTH AMERICA, )
      INC.,                                    )
COLEMAN EQUIPMENT, INC.,                       )
COOPER INDUSTRIES LLC,                         )
CP CHEM COMPANY LLC f/k/a CHEVRON              )
      PHILLIPS CHEMICAL COMPANY LLC,  )
CRANE COMPANY,                                 )
DANA COMPANIES, LLC.,                          )
DAP, INC.,                                     )
DOW CHEMICAL COMPANY,                          )
DUPONT,                                        )
DUTY CONSTRUCTION, INC.,                       )
EATON CORPORATION, Individually and as         )
      successor-in-interest to CUTLER         )
      HAMMER, INC.,                           )
EXXONMOBIL OIL CORPORATION,                    )
FORD MOTOR COMPANY,                            )
FOSTER WHEELER CORPORATION,                    )
GENERAL GASKET CORPORATION,                    )
GENUINE PARTS COMPANY,                         )
GEORGIA-PACIFIC LLC, f/k/a GEORGIA             )
      PACIFIC CORPORATION,                    )
GOODYEAR TIRE & RUBBER COMPANY,                )
GOULDS PUMPS (IPG), INC.,                      )
GRINNELL, LLC,                                 )
GROVE U.S. L.L.C.,                             )
GULF ELECTROQUIP, LTD.,                        )
HONEYWELL INTERNATIONAL, INC.,                 )
HYSOL, a Brand of HENKEL CORPORATION,          )
INDUSTRIAL HOLDINGS CORP, f/k/a                )
      CARBORUNDUM COMPANY,                    )
INGERSOLL RAND COMPANY, Individually           )
      and as Successor-in-Interest to         )
      THERMO KING,                            )
JACOBS ENGINEERING GROUP INC.,                 )
JOHN DEERE COMPANY,                            )
KELLY MOORE PAINT COMPANY,                     )
KOMATSU AMERICA CORP.,                         )
KROGH PUMP COMPANY, INC.,                      )
THE LUBRIZOL CORPORATION,                      )
LYONDELLBASELL ACETYLS, LLC,                   )
LYONDELL CHEMICAL COMPANY,                     )
3M COMPANY,                                    )

2

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

MANITOWOC CRANE GROUP, )
MARATHON OIL COMPANY, )
NAVISTAR, INC., )
P & H MINING EQUIPMENT INC., )
PHILLIPS 66 COMPANY, )
PNEUMO ABEX LLC, successor-in-interest )
  to ABEX CORPORATION, )
RESOLUTE FP US INC., Individually and as )
  Successor-in-Interest to ABITIBI- )
  CONSOLIDATED, )
ROHM AND HAAS COMPANY, )
S & B ENGINEERS AND CONSTRUCTORS, )
  LTD., )
SHELL CHEMICAL COMPANY, )
SHELL OIL COMPANY, )
SPAWGLASS CIVIL CONSTRUCTION, INC., )
STRANGE & COLEMAN, INC., )
TADANO AMERICA CORPORATION, )
TAYLOR-SEIDENBACH, INC., )
TELLEPSEN INDUSTRIAL, LLC, )
TEPSCO, INC., )
TEREX CORPORATION, )
UNION CARBIDE CORPORATION, )
UNIROYAL, INC., )
METROPOLITAN LIFE INSURANCE )
  COMPANY, )
**BILFINGER WESTCON INC., Individually** )
  **and as Successor-in-Interest to** )
  **TEPSCO, INC.,** )
**and** )
**JOY GLOBAL SURFACE MINING INC., f/k/a** )
  **P & H MINING EQUIPMENT, INC.,** )
  **f/k/a HARNISCHFEGER** )
  **CORPORATION,** )
  )
  )
   Defendants. )

## FIRST AMENDED PETITION

The Plaintiffs listed above, by their attorneys, GORI, JULIAN & ASSOCIATES, P.C., for their cause

of action against Defendants, state as follows:

## JURISDICTION, VENUE, AND GENERAL ALLEGATIONS

3

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

1.      The Plaintiff served in the U.S. Air Force from 1965 to 1971 stationed at Lackland Air Force Base, Wichita Falls Air Force Base, and Bergstrom Air Force Base. The Plaintiff worked in 1971 as a Laborer at Baltimore Gas & Electric Company, in Baltimore, Maryland, from 1971 to 1973 as a Laborer at various constructions sites in Baltimore, Maryland, and from 1976 to 2016 as a Heavy Equipment Operator/Laborer at various construction sites for Telepsen, S&B Construction, Geroge Duty, and Tepsco in Louisiana, California, Mississippi, Florida, Tennessee, Maryland, Texas, Colorado, New Mexico, and Arizona. The Plaintiff performed various home remodeling projects, and was a shade tree mechanic. The Plaintiff was secondarily exposed to asbestos containing products through his father, Paul Robert Grepps, Jr., who worked for some time as a Laborer at Glen R. Martin in Baltimore, Maryland. The Plaintiff was secondarily exposed to asbestos containing products through his grandfather, Paul Robert Grepps, Sr., who worked for some time as an Owner/Operator of a Garage in Redding, PA, and who worked for some time as a Laborer at Lee Tires.

2.      Beginning in 1965 Plaintiff was first exposed to asbestos-containing products while in the U.S. Air Force. Plaintiff was not diagnosed with Lung Cancer until May 2016.  At the time Plaintiff was first exposed to asbestos-containing products, and at the time Plaintiff was diagnosed with Lung Cancer, Defendants General Gasket Corporation and Hercules Incorporated maintained a Registered Agent for service of process in the City of St. Louis, Missouri.  Venue is therefore proper in the City of St. Louis, Missouri.

3.      That on or about May 2016, Plaintiff first became aware that he had developed Lung Cancer. However, the Plaintiff later learned that said disease was wrongfully caused.

4.      At various times during the course of Plaintiff's work, Plaintiff was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating from certain products he was working with and around which were manufactured, sold, distributed or installed by the Defendants. Plaintiff's exposure to the materials, products, equipment, activates and conditions attributable to the various Defendants occurred at different times as to each and not necessarily throughout Plaintiff's entire career or life

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

as to any particular Defendant. The below mentioned Defendants are jointly and severally liable in that they

contributed to Plaintiff's injuries:

      (1)    Defendant, AGCO CORPORATION f/k/a MASSEY-FERGUSON, is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute through its registered agent, C. T. Corporation System, 208 S. LaSalle Street, Chicago, IL 60604.

      (2)    Defendant, AIR PRODUCTS AND CHEMICALS, INC., Individually and as Successor-in-Interest to STEARNS-ROGERS CORP., is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute through its registered agent, C.T. Corporation Systems, 208 S. LaSalle, Chicago, IL 60604.

      (3)    Defendant, ALLIED CRANE LLC, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, James N. Dondlinger, 2656 South Sheridan, Wichita, KS 67217.

      (4)    Defendant, ALLIS-CHALMERS CORPORATION PRODUCTS LIABILITY TRUST, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, 3500 Corben Court Madison, WI 53704

      (5)    Defendant, AMERICAN CRANE & EQUIPMENT CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, 531 Old Swede Rd., Douglassville, PA 19518.

      (6)    Defendant, ANCO INSULATIONS, INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute through its registered agent, Brent J. Bourgeois, Roedel, Parsons, Koch, Blache, Balhoff, & McCollister, 8440 Jefferson Highway, Suite 301, Baton Rouge, LA 70809-7654.

      (7)    Defendant, ARMSTRONG PUMPS, INC., is a foreign corporation not presently doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate headquarters located at 93 East Ave., North Tonawanda, NY 14120.

      (8)    Defendant, BORG-WARNER MORSE TEC LLC, as Successor-By-Merger To BORG-WARNER CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its Registered Agent located at Corporation

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

(9) Defendant, BP PRODUCTS NORTH AMERICA, INC., f/k/a Amoco Oil Company,, is a foreign corporation doing business in the State of Missouri; Said corporation may be served through its registered agent, The Prentice-Hall Corporation, 801 Adlai Stevenson Drive, Springfield, IL. 62703.

(10) Defendant, BUCYRUS INTERNATIONAL, INC., is a foreign corporation not presently doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate headquarters located at 1100 Milwaukee Ave., South Milwaukee, WI 53172.

(11) Defendant, BWDAC, INC. f/k/a BWD AUTOMOTIVE CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, Corporation Trust Company, 1209 Orange St., Wilmington, DE 19801.

(12) Defendant, CARRIER CORPORATION d/b/a BRITISHER HTG AND COOLING, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C. T. Corporation System, 208 S. LaSalle Street, Chicago, IL 60604.

(13) Defendant, CATERPILLAR, INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C. T. Corporation System, 208 S. LaSalle Street, Chicago, IL 60604.

(14) Defendant, CBS CORPORATION, a DELAWARE CORP., f/k/a VIACOM, INC., successor by merger to CBS CORP., a PENNSYLVANIA CORP., f/k/a WESTINGHOUSE ELECTRIC CORPORATION, is a foreign corporation doing business in the State of Missouri; Said corporation may be served pursuant to the Missouri Long-Arm Statute through its registered agent, Corporation Services Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

(15) Defendant, CERTAIN-TEED CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C. T. Corporation System, 120 S. Central, Clayton, MO 63105.

(16) Defendant, CP CHEM COMPANY LLC f/k/a CHEVRON PHILLIPS CHEMICAL COMPANY LLC, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C. T. Corporation System, 120 S. Central, Clayton, MO 63105.

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

(17)    Defendant, CHEVRON PHILLIPS CHEMICAL COMPANY LP, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C. T. Corporation System, 120 S. Central, Clayton, MO 63105.

(18)    Defendant, CLARK MATERIAL HANDLING COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, MO 65101.

(19)    Defendant, CLARK-RELIANCE CORPORATION, is a foreign corporation not presently doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate headquarters located at 16633 Foltz Pkwy., Strongsville, OH 44149.

(20)    Defendant, CNH INDUSTRIAL AMERICA LLC, f/k/a CASE INTERNATIONAL HARVESTER, and NEW HOLLAND NORTH AMERICA, INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C. T. Corporation System, 120 S. Central Avenue, Clayton, MO 63105.

(21)    Defendant, COLEMAN EQUIPMENT, INC., is a foreign corporation not presently doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate headquarters located at 24000 W. 43rd Street Bonner Springs, KS 66012.

(22)    Defendant, COOPER INDUSTRIES LLC, is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute through its registered agent, Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

(23)    Defendant, CP CHEM COMPANY LLC f/k/a CHEVRON PHILLIPS CHEMICAL COMPANY LLC, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C. T. Corporation System, 120 S. Central, Clayton, MO 63105.

(24)    Defendant, CRANE COMPANY is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C. T. Corporation System, 120 S. Central Avenue, Clayton, MO 63105.

(25)    Defendant, DANA COMPANIES, LLC., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its

7

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

registered agent, C.T. Corporation System, 1300 E. 9th St., Ste. 1010, Cleveland, OH 44114.

(26)    Defendant, DAP, INC., is a foreign corporation not presently doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate headquarters located at 2400 Boston St., Suite 200, Baltimore, MD 21224.

(27)    Defendant, DOW CHEMICAL COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute through its registered agent, The Corporation Company, 120 South Central Avenue, Clayton, MO 63105.

(28)    Defendant, DUPONT, is a foreign corporation doing business in the State of Missouri; Said corporation may be served through its corporate headquarters located at Dupont Building, 1007 Market St. Wilmington, DE 19898.

(29)    Defendant, DUTY CONSTRUCTION, INC., is a foreign corporation not presently doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate headquarters located at 1515 Haddon, Houston, TX. 77006.

(30)    Defendant, EATON CORPORATION, Individually and as successor-in-interest to CUTLER HAMMER, INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C.T. Corporation System, 120 South Central Ave., Clayton, MO 63105.

(31)    Defendant, EXXONMOBIL OIL CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, Corporation Service Company, 221 Bolivar St., Jefferson City, MO  65101.

(32)    Defendant, FORD MOTOR COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, The Corporation Company, 120 South Central Avenue, Clayton, Missouri 63105.

(33)    Defendant, FOSTER WHEELER CORPORATION, is a foreign corporation doing business in the State of Missouri; Defendant corporation does not maintain a registered agent in Missouri, although it and/or its predecessors in interest have conducted substantial business in Missouri. Said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate headquarters located at 53 Frontage Road, PO Box 9000, Hampton, New Jersey 08827-9000.

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

(34)     Defendant, GENERAL GASKET CORPORATION, is a corporation organized and existing under the laws of the State of Missouri and its registered agent is: Sandra S. McCluskey, 2322 South Seventh St., St. Louis, MO, 63104, however, may be served on its local attorney: A.J. Bronsky-Brown & James, Bank of America Plaza, 800 Market Street, Ste. 1100, St. Louis, MO 63101.

(35)     Defendant, GENUINE PARTS COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, CT Corporation System: 120 South Central Avenue, Suite 400, Clayton, MO 63105.

(36)     Defendant, GEORGIA-PACIFIC LLC, f/k/a GEORGIA PACIFIC CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C.T. Corporation System, 120 S. Central, Clayton, MO 63105.

(37)     Defendant, GOODYEAR TIRE & RUBBER COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, CSC-Lawyers Incorporating Service Company, 221 Bolivar, Jefferson City, MO 65101.

(38)     Defendant, GOULDS PUMPS (IPG), INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate headquarters located at 240 Fall Street, Seneca Falls, NY 13148.

(39)     Defendant, GRINNELL, LLC, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, The Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

(40)     Defendant, GROVE U.S. L.L.C., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, Corporation Service Company, 2711 Centerville Rd. STE. 400 Wilmington, DE. 19808.

(41)     Defendant, GULF ELECTROQUIP, LTD., is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its said corporation may be served at its corporate headquarters: 425 North Wayside Houston, TX. 77020.

(42)     Defendant, HONEYWELL, INTERNATIONAL, INC., a foreign corporation doing business in the State of Missouri; said corporation may be

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

served through its registered agent, CSC-Lawyers Inc. Service Company, 221 Bolivar Street, Jefferson City, MO 65101.

(43) Defendant, HYSOL, a Brand of HENKEL CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its said corporation may be served at its corporate headquarters: One Henkel Way, Rocky Hill, CT 06067.

(44) Defendant, INDUSTRIAL HOLDINGS CORPORATION f/k/a CARBORUNDUM COMPANY, is a foreign corporation doing business in the State of Missouri; Said corporation may be served through its registered agent, The Prentice-Hall Corp. System, Inc., 80 State St., Albany, NY 12207.

(45) Defendant, INGERSOLL RAND COMPANY, Individually and as Successor-in-Interest to THERMO KING, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, CSC-Lawyers Inc. Service Company, 221 Bolivar Street, Jefferson City, MO 65101.

(46) Defendant, JACOBS ENGINEERING GROUP INC., is a foreign corporation not presently doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate headquarters located at 1111 s. Arroyo Parkway Pasadena, CA 91105.

(47) Defendant, JOHN DEERE COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, Gregory R. Noe, One John Deere Place, Moline, IL 61265.

(48) Defendant, KELLY MOORE PAINT COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its said corporation may be served through its registered agent, Robert Stetson, 987 Commercial Street, San Carlos, California 94070.

(49) Defendant, KOMATSU AMERICA CORP., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C. T. Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, IL 60604.

(50) Defendant, KROGH PUMP COMPANY, INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C.T. Corporation System, 818 W. Seventh St., Los Angeles, CA 90017.

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

(51)   Defendant, THE LUBRIZOL CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C.T. Corporation System, 1300 East Ninth Street Cleveland, OH 44114.

(52)   Defendant, LYONDELLBASELL ACETYLS, LLC, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C.T. Corporation System, 1999 Bryan St., Ste. 900 Dallas, TX 75201.

(53)   Defendant, LYONDELL CHEMICAL COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C.T. Corporation System, 208 S. LaSalle Street, Chicago, IL. 60604.

(54)   Defendant, 3M COMPANY is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C.T. Corporation System, 120 S. Central, Clayton, MO 63105.

(55)   Defendant, MANITOWOC CRANE GROUP, a foreign corporation doing business in the State of Missouri; said corporation may be served at its headquarters located at 2400 South 44th St., Manitowoc, WI 54220.

(56)   Defendant, MARATHON OIL COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C. T. Corporation Systems, 120 S. Central, Clayton, MO 63105.

(57)   Defendant, NAVISTAR, INC., is a foreign corporation doing business in the State of Missouri; Said corporation may be served through its registered agent, C.T. Corporation System, 120 South Central Avenue, Clayton, MO 63105.

(58)   Defendant, P & H MINING EQUIPMENT INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute through its registered agent, C. T. Corporation System, 8040 Excelsior Drive, Suite 400 Madison, WI 53717.

(59)   Defendant, PHILLIPS 66 COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, CSC-Lawyers Inc. Service Company, 221 Bolivar Street, Jefferson City, MO 65101.

(60)   Defendant, PNEUMO ABEX LLC, successor-in-interest to ABEX CORPORATION,, as dissolved corporation, is a foreign corporation doing

11

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its said corporation may be served through its registered agent, The Prentice Hall Corporation System, 2711 Centerville Rd., Ste. 400, Wilmington, DE 19808.

(61)    Defendant, RESOLUTE FP US INC., Individually and as Successor-in-Interest to ABITIBI-CONSOLIDATED, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, CT Corporation System, 2 North Jackson St. Ste. 605 Montgomery, AL. 36104.

(62)    Defendant, ROHM AND HAAS COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, CT Corporation System, 208 South LaSalle St., Ste 814, Chicago, IL. 6064.

(63)    Defendant, S & B ENGINEERS AND CONSTRUCTORS, LTD., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C.T. Corporation Systems, Inc., 1999 Bryan St., Ste 900, Dallas, TX 75201.

(64)    Defendant, SHELL CHEMICAL COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute through its Registered Agent, C.T. Corporation System, 5615 Corporate Blvd., Ste. 400 B, Baton Rouge, LA 70808.

(65)    Defendant, SHELL OIL COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, CT Corporation System, 120 South Central Avenue, Clayton, MO 63105.

(66)    Defendant, SPAWGLASS CIVIL CONSTRUCTION, INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent,  C.T. Corporation System, 1999 Bryan St., Ste. 900 Dallas, TX 75201.

(67)    Defendant, STRANGE & COLEMAN, INC., is a corporation organized and existing under the laws of the State of Missouri and may be served through its registered agent, C.T. Corporation Systems, Inc., 120 S. Central Ave., Clayton, MO 63105.

(68)    Defendant, TADANO AMERICA CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, C.T. Corporation System, 1999 Bryan St., STE. 900, Dallas, TX 75201.

12

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

(69)    Defendant, TAYLOR-SEIDENBACH, INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, Ralph I Shepard, 731 S. Scott St., New Orleans, LA 70119.

(70)    Defendant, TELLEPSEN INDUSTRIAL, LLC, is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate headquarters located at 777 Benmar, Suite 400, Houston, TX 77060.

(71)    Defendant, TEPSCO, INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

(72)    Defendant, TEREX CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, CSC-Lawyers Incorporating Service Company, 221 Bolivar, Jefferson City, MO 65101.

(73)    Defendant, UNION CARBIDE CORPORATION, is a foreign corporation doing business in the State of Missouri; Said corporation may be served through its registered agent, C.T. Corporation System, 120 S. Central Avenue, Clayton, MO  63105.

(74)    Defendant, UNIROYAL, INC., is a foreign corporation doing business in the State of Missouri; Defendant corporation does not maintain a registered agent in Missouri, although it and/or its predecessors in interest have conducted substantial business in Missouri.  Said corporation may be served pursuant to the Missouri Long-Arm Statute at its corporate offices located at 70 Great Hill Road, Naugattuck, CT 06770.

(75)    Defendant, METROPOLITAN LIFE INSURANCE COMPANY, is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, CT Corporation System, 120 S Central Ave., Clayton, MO  63105.

**(76)    Defendant, BILFINGER WESTCON INC., Individually and as Successor-in-Interest to TEPSCO, INC., is a foreign corporation doing business in the State of Missouri; said corporation may be served through its registered agent, National Registered Agents, Inc., 1999 Bryan St., Ste. 900, Dallas, TX  75201.**

**(77)    Defendant, JOY GLOBAL SURFACE MINING INC., f/k/a P & H MINING    EQUIPMENT,    INC.,    f/k/a    HARNISCHFEGER**

13

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

**CORPORATION, is a foreign corporation doing business in the State of Missouri; said corporation may be served pursuant to the Missouri Long-Arm Statute through its registered agent, CT Corporation System, 8020 Excelsior Dr., Ste. 200, Madison, WI 53717.**

5.      Plaintiff's exposure to the materials, products, equipment, activates and conditions attributable to the various Defendants occurred at different times as to each and not necessarily throughout Plaintiff's entire career of life as to any particular Defendant.

6.      Each Defendant is amenable to suit in the State of Missouri by reason of having sold, distributed and/or installed the aforementioned asbestos-containing products in Missouri or by reason of having placed the same into the stream of commerce for use in Missouri, and by reason of having committed tortuous acts against Plaintiff in Missouri.

7.      The Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship due to the presence of a Missouri Defendant.   Removal is improper.  Every claim arising under the constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission on a federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office).  No claim of admiralty or maritime law is raised.  Plaintiffs sue no foreign state or agency:  Venue is proper in this county in Missouri.

COUNT I<br>STRICT LIABILITY

1.      Plaintiffs herein incorporate by reference Paragraphs 1 through 7 of this Petition.

2.      At the time Defendants and each of them manufactured, sold and distributed the asbestos-containing products to which Plaintiff was exposed, said products were in a defective condition and were unreasonably dangerous in that:

        (a)      Said products contained friable asbestos fibers as a constituent substance;

14

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

(b)    Said asbestos fibers were highly toxic, deleterious, poisonous and harmful to the health of Plaintiff and others similarly situated;

(c)    Said products were not accompanied by any warning or by adequate warning advising of the danger of exposure to asbestos or of precautions to be employed in the use of asbestos-containing products.

3.    Said products reached the plant in substantially the same condition as when manufactured, distributed and sold.

4.    At all times relevant hereto, said products were used in the manner and environment intended, and in a manner reasonably foreseeable and anticipated by Defendants and each of them.

5.    As a direct and proximate result of said defective and unreasonably dangerous conditions of said products, Plaintiff was exposed to, and inhaled, ingested or otherwise absorbed great amounts of asbestos fibers causing Plaintiff to develop the asbestos-related diseases aforesaid, which has disabled and disfigured Plaintiff; Plaintiff has in the past, and will in the future, be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-related diseases and conditions, including the medical monitoring of their asbestos-related diseases and conditions; Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; as a further result of his asbestos-related diseases and condition, Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of work, thereby losing large sums of money which otherwise would have accrued to him.

WHEREFORE, Plaintiffs pray judgment be entered against the Defendants jointly and severally for actual and compensatory damages as are fair and reasonable, in excess of TWENTY-FIVE THOUSAND ($25,000) DOLLARS, including the cost of this action and any other such relief as the court deems just and equitable.

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

## COUNT II
### NEGLIGENCE

1.    Plaintiffs herein incorporate by reference Paragraphs 1 through 7 of this Petition.

2.    At all times herein set forth, the products of Defendants and each of them were being employed in the manner and for the purposes for which they were intended.

3.    Plaintiff's exposure to, and inhalation, ingestion or absorption of the asbestos fibers emanating from the above-mentioned products was completely foreseeable and could or should have been anticipated by the Defendants and each of them.

4.    Defendants and each of them knew or should have known that the asbestos fibers contained in their products had a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them.

5.    At all times herein relevant, Defendants and each of them had a duty to exercise reasonable care and caution for the safety of the Plaintiff and others working with or around the products of the Defendants containing asbestos.

6.    Defendants and each of them failed to exercise ordinary care and caution for the safety of Plaintiff in one or more of the following respects:

        (a)    Included asbestos in their products, even though it was completely foreseeable and could or should have been anticipated that persons such as the Plaintiff working with or around them would inhale, ingest or otherwise absorb great amounts of that asbestos;

        (b)    Included asbestos in their products when the Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

        (c)    Included asbestos in their products when adequate substitutes for the asbestos in them were available;

        (d)    Failed to provide any or adequate warnings to persons working with or around the products of the dangers of inhaling,

16

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

ingesting or otherwise absorbing the asbestos fibers contained in them;

(e)    Failed to provide any or adequate instructions concerning the safe methods of working with or around the products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them;

(f)    Failed to conduct tests on the asbestos- containing products manufactured, sold, delivered or installed by the Defendants in order to determine the hazards to which workers such as the Plaintiff might be exposed while working with or around the products; and

(g)    Failed to recall asbestos-containing products which it had manufactured, sold, delivered, or installed.

7.    As a direct and proximate result of one or more of the foregoing acts or omissions on the part of the Defendants and each of them, Plaintiff was exposed to, and inhaled, ingested or otherwise absorbed great amounts of asbestos fibers causing Plaintiff to develop the asbestos-related diseases aforesaid, which has disabled and disfigured Plaintiff; Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-related disease and conditions, including the medical monitoring of his asbestos-related diseases and conditions; Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; that as a further result of his asbestos-related disease and conditions, Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of work, thereby losing large sums of money which otherwise would have accrued to him.

WHEREFORE, Plaintiffs pray judgment be entered against the Defendants jointly and severally for actual and compensatory damages as are fair and reasonable, in excess of TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS, including the cost of this action and any other such relief that the court deems just and equitable.

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

COUNT III
## WILFUL AND WANTON MISCONDUCT

1.    Plaintiffs herein incorporate by reference Paragraphs 1 through 7 of this Petition.

2.    Defendants and each of them are guilty of one or more of the following acts or omissions amounting to willful and wanton misconduct:

(a)    Intentionally or with a reckless disregard for the safety of Plaintiff, included asbestos in their products, even though it was completely foreseeable and could or should have been anticipated that persons such as the Plaintiff working with or around them would inhale, ingest or otherwise absorb great amounts of that asbestos;

(b)    Intentionally or with a reckless disregard for the safety of Plaintiff, included asbestos in their products when the Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

(c)    Intentionally or with a reckless disregard for the safety of Plaintiff, included asbestos in the products when adequate substitutes were available;

(d)    Intentionally or with a reckless disregard for the safety of the Plaintiff, failed to provide any or adequate warnings to persons working with or around the products of the dangers of inhaling, ingesting or otherwise absorbing the asbestos fibers in them;

(e)    Intentionally or with a reckless disregard for the safety of the Plaintiff, failed to provide any or adequate instructions concerning the safe methods of working with or around the products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them;

(f)    Intentionally or with a reckless disregard for the safety of the Plaintiff, failed to conduct tests on the asbestos-containing products manufactured, sold or delivered by the Defendants in order to determine the hazards to which workers such as the Plaintiff might be exposed while working with or around the products; and

18

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

(g)    Failed to recall asbestos-containing products which it had manufactured, sold, delivered and installed.

3.    As a direct and proximate result of one or more of the foregoing acts or omissions on the part of the Defendants and each of them, Plaintiff was exposed to, and inhaled, ingested or otherwise absorbed great amounts of asbestos fibers causing Plaintiff to develop the asbestos-related disease aforesaid, which has disabled and disfigured Plaintiff; Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-related diseases and conditions, including the medical monitoring of his asbestos-related diseases and conditions; Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; that as a further result of his asbestos-related disease and conditions, Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of work, thereby losing large sums of money which otherwise would have accrued to him.

WHEREFORE, Plaintiffs pray that, in addition to actual and compensatory damages, they be awarded punitive and exemplary damages against each Defendant separately in an amount in excess of TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS.

COUNT IV
(FRAUDULENT MISREPRESENTATION AGAINST S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC)

Now come the Plaintiffs by their attorneys, GORI, JULIAN & ASSOCIATES, P.C., and for their cause of action against the Defendant, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, states as follows:

1. Plaintiffs repeat and re-allege Paragraph 1 of Count I as and for Paragraph 1 of this Count IV.

2. During the course of his work at the location mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating from certain products he

19

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

was working with and around, which products were supplied by S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC.

3.  Plaintiff was unaware of the dangers of the asbestos-containing products which rendered them unsafe for their intended use.  At the time Plaintiff used or worked around these products, such use was in a manner that was reasonably anticipated by.

4. That on or about May 2016, Plaintiff first became aware that he had developed Lung Cancer. However, the Plaintiff later learned that said disease was wrongfully caused.

5. S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, through its officers and employees, knew or should have known at least by 1930 that asbestos-containing products which it supplied and which were used extensively throughout the facility, were a health hazard to people who worked with and around them, and in the alternative, had no positive proof that prolonged exposure to asbestos was safe.  Notwithstanding this knowledge, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC engaged in the following omissions or commissions:

(a) It deliberately, intentionally, wantonly and designedly furnished asbestos-containing products to Plaintiff for use in his duties at the facility;

(b) It deliberately, intentionally, wantonly and designedly failed to warn Plaintiff about the known dangers of asbestos exposure at the facility;

(c) It deliberately, intentionally, wantonly and designedly failed to inform Plaintiff of its known potentially hazardous work place as a result of asbestos exposure;

(d) It deliberately, intentionally, wantonly and designedly failed to replace the hazardous asbestos-containing products with asbestos substitutes which it knew or should have known by 1930 were available;

20

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

(e) It deliberately, intentionally, wantonly and designedly failed to abate or contain the unsafe work environment although it knew or should have known in the 1930s that containment and abatement were available;

(f) It deliberately, intentionally, wantonly and designedly made Plaintiff work in dangerous areas of the facility knowing that it posed a significant health hazard to people because of the friable and deteriorating condition of asbestos-containing products;

(g) It deliberately, intentionally, wantonly and designedly failed to restrict Plaintiff from working in dangerous areas of the facility which had been identified as posing a significant health hazard because of the friable or deteriorating condition of asbestos-containing products;

(h) It deliberately, intentionally, wantonly and designedly failed to provide any or adequate instructions concerning the safe methods of working with and around the products it supplied, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers;

(i) It deliberately, intentionally, wantonly and designedly failed to provide masks, respirators or other protective apparel to Plaintiff, thereby permitting Plaintiff to work around hazardous asbestos-containing material without protection; and

(j) It deliberately, intentionally, wantonly and designedly failed 1) to provide medical examinations (until the 1980s), 2) failed to determine past asbestos exposure of its employees and workers, and 3) failed to identify those trades that came into contact with asbestos-containing products it supplied.

6. In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC deliberately, intentionally, wantonly and designedly engaged in conduct designed to actively conceal and suppress material facts knowing Plaintiff would rely on these facts to his detriment and cause him bodily harm.

21

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

7. In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC through its silence deliberately, intentionally, wantonly and designedly engaged in false and deceptive conduct of a material nature, knowing or believing said conduct to be false and doing it for the purpose of inducing Plaintiff to continue to work at S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, causing him bodily harm. Plaintiff reasonably believed and relied on Defendant's conduct to his detriment.

8. In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC committed, commanded or expressly authorized the concealment of the known dangers of asbestos intending that the Plaintiff would rely on its silence and thereby inhale, ingest or otherwise absorb asbestos fibers and become injured.

9. S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC undertook a duty to provide a safe work place for Plaintiff. S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC knew that Plaintiff relied on it to provide a safe work place. In permitting and knowing that Plaintiff would rely on Defendant to provide a safe work place, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC deliberately, intentionally, wantonly and designedly engaged in a false representation of a material fact, knowing it to be false and doing it for the purpose of inducing Plaintiff to continue to work at S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC. Plaintiff reasonably believed and relied on Defendant's false representation to his

22

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

detriment.  By this conduct, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC intended to cause bodily harm to Plaintiff.

10.  As a proximate cause of each of the foregoing acts or omissions, active concealments and false representations, and intentional and wanton conduct, both individually and collectively, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed great amounts of asbestos fibers without his consent, causing Plaintiff to develop Lung Cancer; the Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-induced disease and conditions; the Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; and that as a further result of his asbestos-induced disease and conditions, the Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of work, thereby losing large sums of money which otherwise would have accrued to him.

WHEREFORE, Plaintiffs pray judgment be entered against the Defendant in a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS for their economic damages which will fairly and reasonably compensate for the Plaintiff's injuries.

COUNT V

(BATTERY AGAINST S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC)

Now come the Plaintiffs by their attorneys, GORI, JULIAN & ASSOCIATES, P.C., and for their cause of action against the Defendant, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, states as follows:

1.  Plaintiffs repeat and re-allege Paragraph 1 of Count I as and for Paragraph 1 of this Count V.

2. - 5.  Plaintiffs repeat and re-allege Paragraphs 2, 3, 4 and 5 of Count IV as and for Paragraphs 2, 3, 4 and 5 of this Count V.

23

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

6. In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, through its silence deliberately, intentionally, wantonly and designedly concealed the known dangers of asbestos, intending that Plaintiff would come in contact with asbestos and that asbestos fibers would become trapped in Plaintiff's lungs without his consent.

7. In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, through its silence deliberately, intentionally, wantonly and designedly engaged in a course of conduct intending that Plaintiff would inhale, ingest or otherwise absorb asbestos fibers and become injured.

8. In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC committed, commanded or expressly authorized the concealment of the known dangers of asbestos intending that the Plaintiff would come in contact with asbestos and inhale, ingest, or otherwise absorb asbestos fibers which would result in Plaintiff's injury.

9. Plaintiffs repeat and re-allege Paragraph 10 of Count IV as and for Paragraph 9 of this Count V.

WHEREFORE, Plaintiffs pray judgment be entered against the Defendant for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS for their economic damages, which will fairly and reasonably compensate for the Plaintiff's injuries.

COUNT VI
(NEGLIGENCE AGAINST S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC)
Now come the Plaintiffs by their attorneys, GORI, JULIAN & ASSOCIATES, P.C., and for their cause of action against the Defendant, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, states as follows:

24

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

1. Plaintiffs repeat and re-allege Paragraph 1 of Count I as and for Paragraph 1 of this Count VI.

2. - 4. Plaintiffs repeat and re-allege Paragraphs 2, 3, and 4 of Count IV as and for Paragraphs 2, 3, and 4 of this Count VI.

5. S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, through its officers and employees, knew or should have known at least by 1930 that asbestos-containing products which it supplied and which were used extensively throughout the facility, were a health hazard to people who worked with and around them, and in the alternative, had no positive proof that prolonged exposure to asbestos was safe.

6. S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, as employer of Plaintiff, owed to Plaintiff a duty to provide a safe place to work and a duty to give Plaintiff timely notice of latent or concealed dangers which were known or should have been known by S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC.

7. S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC breached its duties to Plaintiff by engaging in the following omissions or commissions:

(a) It negligently furnished asbestos-containing products to Plaintiff for use in his duties at the facility;

(b) It negligently failed to warn Plaintiff about the known dangers of asbestos exposure at the facility;

(c) It negligently failed to inform Plaintiff of its known potentially hazardous work place as a result of asbestos exposure;

(d) It negligently failed to replace the hazardous asbestos-containing products with asbestos substitutes which it knew or should have known by 1930 were available;

25

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

(e) It negligently failed to abate or contain the unsafe work environment although it knew or should have known in the 1930s that containment and abatement were available;

(f) It negligently made Plaintiff work in dangerous areas of the facility knowing that it posed a significant health hazard to people because of the friable and deteriorating condition of asbestos-containing products;

(g) It negligently failed to restrict Plaintiff from working in dangerous areas of the facility which had been identified as posing a significant health hazard because of the friable or deteriorating condition of asbestos-containing products;

(h) It negligently failed to provide any or adequate instructions concerning the safe methods of working with and around the products it supplied, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers;

(i) It negligently failed to provide masks, respirators or other protective apparel to Plaintiff, thereby permitting Plaintiff to work around hazardous asbestos-containing material without protection; and

(j) It negligently failed 1) to provide medical examinations (until the 1980s), 2) failed to determine past asbestos exposure of its employees and workers, and 3) failed to identify those trades that came into contact with asbestos-containing products it supplied.

8. S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC undertook a duty to provide a safe work place for Plaintiff. S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC knew that Plaintiff relied on it to provide a safe work place. In permitting and knowing that Plaintiff would rely on Defendant to provide a safe work place, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC negligently engaged in a false representation of a material fact, knowing it to be false and doing it for the

26

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

purpose of inducing Plaintiff to continue to work at S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC. Plaintiff reasonably believed and relied on Defendant's representation to his detriment.

9.   The breach by S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC of its duties to Plaintiff was a direct and proximate cause of his development and contraction of an asbestos-related disease, including Lung Cancer, and resulted in damages more particularly described below.

10.   As a direct and proximate cause of each of the foregoing negligent acts or omissions, both individually and collectively, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed great amounts of asbestos fibers without his consent, causing him to develop Lung Cancer; the Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-induced disease and conditions; the Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; and that as a further result of his asbestos-induced disease and conditions, the Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of work, thereby losing large sums of money which otherwise would have accrued to him.

WHEREFORE, Plaintiffs pray judgment be entered against the Defendant for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS for their economic damages, which will fairly and reasonably compensate for the Plaintiff's injuries.

COUNT VII

(WILFUL AND WANTON COUNT AGAINST S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC)

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

Now come the Plaintiffs by their attorneys, GORI, JULIAN & ASSOCIATES, P.C., and for their cause of action against the Defendant, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, states:

1. Plaintiffs repeat and re-allege Paragraph 1 of Count I as and for Paragraph 1 of this Count VII.

2. - 4. Plaintiffs repeat and re-allege Paragraphs 2, 3, and 4 of Count IV as and for Paragraphs 2, 3, and 4 of this Count VII.

5. S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, through its officers and employees, knew or should have known at least by 1930 that asbestos-containing products which it supplied and which were used extensively throughout the facility, were a health hazard to people who worked with and around them, and in the alternative, had no positive proof that prolonged exposure to asbestos was safe.

6. S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC is guilty of one or more of the following acts or omissions amounting to wilful and wanton misconduct:

(a) It intentionally or with reckless disregard for the safety of Plaintiff, furnished asbestos-containing products to Plaintiff for use in his duties at the facility;

(b) It intentionally or with reckless disregard for the safety of Plaintiff, failed to warn Plaintiff about the known dangers of asbestos exposure at the facility;

(c) It intentionally or with a reckless disregard for the safety of Plaintiff, failed to inform Plaintiff of its known potentially hazardous work place as a result of asbestos exposure;

(d) It intentionally or with reckless disregard for the safety of Plaintiff, failed to replace the hazardous asbestos-containing products with asbestos substitutes which it knew or should have known by 1930 were available;

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

(e) It intentionally or with reckless disregard for the safety of Plaintiff, failed to abate or contain the unsafe work environment although it knew or should have known in the 1930s that containment and abatement were available;

(f) It intentionally or with reckless disregard for the safety of Plaintiff, made Plaintiff work in dangerous areas of the facility knowing that it posed a significant health hazard to people because of the friable and deteriorating condition of asbestos-containing products;

(g) It intentionally or with reckless disregard for the safety of Plaintiff, failed to restrict Plaintiff from working in dangerous areas of the facility which had been identified as posing a significant health hazard because of the friable or deteriorating condition of asbestos-containing products;

(h) It intentionally or with reckless disregard for the safety of Plaintiff, failed to provide any or adequate instructions concerning the safe methods of working with and around the products it supplied, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers;

(i) It intentionally or with reckless disregard for the safety of Plaintiff, failed to provide masks, respirators or other protective apparel to Plaintiff, thereby permitting Plaintiff to work around hazardous asbestos-containing material without protection; and

(j) It intentionally or with reckless disregard for the safety of Plaintiff, failed 1) to provide medical examinations (until the 1980s), 2) failed to determine past asbestos exposure of its employees and workers, and 3) failed to identify those trades that came into contact with asbestos-containing products it supplied.

7. In failing to act on each of these items as listed in Paragraph 6, both individually and collectively, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC intentionally or with reckless disregard for the safety of Plaintiff engaged in a course of conduct designed to actively conceal and suppress material facts knowing Plaintiff would rely on those facts to his detriment and cause him bodily harm.

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

8. In failing to act on each of these items as listed in Paragraph 6, both individually and collectively, S & B ENGINEERS AND CONSTRUCTORS, LTD., UNION CARBIDE CORPORATION, and TELLEPSEN INDUSTRIAL, LLC, through its silence, intentionally or with reckless disregard for the safety of Plaintiff, engaged in false and deceptive conduct of a material nature, knowing or believing said conduct to be false and doing it for the purpose of inducing Plaintiff to continue to work at its facility, causing him bodily harm. Plaintiff reasonably believed and relied on Defendant's conduct to his detriment.

9. Plaintiffs repeat and re-allege Paragraph 10 of Count VI as and for Paragraph 9 of this Count VII.

WHEREFORE, Plaintiffs pray that they be awarded, in addition to their economic damages in excess of FIFTY THOUSAND ($50,000.00) DOLLARS, punitive and exemplary damages.

COUNT VIII

(NEGLIGENCE COUNT AS TO MANUFACTURERS OF ASBESTOS CONTAMINATED TALCUM PRODUCTS)

Now comes the Plaintiffs by their attorneys, GORI, JULIAN & ASSOCIATES, P.C., and for their cause of action against the Defendants, COLGATE-PALMOLIVE COMPANY, Individually and Successor-in-Interest to CASHMERE BOUQUET TALC, CYPRUS AMAX MINERALS CO., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO SIERRA TALC COMPANY, UNITED TALC COMPANY, AND PAUL W. WOOD COMPANY, H.M. ROYAL, INC., IMERYS TALC AMERICA, INC., Individually and as Successor-in-Interest to LUZENAC GROUP and CYPRUS MINERALS CO., JOHNSON & JOHNSON, and VANDERBILT MINERALS, LLC, states:

1.      The Plaintiff MICHAEL GREPPS and/or his family , used asbestos contaminated talcum powder products.

2.      At various times throughout the course of Plaintiff's lifetime, Plaintiff was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating from the talcum powder products which were manufactured, sold, and/or distributed by these Defendants.

3.       Defendants manufactured, sold, and/or distributed asbestos contaminated talcum powder

30

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

products to which Plaintiff was exposed. Additionally and/or alternatively, Defendants otherwise engaged in acts and omissions to promote and facilitate such manufacture, sale, and/or distribution of asbestos contaminated talcum products from which it derived substantial financial benefit. Additionally and/or alternatively, Defendants are liable as the successor-in-interest to said related entities.

4.     Plaintiff's exposure to the talcum powder products attributable to the various Defendants occurred at different times as to each and not necessarily throughout Plaintiff's entire life as to any particular Defendant.

5.     At all times herein set forth, the Defendants' products were being employed in the manner and for the purposes for which they were intended.

6.     The Plaintiff's exposure to and inhalation, ingestion or absorption of the asbestos fibers emanating from the above-mentioned products was completely foreseeable and could or should have been anticipated by the Defendants.

7.     The Defendants knew or should have known that the asbestos fibers contaminating their products had a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them.

8.     At all times herein relevant, the Defendants had a duty to exercise reasonable care and caution for the safety of the Plaintiff and others using and/or exposed to the products of the Defendants contaminated by asbestos.

9.     The Defendants failed to exercise ordinary care and caution for the safety of the Plaintiff in one or more of the following respects:

(a)     Sold, manufactured, and/or delivered asbestos contaminated talcum products, even though it was completely foreseeable and could or should have been anticipated that persons such as the Plaintiff using and/or exposed to them would inhale, ingest or otherwise absorb great amounts of that asbestos;

31

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

(b)     Sold, manufactured, and/or delivered asbestos contaminated talcum products when the Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

(c)     Sold, manufactured, or distributed asbestos contaminated talcum products when adequate substitutes were available;

(d)     Failed to provide any or adequate warnings to persons using and/or exposed to the contaminated talcum products of the dangers of inhaling, ingesting or otherwise absorbing the asbestos fibers contained in them;

(e)     Failed to provide any or adequate instructions concerning the safe methods of using the talcum products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them; and

(f)     Failed to conduct tests on the talcum products manufactured, sold, and/or delivered by the Defendants in order to determine the hazards to which users and others similarly situated, such as the Plaintiff, might be exposed while using and/or exposing themselves to the products.

10.     That as a direct and proximate result of one or more of the foregoing acts or omissions, negligent or otherwise, on the part of the Defendants mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed great amounts of asbestos fibers causing Plaintiff to develop the asbestos disease aforesaid, which has disabled and disfigured the Plaintiff; the Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-induced Lung Cancer; the Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; that as a further result of his asbestos-induced Lung Cancer, the Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of work, thereby losing large sums of money which otherwise would have accrued to him.

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

WHEREFORE, Plaintiffs pray judgment be entered against the Defendants for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS which will fairly and reasonably compensate for the Plaintiff's injuries.

COUNT IX

(NEGLIGENCE COUNT AS TO MANUFACTURERS OF BRAKE GRINDING PRODUCTS)

Now comes the Plaintiffs by their attorneys, GORI, JULIAN & ASSOCIATES, P.C., and for their cause of action against the Defendant(s), HENNESSY INDUSTRIES, INC., states:

1.    During the course of Plaintiff's work at the location(s) mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating from certain products Plaintiff was working with and around because of the defective brake grinders sold by Defendant(s).

2.    At all times herein set forth, the Defendant's brake grinder(s) were being employed in the manner and for the purposes for which they were intended.

3.    The Plaintiff's exposure to and inhalation, ingestion or absorption of the asbestos fibers caused by the defective above-mentioned products was completely foreseeable and could or should have been anticipated by the Defendant.

4.    The Defendant(s) knew or should have known that their brake grinder(s) were not effective at preventing exposure to asbestos fibers, which had a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them.

5.    At all times herein relevant, the Defendant(s) had a duty to exercise reasonable care and caution for the safety of the Plaintiff and others working with and around their products while using other asbestos containing products.

6.    At all times herein relevant, the Defendant(s) knew or should have known that their product would be used with asbestos containing products.

33

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

7.     The Defendant(s) failed to exercise ordinary care and caution for the safety of the Plaintiff in one or more of the following respects:

a) Defendant's brake grinder's exhaust system was inadequate in collecting asbestos fibers to prevent inhalation by persons operating the equipment;

b) The operation of Defendant's brake grinder caused asbestos fibers to be released into the air, even without an effective exhaust system;

c) Defendant(s) knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

d) Defendant, following the definite and confirmed discovery of the release of asbestos fibers through the normal operation of the product, did nothing to eliminate the defect or the risk, continuing to sell the defective product and dust collection systems;

e) Defendant failed to provide any or adequate warnings to persons properly using Defendant's brake grinders of the dangers of inhaling, ingesting or otherwise absorbing the asbestos fibers contained in them;

f) Defendant failed to provide any or adequate instructions concerning the safe methods of Defendant's brake grinders, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them; and

g) Defendant failed to conduct adequate tests on Defendant's brake grinders performance and efficiency to filter out asbestos containing products in order to determine the hazards to which workers such as the Plaintiff might be exposed while working with the products.

8.     That as a direct and proximate result of one or more of the foregoing acts or omissions, negligent or otherwise, on the part of the Defendant(s) mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed great amounts of asbestos fibers causing Plaintiff to develop Lung Cancer, which has disabled and disfigured the Plaintiff; the Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-induced Lung Cancer; the Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

absorption of said asbestos fibers; that as a further result of his asbestos-induced Lung Cancer, the Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of employment, thereby losing large sums of money which otherwise would have accrued to him.

WHEREFORE, Plaintiffs pray judgment be entered against the Defendants for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS which will fairly and reasonably compensate for the Plaintiff's injuries.

COUNT X<br>(NEGLIGENCE COUNT AS TO MANUFACTURERS OF RESPIRATOR PRODUCTS)

Now comes the Plaintiffs, MICHAEL GREPPS and ANN GREPPS, by their attorneys, GORI, JULIAN & ASSOCIATES, P.C., and for their cause of action against the Defendants, states:

1.    During the course of Plaintiff's work at the location(s) mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating from certain products Plaintiff was working with and around because faulty and leaky respirators were sold by Defendants: AMERICAN OPTICAL CORPORATION, HONEYWELL SAFETY PRODUCTS USA INC., Individually and as Successor-in-Interest to BACOU-DALLOZ d/b/a WILLSON SAFETY PRODUCTS, as Successor-in-Interest to PULMOSAN SAFETY EQUIPMENT CORPORATION, 3M COMPANY, MINE SAFETY APPLIANCES COMPANY.

2.    At all times herein set forth, the Defendants' respirator products were being employed in the manner and for the purposes for which they were intended.

3.    The Plaintiff's exposure to and inhalation, ingestion or absorption of the asbestos fibers caused by the leaky and defective above-mentioned products was completely foreseeable and could or should have been anticipated by the Defendants.

4.    The Defendants knew or should have known that their respirator products were not effective protection against asbestos fibers, which had a toxic, poisonous, and highly deleterious effect upon the health

35

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

of persons inhaling, ingesting or otherwise absorbing them.

5.      During the late 1950s and into the mid-1970s, the Bureau of Mines and later NIOSH respirator approval schedules were faulty in that the provisions for approval allowed the listing of protection for asbestos even though it was common knowledge in the health and safety professions and by Defendant respirator manufacturers that asbestos was carcinogenic and that only the highest level of filtration efficiency cartridges, i.e. High Efficiency Particulate Arrestance ("HEPA") filters, should be used on respirators used for protection against inhalation of asbestos fibers.

6.      Many respirator manufacturers took advantage of the slow regulatory development and revision process to continue to profit from the sale of respirators that were never designed for protection against extremely hazardous substances, such as asbestos, until as late as 1986 when Occupational Safety and Health Administration ("OSHA") finally required nothing less than HEPA filter respirators for such.

7.      At all times herein relevant, the Defendants had a duty to exercise reasonable care and caution for the safety of the Plaintiff and others working with and around the products containing asbestos.

8.      The Defendants failed to exercise ordinary care and caution for the safety of the Plaintiff in one or more of the following respects:

> (a)     Defendants-respirators' strap suspension made the facepiece to face seal very unstable because the facepiece makes a natural cradling effect on a design already weak because of the seal on the chin rather than under the chin as the respirator fits;
>
> (b)     Continuous loop headbands are extremely difficult to adjust and tension, discouraging proper adjustment by the wearer. In addition the strap adjustment clips slip, allowing the headband to loosen during use;
>
> (c)     The design of the filter receptacle on the respirators and the design and location of the exhalation valves make it extremely difficult, if not impossible to perform user seal checks Defendants' respirators. The user seal check is the only means by which the Plaintiff had to verify proper donning of the respirator, without leakage, each time Plaintiff put on the

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

respirator;

(d)     The filter is very difficult to position and insert into the filter receptacle without allowing leakage around the filter and filter receptacle assembly;

(e)     Resin impregnated felt filters were electrostatically charged as a by-product of the resin impregnation of the filters. The electrostatic charge was a factor in the efficiency of the filter for passing the approval tests. Exposed to high humidity, mists of oils or other liquids would cause the filters to lose their electrostatic charge and would appreciably increase the leakage of small particulates and fibers thru the filter. This electrostatic filter efficiency degradation was a well-known fact amongst respirator manufacturers as early as the mid 1950's. Moreover, even though it was completely foreseeable and could or should have been anticipated that persons such as the Plaintiff working with or around them would inhale, ingest or otherwise absorb great amounts of that asbestos, Defendants continued to sell such defective respirators;

(f)     Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

(g)     Defendants failed to provide any or adequate warnings to persons properly using Defendants' respirators of the dangers of inhaling, ingesting or otherwise absorbing the asbestos fibers contained in them;

(h)     Defendants failed to provide any or adequate instructions concerning the safe methods of Defendants' respirators, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them; and

(i)     Defendants failed to conduct tests on Defendants' respirators performance and efficiency to filter out asbestos containing products in order to determine the hazards to which workers such as the Plaintiff might be exposed while working with the products.

9.     That as a direct and proximate result of one or more of the foregoing acts or omissions on the part of the Defendants mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

absorbed great amounts of asbestos fibers causing Plaintiff to develop Lung Cancer, which has disabled and disfigured the Plaintiff; the Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his his asbestos-induced Lung Cancer; the Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; that as a further result of his asbestos-induced Lung Cancer, the Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of employment, thereby losing large sums of money which otherwise would have accrued to him.

WHEREFORE, Plaintiffs pray judgment be entered against the Defendants for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS which will fairly and reasonably compensate for the Plaintiff's injuries.

### COUNT XI
### (WILLFUL AND WANTON COUNT AS TO MANUFACTURERS OF RESPIRATOR PRODUCTS)

Now comes the Plaintiff by Plaintiffs, MICHAEL GREPPS and ANN GREPPS, by their attorneys, GORI, JULIAN & ASSOCIATES, P.C., and for their cause of action against the Defendants, states:

1. - 7.  Plaintiffs repeat and re-allege Paragraphs 1, 2, 3, 4, 5, 6 and 7 of Count I as and for Paragraphs 1, 2, 3, 4, 5, 6 and 7 of this Count.

8.  Defendants are guilty of one or more of the following acts or omissions amounting to wilful and wanton misconduct:

(a)  Intentionally or with a reckless disregard for the safety of Plaintiff, Defendants' respirators' strap suspension made the facepiece to face seal very unstable because the facepiece makes a natural cradling effect on a design already weak because of the seal on the chin rather than under the chin as the respirator fits;

(b)  Intentionally or with a reckless disregard for the safety of Plaintiff, Defendants' continuous loop headbands are extremely difficult to adjust and tension, discouraging proper adjustment

38

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

by the wearer. In addition the strap adjustment clips slip, allowing the headband to loosen during use;

(c)     Intentionally or with a reckless disregard for the safety of Plaintiff, Defendants' defectively designed filter receptacles on respirators and the defectively designed the location of the exhalation valves making it extremely difficult, if not impossible to perform user seal checks Defendants' respirators. The user seal check is the only means by which the Plaintiff had to verify proper donning of the respirator, without leakage, each time Plaintiff put on the respirator;

(d)     Intentionally or with a reckless disregard for the safety of Plaintiff, Defendants' respirator filters were very difficult to position and insert into the filter receptacle without allowing leakage around the filter and filter receptacle assembly;

(e)     Intentionally or with a reckless disregard for the safety of Plaintiff, Defendants used resin impregnated felt filters, which were electrostatically charged as a by-product of the resin impregnation of the filters on Defendants' respirators. The electrostatic charge was a factor in the efficiency of the filter for passing the approval tests. Exposed to high humidity, mists of oils or other liquids would cause the filters to lose their electrostatic charge and would appreciably increase the leakage of small particulates and fibers thru the filter. This electrostatic filter efficiency degradation was a well-known fact amongst respirator manufacturers as early as the mid 1950's. Moreover, even though it was completely foreseeable and could or should have been anticipated that persons such as the Plaintiff working with or around them would inhale, ingest or otherwise absorb great amounts of that asbestos, Defendants continued to sell such defective respirators;

(f)     Intentionally or with a reckless disregard for the safety of Plaintiff, Defendants sold leaky respirators, even though it was completely foreseeable and could or should have been anticipated that persons such as the Plaintiff working with or around them would inhale, ingest or otherwise absorb great amounts of that asbestos;

(g)     Intentionally or with a reckless disregard for the safety of Plaintiff, Defendants sold leaky respirators even when the Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or

39

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

otherwise absorbing them;

(h)     Intentionally or with a reckless disregard for the safety of the Plaintiff, Defendants failed to provide any or adequate warnings to persons using Defendants' respirators while working with and around the products of the dangers of inhaling, ingesting or otherwise absorbing the asbestos fibers in them;

(i)     Intentionally or with a reckless disregard for the safety of the Plaintiff, Defendants failed to provide any or adequate instructions concerning the safe methods of using Defendants' respirators while working with and around the products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them; and

(j)     Intentionally or with a reckless disregard for the safety of the Plaintiff, Defendants failed to conduct tests on the performance and efficiency of their respirators for work around asbestos containing products, in order to determine the hazards to which workers such as the Plaintiff might be exposed while working with the products.

9.      Plaintiffs repeat and re-allege Paragraph 9 of Count I as and for Paragraph 9 of this Count IV.

WHEREFORE, Plaintiffs pray that they be awarded, in addition to their compensatory damages, punitive and exemplary damages in an amount in excess of FIFTY THOUSAND ($50,000.00) DOLLARS.

## COUNT XII

Come now, Plaintiffs, by and through their attorneys, GORI, JULIAN & ASSOCIATES, P.C., and for their cause of action against the Defendant Honeywell International, Inc., states:

1.      Plaintiffs herein incorporate by reference Paragraphs 1 through 7 of this Petition.

2.      Upon information and belief, Defendant Honeywell International, Inc., manufactured, sold, and/or distributed asbestos-containing products as late as 2001, and possibly continued to manufacture, sell, and/or distribute said products from 2001-present. Investigation continues as to the last date Defendant Honeywell, International, Inc., manufactured, sold, and/or distributed asbestos-containing products.

40

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

3.      At the time Defendant Honeywell International, Inc., manufactured, sold, and/or distributed asbestos-containing products to which Plaintiff was exposed, said products were in a defective condition and were unreasonably dangerous in that:

     a.      Said products contain asbestos as a constituent substance;

     b.      Said asbestos was highly toxic, deleterious, poisonous, carcinogenic and harmful to the health of Plaintiff and others similarly situated;

     c.      Said products were not accompanied by any or adequate warnings advising of the danger of exposure to asbestos or of precautions to the development and the use of asbestos-containing products.

4.      Said substances and products reached Plaintiff's work site and/or home in substantially the same condition as when manufactured, distributed and sold.

5.      At all times relevant hereto, said products were used in the manner and environment intended, and in a manner reasonably foreseeable and anticipated by Defendants.

6.      The aforesaid asbestos products or processes containing each were in a defective condition and constituted abnormally hazardous and ultra hazardous substances.

7.      As a direct and proximate result of said defective, unreasonably dangerous and ultra hazardous conditions of said products and processes Plaintiff was exposed to and inhaled, ingested or otherwise absorbed great amounts of asbestos and products or processes containing each causing Plaintiff to develop the asbestos-related disease aforesaid, which has disabled and disfigured Plaintiff.  Plaintiff has in the past and will in the future expend large sums of monies for hospital, medical and healthcare services necessary for the treatment of his chemically-induced diseases and conditions, including the medical monitoring of his condition; and that Plaintiff further fears that he will contract additional diseases as a result of his exposure.

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

WHEREFORE, Plaintiffs pray judgment be entered against the Defendant jointly and severally for actual compensatory damages as are fair and reasonable, in excess of $50,000.00, including the cost of this action and any other such relief as the Court deems just and equitable.

COUNT XIII

CONSPIRACY AGAINST METROPOLITAN LIFE INSURANCE COMPANY, and PNEUMO ABEX CORPORATION, AS SUCCESSOR-IN-INTEREST TO ABEX CORPORATION

1.      Plaintiffs herein incorporate by reference Paragraphs 1 through 7 of this Petition.

2.      During the course of his work, Plaintiff was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating from certain products he was working with and around which were manufactured, sold or distributed by the Defendants named in Count I above.

3.      The Defendants, including METROPOLITAN LIFE INSURANCE COMPANY, and PNEUMO ABEX CORPORATION, as successor-in-interest to ABEX CORPORATION, individually and as agents of one another and as co-conspirators, agreed and conspired among themselves and with other asbestos manufacturers, distributors, and trade organizations, to injure the Plaintiff in the following manner.

4.      Beginning in the late 1920's, the conspirators, Johns-Manville, Raybestos-Manhattan, Metropolitan Life, and Pneumo Abex Corporation, and others conducted research on asbestos-related health problems and as a result undertook a duty to inform the consuming public about any health risks that could be associated therewith. In approximately 1929, the conspirator, Metropolitan Life Insurance Company, through its agents and employees acting within the scope of their employment, notably Dr. Anthony J. Lanza, began an investigation of asbestos-related health hazards in the United States, by studying asbestos mines in Canada and on the Eastern seaboard of the United States. In 1935, this study was altered by Lanza, with the full knowledge of Metropolitan, at the request of and in concert with the asbestos industry, and the conspirators named herein in order wrongly to influence the United States Public Health Service, the United States medical community and various state legislatures, including the New Jersey Worker's Compensation Commission. At all times mentioned herein, Metropolitan Life Insurance Company was the general medical, disability and life

42

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

insurance carrier, both occupational and non-occupational, for the conspirators Johns-Manville in the U.S. and Canada, and Raybestos-Manhattan, as well as others in the industry.

5.     Dr. Lanza's omission of any citation to the significant English literature from his 1935 published report was a continuation of the policy of Metropolitan Life and its co-conspirators, to misrepresent and suppress relevant information about the seriousness of asbestosis disease, especially to asbestos industry employees and consumers of asbestos products.

6.     The following conspirators were members of the trade association known as the Quebec Asbestos Mining Association ("Q.A.M.A."): Johns-Manville Corporation, Carey Canada, individually and as successor to Quebec Asbestos Corporation, National Gypsum Company and Turner & Newall, individually and successor to Bell Asbestos. These conspirators, members of the Q.A.M.A., participated in the above-described material misrepresentations of the work of Dr. Leroy Gardner published by Dr. Arthur Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators dated 10/29/47, 11/26/47, 3/6/38, 10/15/48, 3/8/49, 3/21/51 and 9/6/50 and all indicating close monitoring of the editing process of Dr. Gardner's work by Q.A.M.A.'s representative Mr. Ivan Sabourin, acting on behalf of all Q.A.M.A. members, and also acting in close concert with the Metropolitan Life Insurance Company and Dr. Anthony J. Lanza.

7.     In addition to the above described actions, the conspirators, through their agent, Dr. Anthony J. Lanza of the Metropolitan Life Insurance Company, made a concerted effort to discredit and to terminate the studies and experiments of certain scientists who were developing data of profound importance for the area of public health in relation to the lung cancer hazard which in fact did exist for workers and bystanders in the asbestos industry.

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

8.     Because of the above-described efforts of Dr. Lanza of Metropolitan Life, and the other co-conspirators, many other active scientists in the field of environmental cancer were driven out of their laboratories soon after describing their findings on cancer hazards of asbestos/industrial health origin. This included Dr. Gerritt Schepers, who had conducted in-patient studies in South Africa. (Lanza and Vandiver Brown suppressed the publication of Schepers work while Schepers was affiliated at New York University.) These efforts wrongfully obstructed and confused the real asbestos hazard situation, and had a profound retarding effect on the evaluation of the truth in asbestos and asbestos-related health and cancer research.

9.     In addition to all allegations above, the conspirators actively suppressed publications concerning asbestosis in the Asbestos Magazine, a trade magazine and important source of information to the public, and also to users of asbestos products, including users such as the Plaintiff herein. This magazine was read by sales and marketing personnel in the asbestos industry.

10.    The acts of the defendant conspirators, as described above, constitute a fraudulent misrepresentation/concealment which proximately caused the injuries to the Plaintiff in the following manner:

A.     The material published or caused to be published by the conspirators was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

B.     The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended the publication of false and misleading reports, and/or the non-disclosure of documented reports of the health hazards of asbestos:

    1.     To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;

    2.     To assist in the continued pecuniary gain of the Defendants through the sale of asbestos products to an ignorant public;

44

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

3.    To influence in the Defendant's favor legislation to regulate asbestos exposures and limit medical and disability claims for compensation;

4.    To provide a defense in lawsuits brought for injury resulting from asbestos disease;

5.    To prevent relevant medical inquiry about asbestos disease;

6.    To mislead the general public, and the Plaintiff herein, about the hazards associated with asbestos products; and

7.    To induce the Plaintiff to use and continue to use asbestos products.

C.    The Plaintiff reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products to asbestos because Plaintiff believed it to be safe.

D.    Defendants individually, and as members of a conspiracy, and as agents of other co-conspirators intended that the Plaintiff rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue his exposure to those products.

E.    Defendants individually, and as members of a conspiracy, and as agents of other co-conspirators were in a position of superior knowledge regarding the health hazards of asbestos and therefore the Plaintiff and others deciding to use said asbestos-containing products to which Plaintiff was exposed had a right to rely and did rely on the published reports commissioned by the Defendant regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

F.    Plaintiff suffered injuries as a direct and proximate result of the acts alleged above.

45

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

11.     As a direct and proximate result of Metropolitan Life's intentional publication of deceptive and misleading medical data and information, as described in the preceding paragraphs, upon which data the Plaintiff reasonably relied, the Defendant caused asbestos and/or asbestos-containing products to be used by Plaintiff and Plaintiff has inhaled or otherwise ingested hazardous asbestos dust, and/or will inhale or ingest hazardous asbestos dust, resulting in injuries.

12.     Additionally and alternatively, as a direct and proximate result of Metropolitan Life, and Pneumo Abex Corporation's actions and omissions as described above, the Plaintiff was caused to remain ignorant concerning the danger of human exposure to asbestos, resulting in damage to the Plaintiff by depriving the Plaintiff, his agents, employees and the general public, of opportunities to be aware of the hazards of asbestos exposure, and thus the opportunity to take proper safety precautions and/or avoid exposure to asbestos dust. Because of this ignorance on the part of the Plaintiff, Metropolitan Life, and Pneumo Abex Corporation's failure to warn, Metropolitan Life, and Pneumo Abex Corporation's concealment from the Plaintiff of the alteration of its published test results, and the actions and omissions and concerted design and conspiracy of Metropolitan Life, and Pneumo Abex Corporation, and others, all as described above, the Plaintiff was occupationally exposed to asbestos and/or asbestos-containing products used at his places of work and have inhaled or otherwise ingested hazardous asbestos dust resulting in his developing an asbestos-related disease.

13.     As a direct and proximate result of one or more of the foregoing acts or omissions on the part of Metropolitan Life, and Pneumo Abex Corporation, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed great amount of asbestos fibers causing Plaintiff to develop the asbestos diseases aforesaid, which has disabled and disfigured the Plaintiff; the Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-induced diseases and conditions; the Plaintiff has in the

Electronically Filed - City of St. Louis - September 23, 2016 - 11:58 AM

past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; that as a further result of his asbestos-induced Lung Cancer, the Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of work, thereby losing large sums of money which otherwise would have accrued to him.

WHEREFORE, Plaintiffs pray that, in addition to actual and compensatory damages, they be awarded punitive and exemplary damages against each Defendant separately in an amount in excess of TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS.

## COUNT XIV
## LOSS OF CONSORTIUM

1.      Plaintiff, ANN GREPPS, hereby incorporates the allegations contained in Counts I-XII of the Petition.

2.      That as a direct and proximate result of one or more of the foregoing acts or omissions of the Defendants, the Plaintiff, ANN GREPPS, as well as other family members, has been deprived of the companionship, society and services with her husband, MICHAEL GREPPS, all to her damage in an amount in excess of $50,000.00.

WHEREFORE, Plaintiff prays judgment be entered against the Defendants for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS which will fairly and reasonably compensate for the Plaintiff's injuries.

GORI, JULIAN & ASSOCIATES, P.C.

By:   /s/ Randy L. Gori
        Randy L. Gori, #47619
        Barry Julian, #45962
        Attorneys for Plaintiff
        156 N. Main St.
        Edwardsville, IL 62025
        (618) 659-9833
        (618) 659-9834 (facsimile)
        randy@gorijulianlaw.com